IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

EPAC TECHNOLOGIES, INC.

                **PLAINTIFF**

V.                                        CIVIL ACTION NO. 3:12-CV-00463

THOMAS NELSON, INC.

                **DEFENDANT**


# Report and Recommendation of Special Master, Craig Ball

## Table of Contents

Executive Summary ........................................................................................................................... 1

Analysis per FRCP Rule 37(e) ............................................................................................................ 2

The Duty to Preserve ......................................................................................................................... 3

What Should Thomas Nelson, Inc. Have Done to Meet the Duty to Preserve? ....................... 5

What ESI was Lost that Should Have Been Preserved? .............................................................. 6

    1.    Book Samples ................................................................................................................... 6

    2.    Red Prairie Warehouse Management System ............................................................. 7

    3.    The Postini Purge ............................................................................................................ 9

        •    Postini Purge Remediation ..................................................................................... 14

        •    Sufficiency of Postini Purge Remediation ............................................................. 17

Prejudice Flowing from the Postini Purge ................................................................................... 17

Numbers Do Not Tell the Whole Story ......................................................................................... 18

Sanctions under Rule 37(e) ............................................................................................................ 19

Recommended Actions to Cure Prejudice .................................................................................... 21

## Executive Summary

Prior to the end of 2014, Thomas Nelson, Inc.'s conduct in discovery failed to meet minimum standards of diligence and competence. Thomas Nelson, Inc. did not implement a timely or properly-scoped legal hold. Through negligence and gross inattention, Thomas Nelson, Inc. failed to interdict the deletion of almost 1.5 million e-mail messages and disposed of structured data it was obliged to preserve. As a result, electronic and tangible evidence material to the issues before the Court was lost, and in all likelihood, some of that evidence cannot be recovered or retrieved through additional discovery.

1

Though I've identified multiple culpable instances of incompetence, misinformation and lack of diligence, none manifested as intentional acts to deprive EPAC of evidence in this cause so as to warrant the most serious sanctions. Further, Thomas Nelson, Inc. demonstrated estimable diligence, cooperation and industry in 2015 in its efforts to ameliorate prior failures and has largely succeeded in addressing the most serious consequences of its conduct, save for the prejudice occasioned by avoidable expense and delay. Based on the extensive relevant privileged and non-privileged electronic evidence I've reviewed, I'm persuaded that EPAC has now been supplied most of the responsive electronically stored information that should have been supplied in a reasonably complete, competent and proportionate discovery effort. Accordingly, I recommend the following measures to cure prejudice to EPAC occasioned by Thomas Nelson, Inc.'s malfeasance:

1. Exclude documentary evidence or testimony offered or elicited by Thomas Nelson, Inc. going to the proposition that books supplied by EPAC pursuant to the supply channel known as EPAC2[1] were defective in quality, durability or appearance or were otherwise not of merchantable quality as of the start of the cure period. The Court should consider an instruction to the finder of fact that the books supplied were of sufficient quality, durability and appearance to be merchantable as of the start of the cure period and were, in fact, sold by Thomas Nelson, Inc. to its customers. The failure to preserve warehouse management data for relevant periods is of little import if no party need demonstrate whether the bulk of sample books were sold or whether any were returned as defective. They were sold. They were not returned as defective.

2. Shift not more than seventy-five percent (75%) of the cost of the Special Master's work to Thomas Nelson, Inc.

3. Permit key witnesses to be re-deposed on issues reasonably related to information belatedly produced in discovery by Thomas Nelson, Inc., at Thomas Nelson, Inc.'s cost for costs reasonably incurred, exclusive of attorneys' fees.

In making these recommendations, I have considered the broad access to information afforded EPAC in the last year, as well as the substantial sums Thomas Nelson, Inc. was required to bear for e-discovery service providers and outside counsel to recover and process the data supplied to EPAC and to the Special Master. Though these expenditures were self-inflicted wounds, they were wounds nevertheless. I have also factored in issues of proportionality and cooperation attendant to EPAC's conduct in discovery. As I was not been tasked to investigate EPAC's conduct or that of its counsel, I will limit my comments here to observing that cooperation between parties is a two-way street, and it was not well traveled in either direction.

## Analysis per FRCP Rule 37(e)
Amended rule 37(e) authorizes and specifies measures a court may employ if information that should have been preserved is lost. The threshold inquiry centers on:

1. Whether and when the duty to preserve arose;
2. What electronically stored information (ESI) should have been preserved; and

---

[1] "EPAC2" is shorthand for the Print on Demand ("POD") production and fulfillment system that is the subject of the disputed contract. EPAC is an entity, and EPAC2, a process.

3. Whether ESI that should have been preserved was lost.

## The Duty to Preserve

Determining when a duty to preserve arose implicates questions of fact and of state of mind. The duty is triggered by a party's reasonable anticipation of a claim or litigation that will be informed by potentially responsive ESI bearing on the reasonably foreseeable claims or defenses that will be in issue. The mere potential for litigation or the fact of a dispute is not alone a sufficient trigger in most instances; accordingly, the duty may not attach where, for example, discussions of amicable resolution or a course of continued dealing demonstrate that the potential for litigation was more remote than a bare reading of claims letters suggests.

There are multiple milestone events that *could* have served to prompt Thomas Nelson, Inc. (TNI) to initiate a legal hold, including, *inter alia,* the alleged breach of contract, the demand for cure of breach, cancellation of the contract, receipt of EPAC's first express demand for preservation, receipt of a subsequent demand for preservation, receipt of a draft Complaint and filing and service of the lawsuit. Only the last of these is an unequivocal trigger of the preservation duty; but, the facts bear out that TNI anticipated litigation with EPAC much earlier. The approximate dates of each event follow:

> Late 2010: Alleged Breach of Contract
>
> February 3, 2011: Demand for Cure
>
> March 31, 2011: Notice of Remedy and Cure
>
> April 6, 2011: Cancellation of Contract
>
> April 12, 2011: EPAC's First Demand for Preservation of Evidence
>
> April 18, 2011: TNI's General Counsel instructs key employee George Gower to retain information
>
> July 26, 2011: EPAC's Second Demand for Preservation of Evidence
>
> January 20, 2012: TNI's Receipt of EPAC's Draft Complaint
>
> May 8, 2012: Suit Filed
>
> January 20, 2012: Formal Hold Directive to Multiple TNI Custodians

Of these, I suggest it is reasonable and appropriate to treat **April 18, 2011,** as the latest date by which Thomas Nelson, Inc. was under a legal duty to preserve.

A strong argument can be made that the notice of breach and demand for cure should have sufficed to trigger a preservation duty, particularly as TNI's counsel characterized efforts to cure as being "obviously futile."[2] However, it's clear from the context of the demand, as well as other material reviewed, that TNI nonetheless regarded the prospect of litigation as remote. TNI's expectation seemed to be that EPAC

---

[2] "In the event EPAC wishes to propose an earlier termination date in order to avoid the obviously futile time, effort, and expense of attempting to remedy the deficiencies in the standards and processes required to be met by EPAC in the Agreement, Nelson is prepared to consider such an early termination date." *Letter from EPAC General Counsel, Frank Wentworth, to Greg Beattie, Counsel for EPAC (February 3, 2011).*

would not bring suit or EPAC might ultimately be dissuaded from pursuing the matter so as not to imperil the parties' existing EPAC1[3] business relationship or in the hope of yet receiving EPAC2 Print on Demand ("POD") work. I cannot say that TNI's perspective was unreasonable; indeed, EPAC's March 31, 2011, Notice of Remedy and Cure was cordial and rattled no sabers. Too, EPAC's liaison suggested the possibility of modifying the arrangement to re-engage the parties.[4]

The same analysis applies to the cancellation of the contract on April 6, 2011. The tenor of the parties' dealings at that juncture was consistent with their simply parting ways without the prospect of litigation.

But, by the time the April 12, 2011, demand for preservation arrived from EPAC's legal counsel, TNI's General Counsel, Frank Wentworth, could not help but see that the matter might be heading to court.

My rationale in settling on the April 18, 2011, date rather than on the date of the demand for preservation is that, although the demand should have triggered preservation, there must nonetheless be a reasonable time to get the notice, read it, assess its impact and initiate a hold. Thus, the most unequivocal indication that these things had transpired is the April 18 instruction, six days later by General Counsel Wentworth to George Gower, TNI's VP of Inventory Management Production, directing Mr. Gower to preserve relevant information respecting EPAC. Mr. Wentworth's act of issuing a legal hold to Mr. Gower is a compelling basis by which to conclude that Mr. Wentworth anticipated litigation and thus the need for preservation.

TNI's counsel noted and esteemed EPAC's demand for preservation of evidence. This is clear from Mr. Wentworth's statement to George Gower on April 18, 2011, that, "[t]hey hint they are considering legal action." This prompted, in the same communication, an instruction to George Gower to "[p]lease be sure to preserve all documents and records in any way relating to the EPAC contract(s) and this project."[5] Mr. Gower replied, "I am keeping all communication between anyone from team [sic] in a computer folder." These exchanges between Mr. Wentworth and Mr. Gower were copied to Stuart Bitting (Executive Vice President and Chief Financial Officer), Tom Harris (Vice President, Business Analyst Executive Administration) and Mark Schoenwald (President and Chief Executive Officer).[6]

---

[3] "EPAC1" refers to conventional print processes pre-dating Print-on-Demand. Before this litigation, EPAC and TNI did business together outside the context of Print on Demand.

[4] *March 7, 2011 e-mail from EPAC's Chris Sawyer to TNI's George Gower*: "I understand that the landscape has changed somewhat since our agreement was signed. Both companies have spent a lot of time, money and energy putting this plan in place. We are at the goaline and want to find a way to continue that makes sense for both of us. You had asked me what our min - max per week would be for Fairfield. Right now we would be comfortable if we could bring in weekly volume of 10,000 units or 2,000 per day average. Last week we turned a little over 11,000 units for Nelson without missing a step. I would like to see us simply change the volume commitments on the existing agreement to a more realistic number and continue as one of your digital suppliers. Your thoughts?"

[5] On December 1, 2015, U.S. Magistrate Judge John Bryant ordered that TNI's litigation hold notices were not privileged and should be produced to EPAC. Accordingly, I have shared only pertinent contents of items claimed to be privileged and only to the extent these constitute litigation hold notices.

[6] My review of other privileged correspondence causes me to conclude that, although the legal hold directive of April 18, 2011, was solely targeted to George Gower, General Counsel Wentworth mistakenly believed that it also served as a legal hold directive to Messrs. Bitting, Harris and Schoenwald.

4

## What Should Thomas Nelson, Inc. Have Done to Meet the Duty to Preserve?

By virtue of the extensive access to e-mail and other material afforded me, I believe I have a good grasp of what occurred and what was known and when. Some of this includes what TNI has claimed are confidential attorney-client communications; consequently, I will be guarded respecting these matters, and as feasible, I will endeavor not to ground my conclusions on privileged matter.

The anticipation of litigation standard is as much a valve as a trigger. Anticipation of litigation does not invariably prompt an all-out effort to preserve every conceivable source of potentially responsive information. Instead, the scope of preservation should be fairly tied to a good faith, *subjective* assessment of the likelihood of litigation and to a reasonable, *objective* assessment of the proportionality factors laid out in FRCP 26(b)(1), of the claims and defenses most likely to be asserted and of the sources and custodians most likely to hold responsive information.

In assessing what TNI should have done, the appropriate scope of preservation need not entail casting a wide net. The scope need only have been what was reasonable at the time, based on what Mr. Wentworth knew or should have known of the nature of the claims, counterclaims and defenses he could reasonably anticipate. As a first step, Mr. Wentworth acted prudently in instructing Mr. George Gower (a key player in the EPAC POD deal) to preserve information. Mr. Wentworth should also have instructed those copied on the message to themselves preserve information. Mr. Wentworth did not do this; yet, affording him the benefit of the doubt (and consistent with other material I've reviewed), Mr. Wentworth assumed that copying senior management with the instruction to Mr. Gower was sufficient to prompt senior management to preserve their relevant collections.

Mr. Wentworth was obliged to inquire of the IT staff what sources of data might bear on readily foreseeable claims and defenses, and what data retention and purge settings might apply. It behooved the legal staff to ascertain what potentially relevant data was slated for destruction and take reasonable steps to preserve it, most particularly if it might be the only readily accessible copy of such relevant information held by TNI. In the last century, it was plausible that even competent in-house counsel might fail to consider preservation in anticipation of litigation. By 2011, it was inconceivable. Mr. Wentworth didn't overlook the duty to preserve; instead, he failed to implement a preservation plan with a minimally sufficient scope.

Mr. Wentworth would be expected to know that putting a legal hold in place requires his notifying the IT department. I saw no indication he or others did so until a much later time, and I've seen evidence that persuades me that there was no timely notification of IT by anyone. As Mr. Wentworth was a key player in setting data retention schedules for Thomas Nelson, Inc., he knew or should have known that, unless steps were taken to preserve e-mail, it would purge automatically in six months. Thus, unless affirmative steps were taken by TNI's IT personnel or custodians to preserve them, messages prior to mid-October 2010 could only be retrieved from backup tapes or locally-stored collections, if at all. Moreover, each day that a preservation effort was delayed was a day that e-mail purged from the system. Failing to notify IT was failing to act to preserve data, but for that which Messrs. Gower, Bitting, Harris, Schoenwald (and Wentworth himself) might retain.

Notably lacking from the scope of Mr. Wentworth's efforts to preserve was any effort to preserve tangible or electronic evidence of matters TNI expected to assert as grounds for termination or as grounds for its counterclaims. Of tens of thousands of sample books supplied by EPAC to TNI under the disputed

5

arrangement, not a single instance of a misprinted or damaged book appears to have been retained. Though some of the samples may have been discarded as TNI claims, the most reliable information I've gathered reveals that the bulk of them were sold without recording or retaining a single customer complaint about print quality.

## What ESI was Lost that Should Have Been Preserved?

### 1. Book Samples

Spoliation is not simply the destruction of evidence, but encompasses conduct making evidence unavailable, even if only by significant delay. Whether Thomas Nelson, Inc. disposed of the sample books by throwing them into the trash or by selling them to bookstores (such that it is infeasible to recover any examples), the effect of depriving EPAC of the tangible evidence is the same. TNI was under an obligation to act reasonably and diligently to preserve this evidence and failed to do so. Still, I saw no evidence that the disposition of the books was coupled with an intent to deprive EPAC of this evidence. In fact, reviewing thousands of relevant communications, I saw nothing to suggest an effort to dispose of the books tied in any way to frustrating EPAC's claims in this litigation.

The greater weight of evidence obtained in my investigation points to the conclusion that tens of thousands of EPAC2 book samples were sold into the marketplace. Moreover, nothing emerged to suggest that any of the books sold were returned or prompted complaints of defect from customers. The best evidence that they were of merchantable quality may be the fact that they were disposed of by sale; although, TNI may respond that they were sold in error and did not, in fact, reflect the standards of finish and durability TNI demands from suppliers. Perhaps, but the most compelling evidence of inferiority is the product claimed inferior, and all candidates for same—out of tens of thousands of possible examples—were lost, sold or discarded by TNI during the pendency of a litigation preservation duty. It appears not so much as a photograph of a defective book survives.

The absence of examples is not the sole means by which defects in the EPAC2 samples might be established. There are records of e-mail exchanges and witness observations, as well. But, to allow these into evidence in the face of TNI's failure to preserve any tangible examples of the most compelling evidence would be manifestly unfair to EPAC and effectively reward TNI's failure to meet its preservation obligation. A more just resolution would be to limit the introduction of testimony or records going to defects in the books.[7]

The legal standard for spoliation sanctions for failure to preserve the sample books is not governed by FRCP Rule 37(e) because Rule 37(e) applies solely to loss of electronically stored information, not tangible evidence. Accordingly, the Court need not find that Thomas Nelson, Inc. acted with intent to deprive EPAC of this evidence in assessing sanctions. The *Silvestri* doctrine[8] may still be applied were the Court to decide that the failure to preserve the book samples works such a manifest hardship as to deny EPAC its day in court. However, appropriate sanctions should be no greater than necessary to cure the prejudice, and

---

[7] If one credits Thomas Nelson, Inc.'s contention that the books were so flawed as to constitute breach, it may fairly be argued that the loss of the tangible evidence hurts Thomas Nelson, Inc. as much or more than EPAC. However, as Thomas Nelson, Inc. was solely responsible for the loss of this evidence, allowing Thomas Nelson, Inc. to claim victim status at its own hand is like allowing a son to seek clemency as an orphan when he killed his parents.

[8] *Silvestri v. General Motors*, 271 F.3d 583 (4th Cir. 2001).

6

the failure to preserve the book samples doesn't hamper EPAC or Thomas Nelson, Inc. with respect to their ability to prosecute or defend claims unrelated to the physical condition of the missing tangible evidence. Excluding evidence of defects in the books is not only a balanced response, it has the added benefit of comporting with other evidence developed during my investigation by which I must conclude that all material defect issues affecting merchantability of the EPAC2 books had been resolved by the start of the cure period.

## 2. Red Prairie Warehouse Management System

Pursuant to the disputed POD contract, EPAC reportedly supplied 30,000-40,000 books to Thomas Nelson, Inc. during roughly the last quarter of 2010. The bulk of these would have been delivered in cartons containing 24 or 36 books; so, at least 1,000 cartons. The merchantability of these books is much in dispute here, with EPAC claiming that the books were compliant and salable and Thomas Nelson. Inc. asserting that the books reflected a number of quality control issues attendant to, *inter alia,* cover finishes, print registration, scuffing and chipping. The best evidence of the condition of the books as shipped would, of course, be the books themselves. Unfortunately, not one example of the books claimed to be defective appears to have been retained by Thomas Nelson, Inc. Again, a compelling indicator whether the EPAC POD books were merchantable would be their sale without prompting customer complaints or returns for defects. Reportedly, Thomas Nelson, Inc. denies (or has denied) that the bulk of the books were sold, claiming instead that they were thrown in the trash. Objective electronic evidence tending to prove the books were sold or returned would be highly probative and possibly dispositive of the merchantability issue. Certainly, it strongly bears on Thomas Nelson, Inc.'s claims of defect.

Throughout 2010 and 2011, Thomas Nelson, Inc. employed a supply chain management system called Red Prairie to track the receipt and distribution of books in its warehouse. Red Prairie was managed by Marvin Maphet, a 36-year veteran of Thomas Nelson, Inc. and currently an employee of its corporate successor, Harper Collins Christian Publishing, Inc.[9] I interviewed Mr. Maphet for several hours and found him to be a careful and credible witness.

Mr. Maphet explained that, when cartons of books arrived at the Thomas Nelson, Inc. warehouse, the "license plate" on each carton was scanned into the Red Prairie system which allowed for tracking of, *e.g.,* information about order, contents, printer and disposition within the warehouse system. In his words, "Anytime a carton went into a bin or went out of a bin, they scanned it."

Mr. Maphet confirmed that any full carton sales would have tracked the supplier who printed the contents; accordingly, data for cartons of EPAC POD books in Red Prairie could be queried from the system throughout 2010 and 2011, so long as the transaction involved a full carton.

But when I inquired if it were possible for anyone to currently consult the Red Prairie data from 2010-2011 transactions, Mr. Maphet advised me that, after expert efforts to recover it, the Red Prairie archive data no longer exists. When I asked Mr. Maphet to explain his certainty that the data is gone, he replied:

> "Okay, let me just go through the process. Red Prairie had two environments. In other words, the Red Prairie software and the supporting databases were installed in two different environments. One was the Production Environment, which is very common for any systems, and the other one

---

[9] To the best of my knowledge, EPAC never sought Mr. Maphet's deposition.

was Archive. All the real work, as you can imagine, happened in Production and there was a lot of activity, a lot of transactions that would happen. So, as an order would come down and be fulfilled, transactions would be created within Red Prairie, those transactions would stay within the Production system, my understanding is, approximately two week. Not a real long time; it could have been one week, it could have been three weeks. Roughly around two weeks, because if we kept much more transactional data out there it bogged the system down."

"After two weeks, we would take that transactional data and copy it into the Archive environment, and so, all the transactional data would be in Archive. But, and the reason for the Archive would be if there were some specific issue, that Customer Service needed something six months later, they could go to Archive and find out who something was shipped to, that kind of thing. However, the Archive deleted the transactional information after 365 days."

"I brought in a Red Prairie person—I don't remember if that was three or four months ago—to look at our Archive and she indicated that that purge process had been running forever and never were turned off. So, the transactional data in our Archive system was gone. So, the data is not there."

On further inquiry, the "Red Prairie person" was identified as Dusti Morgner, identified to me as a consultant with EnVista Corporation but who identifies herself on LinkedIn as a Thomas Nelson, Inc. employee from April 2006 to March 2014 and holding the title, "Warehouse Management System Administrator." Ms. Morgner's examination of the Red Prairie system probably occurred on or about March 2015, while Ms. Morgner was employed by GetUsROI, LLC.

The data in question existed for approximately 54 weeks before it was auto-purged; consequently, a complete record of EPAC2 shipments and sales from July 2010 through April 2011 was readily accessible to Thomas Nelson, Inc.'s IT staff until July 2011 and a partial record through April 2012. In short, the data was readily accessible until well past the April 2011 attachment of a preservation duty in this cause. As well, there is some indication that the Red Prairie Archive may have been backed up to tape as a means of disaster recovery, extending access to the data later in the interval when Thomas Nelson, Inc. was obliged to preserve it. No backup tapes holding Red Prairie data earlier than 2013 have been retained.

Mr. Maphet was unable to identify any effort made to examine or preserve the Red Prairie Archive data prior to 2015. Despite his role as administrator of the Red Prairie Archive, Mr. Maphet was not advised of a legal hold for this case until the first quarter of 2015. Mr. Maphet stated that the reason he did not preserve the data was because no one asked him to do it. Preservation simply wasn't "on his radar" in 2011 or 2012, and he wasn't even asked to determine if the EPAC2 sales data existed.

Notwithstanding, Mr. Maphet ultimately sought data from other sources and that data allowed him to assess whether EPAC2 books were sold and whether they were returned. He looked at reports. He looked at "patterns." He found no returns and no large adjustments. In short, he found nothing inconsistent with the conclusion that Thomas Nelson, Inc. sold the 30,000-40,000 POD books it received from EPAC.

Mr. Maphet advised that further unexplored information bearing on sales exists in two locations accessible to Thomas Nelson, Inc. These are the Monthly Sales Tapes that Mr. Maphet referred to as "sacred" data, hence its faithful retention for 26 years. These tapes are still retained by Thomas Nelson, Inc. in its computer room in Nashville. Additionally, their contents were fully extracted and supplied to Harper Collins in conjunction with Thomas Nelson, Inc.'s sale to Harper Collins. Mr. Maphet personally

8

worked for weeks to extract and transfer the contents of the "sacred" tapes. This data has not been examined or, at least, there appears to have been no disclosure or production of any of this data to the extent it tends to confirm or refute Thomas Nelson, Inc.'s claims to have discarded most of the EPAC2 books as unsalable.

This "sacred" sales data has long been available to Thomas Nelson, Inc.; but in the fullness of time, the data has migrated to formats and locations that render it relatively inaccessible to TNI. The Court may wish to order restoration of this data, but I do not recommend doing so. I see no point in prompting further delay to obtain data that bears on an issue that really shouldn't be a matter of good faith contention: *Thomas Nelson, Inc. sold the EPAC2 books, and there is no credible evidence to support a claim that they were unacceptable to the customers who purchased them.* As noted, the most compelling evidence of their merchantability of the POD books is that they were, in fact, sold without issue. Thomas Nelson, Inc. failed to preserve evidence that might have shown otherwise, and it should not be permitted to proffer an unsupported proposition when it has failed to preserve key evidence that EPAC could have used to confirm the book sales.

### 3. The Postini Purge

"Postini" refers to a now-defunct e-mail archival service owned by Google and marketed to Thomas Nelson, Inc. through a reseller named Cloud Sherpas, Inc. Postini enabled Thomas Nelson, Inc. to effectuate a legal hold on e-mail accounts of selected employees by replicating their mail in the Cloud. E-mail sent or received by employees on legal hold would be copied ("journaled") via the Internet to a Google Postini online archive where it was stored for a user-configurable retention period ranging from one to ten years. The service is sold "by the seat," meaning an annual subscription fee is assessed per archived mail account.

Thomas Nelson, Inc. entered into an agreement with Cloud Sherpas in July 2010 to use Google Postini for spam filtering and for litigation holds. The litigation hold services initially purchased included 10 Google Message Discovery (GMD) seats for 10-year retention.

In February 2011, Thomas Nelson, Inc. increased the number of 10-year litigation hold accounts to 65. On June 13, 2011, it again increased the subscribed seats to 75 accounts, then to 100 seats on December 12, 2011 and finally to 175 seats on June 10, 2012. Notably, Thomas Nelson, Inc. subscribed to just ten GMD seats throughout most of the focal interval for e-mail relevant to this dispute.

By January 20, 2012, when EPAC e-mailed TNI's General Counsel its draft Complaint, there cannot be the slightest doubt that TNI anticipated litigation with EPAC and grasped the scope of the issues to be litigated. That same day, TNI's counsel circulated a broad and highly detailed legal hold directive to George Gower, Stuart Bitting, Tom Harris, Troy Edens, Mark Schoenwald, Rick Proctor, and Matt McCurry.[13] In turn, Mr. Proctor, chief of Information Technology for TNI, forwarded a copy of the hold notice to his subordinate, Scott Gibbs, a Network Administrator charged with primary responsibility for preservation of information

---

[13] Tellingly, the preservation duties set out in this hold notice were ignored by all recipients, among them directives to disable automatic deletion of e-mail, to cease rotation of backup tapes and to create mirror images of personal computers and laptops. The legal hold notice was a boilerplate form deployed without guidance, follow up or expectation that those to whom it was directed would or could carry out the tasks required.

from e-mail systems, databases and other electronic sources. Mr. Gibbs was the person with administrative oversight of the Google Postini archive.[14]

Mr. Gibbs told me that he was unaware TNI anticipated the EPAC litigation until he received the copy of the January 20, 2012, hold directive from Mr. Proctor.

Mr. Gibbs replied to Mr. Proctor stating, "I went ahead and checked. All of them are already on legal hold." Mr. Proctor acknowledges with, "Cool thanks." [15]

The problem with this exchange is that, if Mr. Gibbs had actually checked on the status of the Postini archive, he should have discovered that messages subject to hold were being purged. So, when Mr. Gibbs assured Mr. Proctor that he "checked" that the persons named in the notice were, in fact, on hold, his check did not extend to confirming that Postini was preserving, not purging, their e-mail.[16]

On January 25, 2012,[17] Scott Gibbs contacted Cloud Sherpas seeking assistance in exporting 25 users' e-mail accounts out of Postini Archiving (i.e., retrieving stored messages for those users). I believe this effort was tied to a DOJ investigation into the acquisition of TNI by HarperCollins Publishing and not to the EPAC litigation. This exchange confirms Mr. Gibbs' use of the Postini management console for the archive; so, Mr. Gibbs was in a position to note the purging, but failed to do so.[18]

Had Mr. Gibbs checked the status of the Postini system with respect to its legal hold functionality, he would have discovered that messages subject to legal hold were being purged by the tens and hundreds of thousands of messages each month. It wasn't until his October 2013 entry into the Postini archives to finally collect e-mail for this litigation that Gibbs discovered the massive purge. Using a feature in the Postini console, Mr. Gibbs generate the purge summary data reproduced at right. It details the number of items and gigabyte volume of items purged each month between February 2011 and June 2012.

| Date Purged | # Items Purged | Volume Purged (Gigabytes) |
|---|---|---|
| February 2011 | 1,880 | .14 |
| March 2011 | 23,973 | 1.9 |
| April 2011 | 23,689 | 2.5 |
| May 2011 | 28,317 | 2.4 |
| June 2011 | 32,923 | 3.1 |
| July 2011 | 30,382 | 3.1 |
| August 2011 | 35,261 | 3.2 |
| September 2011 | 35,931 | 3.2 |
| October 2011 | 43,695 | 4.9 |
| November 2011 | 78,352 | 9.5 |
| December 2011 | 114,869 | 16 |
| January 2012 | 210,116 | 33 |
| February 2012 | 203,781 | 34 |
| March 2012 | UNKNOWN | UNKNOWN |
| April 2012 | 196,486 | 34 |
| May 2012 | 210,613 | 35 |
| June 2012 | 199,058 | 34 |
| TOTAL FOR INTERVAL | 1,469,326.00 | 219.94 GB |

---

[14] Mr. Gibbs left TNI in November 2013 when his role was made redundant by the HarperCollins acquisition. Neither Mr. Gibbs nor Mr. Proctor took the steps required by the plain language of the 1/20/12 hold notice, although Mr. Gibbs undertook some of the tasks almost two years later, in October of 2013.

[15] I take this exchange to mean that the e-mail accounts of George Gower, Stuart Bitting, Tom Harris, Troy Edens, Mark Schoenwald, Rick Proctor, and Matt McCurry were already among those made subject to Postini retention.

[16] Moreover, my examination of Mr. Gibbs' computer revealed that Mr. Gibbs did not begin collection of information from the various key custodians until October of 2013, after he realized that the Postini archive had been purging content it was supposed to have preserved.

[17] This verified date is somewhat at odds with Scott Gibbs' assertion in mid-October 2013 that he "hadn't been in the archiving system for over a year." Based on the evidence, Mr. Gibbs had been in the archive just nine months prior; but, the discrepancy is modest enough to likely be a good faith mistake.

[18] Mr. Gibbs related that he had successfully exported 15 of the accounts but that the remaining ten accounts were generating error messages.

Each purge event in the table reflects the disposal of messaging from about 13 months prior to the data of the purge. At least 750,000 messages and attachments from the interval of greatest relevance to this litigation were purged, all after a duty to preserve for this matter attached.

Mr. Gibbs overlooked the fact that the e-mail preservation system was serving as an e-mail destruction system. Before this was discovered, roughly 1.5 million e-mails on legal hold were purged.

The fault comes into harsh relief in light of the timeline:

- April 18, 2011: Legal hold obligation attaches.

- May 9, 2012: EPAC files suit.

- July 2012: HarperCollins Publishers completes its acquisition of TNI, preceded by a U.S. Department of Justice inquiry into the acquisition, which prompted a massive data collection and production.

- December 2012: EPAC serves written discovery.

- In-house counsel at TNI retired and new in-house counsel was installed.

- EPAC moved to compel responses to discovery, and the Court heard same in September of 2013.

- October 15, 2013: Scott Gibbs discovers the Postini system is purging e-mail subject to legal hold.

It was not until *October, 15, 2013* that TNI explored its Postini e-mail archive for this suit and recognized that archive contents subject to hold were being relentlessly purged. This was thirty months after a preservation duty attached, sixteen months after suit was filed, and almost a year after discovery was served. It is one thing to negligently fail to preserve information for anticipated litigation and another to fail to preserve—and fail even to seek—patently responsive information until long after suit has been filed and discovery requests served and compelled.

Thomas Nelson, Inc. takes the position that it had assumed that the preservation interval for the Postini archive was ten years and that it had been so since the service was initiated in July of 2010. However, it appears that the system was initially configured for a one year retention and purge. As the purging ceased in June 2012, it's assumed the retention setting was changed from one year to ten years during June or July of 2012.[23] Accordingly all messages in the Postini archive older than June or July 2011 have purged and cannot be restored from Postini.

The careless purge of the Postini e-mail archive, coupled with the failure to monitor legal hold and uncover the ongoing purge, should have prompted resort to both readily-accessible and less-accessible alternate sources of e-mail without Court intervention. The negligent destruction of nearly 1.5 million messages and their attachments is the sort of event that constitutes "good cause" to warrant resort to less accessible sources pursuant to FRCP Rule 26(b)(2)(B). If Thomas Nelson, Inc. chose to interpose

---

[23] I have been unable to determine what prompted or who made the change because the record of those transactions has also been purged with the passage of time. The date of June or July 2012 reportedly coincides with a major reduction by TNI in the number of Postini archival accounts to which it subscribed.

inaccessibility of, *e.g.,* the e-mail backup tapes or drive images from the DOJ investigation[24] as a justification to eschew searching such sources, Thomas Nelson, Inc. was bound to do so *explicitly* by identifying the particular sources it was electing not to search and by making formal and specific objection that these sources were not reasonably accessible. Litigants may not close their eyes and hope that bad things will just go away of their own accord. Thomas Nelson, Inc. did nothing.

EPAC characterizes Thomas Nelson, Inc.'s disclosures respecting the failure to retain Postini-archived e-mail as an effort to hide and manipulate discovery. It is true that TNI was loathe to acknowledge the loss or concede its magnitude. It is also true that TNI later sought to lay blame for the loss on its contractor, Cloud Sherpas, and on Google, denying that TNI's own personnel had any culpability. In fact, the fault for same resides with Thomas Nelson, Inc., most likely in the actions of its IT personnel in setting up and/or altering retention settings and undoubtedly in its failure to competently meet and monitor its legal hold obligations with respect to the Postini archives.[25]

But as incompetent as this was, I found no evidence that prompts me to conclude that it grew out of an intentional effort to deprive EPAC of the contents of the Postini archive for use in this litigation. My review of communications, records and testimony[26] makes clear that Thomas Nelson, Inc.'s IT personnel *believed* the e-mail was being preserved until they belatedly discovered that it was not. Certainly it *should* have been preserved, and unrelenting loss of same *should* have been discovered much sooner than it was; but I am persuaded that these failures are a consequence of negligence and inattention, not guile.

TNI's efforts to point the finger at Google weren't entirely fanciful. At worst, it was wishful thinking. Preliminary communications with Cloud Sherpas afforded leeway for uncertainty as to who was to blame, and the earliest explanations communicated to Thomas Nelson, Inc.'s management and counsel by IT personnel were calculated to leave the impression that the fault lay elsewhere than Thomas Nelson, Inc.'s own IT staff. This was not an effort by management or counsel to mislead EPAC; instead, I believe it to be an entirely too human effort by IT to deflect scrutiny of IT from management and counsel. Google was a convenient scapegoat, but not a fabricated one. I've found no evidence that prompts me to conclude that, even as late as 2014, Thomas Nelson, Inc.'s senior management, in-house or outside counsel knew that fault for destruction of Postini e-mail lay with its own IT department.[27]

---

[24] In connection with the DOJ inquiry, Thomas Nelson, Inc. engaged national e-discovery counsel and a large e-discovery service provider. The contents of e-mail accounts and the hard drives of many key custodians were professionally preserved in conjunction with this effort. Much of this data was available to TNI but was not disclosed or explored before the Court intervened. Some of this material has now been explored and it yielded a considerable volume of e-mail.

[25] The only evidence as to who initially configured the Postini message archiving system is a July 15, 2010, e-mail from Cloud Sherpas to Scott Gibbs instructing him how to activate and set up the archival accounts. The e-mail concludes, "Let me know if you have any questions. Good luck." Regardless, even if the Postini system was misconfigured by Cloud Sherpas when the Postini archival services were subscribed to in 2010, Thomas Nelson, Inc.'s personnel had been in and out of the system on multiple occasions before October of 2013 and were obliged to both monitor legal hold and to search and collect from the archive to meet its discovery duties.

[26] I include within "testimony" the witness interviews and statements obtained during my investigation.

[27] As the change was not undertaken to intentionally deprive EPAC of ESI in this case, it's not crucial to determine if the negligent failure to preserve was due to the carelessness of a Thomas Nelson, Inc. employee or that of a contractor to whom Thomas Nelson, Inc. delegated its retention responsibilities. The process failed magnificently, and Thomas Nelson, Inc. is responsible for that failure.

Had a properly-scoped and –managed legal hold been put in place in April 2011, exploration of the Postini archive should have revealed the purge settings. The most relevant communications in the archive would not have begun to purge until the second half of 2011, and the bulk of these were not extinguished until April or May of 2012.[28]

All of this must be weighed against the fact that, when the duty to preserve arose in April 2011, only a single custodian, George Gower, was placed on hold. No IT personnel were notified for at least eight months. As the standard retention setting for TNI e-mail was six months, some communications from early in the history of the EPAC2 transaction would have been purged by April 2011, had key custodians been promptly notified of the need to preserve relevant messaging. For custodians whose mail had not been committed to the Postini archive, backed up to tape or set aside by the custodians for business purposes,[29] their mail before September 2010 was already gone. I have no criticism of Thomas Nelson, Inc. for any failure to retain ESI purged *before* a preservation duty attached (either by operation of law or when initiated by counsel or through internal hold directives).[30]

Save for erroneously claiming that e-mail being purged was being held, Scott Gibbs took no action in connection with this matter before October of 2013. When Mr. Gibbs did ultimately act, he performed as capably as his e-discovery skills, training and tools allowed; which is to say, not all that well, but in good faith and with due diligence.[31] Gibbs used his rudimentary tools and skills to collect and search for messaging he deemed responsive within the collections of Dean Nelson, Tom Harris, George Gower, Stuart Bitting, Matt McCurry, Susan Owens, Frank Wentworth and Walter Hall; but, by the time Mr. Gibbs did so, he was closing the barn door after the cows had departed.

Once more, I uncovered nothing to indicate that this belated effort to preserve and search e-mail came coupled with an effort to destroy or conceal ESI; that is, if there was an intentional effort to deprive EPAC of particular ESI by EPAC's employees, I did not discover it. Instead, I discerned arrogance by management, lack of initiative by IT and a pitiable lack of legal leadership, the last at the very heart of the failure. EPAC argues that it has been the victim of a carefully executed effort to hide evidence. I observed little care, pitiful execution and far too little effort until the Court's intervention late in 2014.

---

[28] It should be noted that the anticipation of litigation sufficient to prompt a preservation duty also suffices to support assertion of work product privilege; consequently, certain communication after April of 2011 would have been withheld from discovery based on privilege (as borne out by subsequent assertions). Nonetheless, the duty to preserve applies to relevant, potentially-privileged material, even if such material is ultimately exempt from discovery.

[29] This would not include the messaging of certain senior executives (*e.g.,* General Counsel) whose messaging was on perennial hold. That content was deleted in the Postini purge, but has lately been restored from other sources, including the DOJ investigation collection and backup tapes.

[30] E-mail routinely purged from an Exchange server will often endure on backup tapes maintained for disaster recovery or other purposes. Litigants routinely resist demands that they resort to tape media to restore data deleted in the usual course of business *before a duty to preserve attached.* The customary contention is that tape media is not reasonably accessible due to considerations of undue burden or cost. Thomas Nelson, Inc. is well within its rights to contest efforts to compel discovery from tape media, but only insofar as it has seasonably identified the media, objected to restoration and, when faced with a Motion to Compel, proven the asserted undue burden or cost.

[31] My criticism of Mr. Gibbs goes to his lack of skill, experience, tools and training with respect to the particular tasks demanded of him in effectuating a legal hold of ESI in anticipation of litigation and civil discovery, while acting with little or no guidance or direction from counsel. I intend no criticism of Mr. Gibbs' general technical skills nor do I suggest he is not otherwise a well-qualified network administrator.

- **Postini Purge Remediation**

Rule 37(e) requires a threshold consideration of three issues before sanctions for spoliation of ESI may be considered:

1. Should the lost ESI have been preserved in the anticipation or conduct of litigation?

2. Was it lost because a party failed to take reasonable steps to preserve it?

3. Can the lost ESI be restored or replaced through additional discovery?

Under the Rule, the Court need not consider issues of prejudice or intent to deprive unless all three of these threshold questions are answered affirmatively. Here, the evidence readily and amply supports a "yes" answer to the first two inquiries. Accordingly, my work over the preceding year entailed a thorough exploration into whether the "lost" ESI could be restored or replaced.

EPAC insists that my role was to wrest the discovery process away from Thomas Nelson, Inc. and its counsel, collecting, processing and reviewing the data while substituting my judgment as to responsiveness and privilege for that of Thomas Nelson, Inc.'s chosen counsel. I disagree, and I do not believe this to have been the Court's intent in appointing me, else, I would have respectfully declined the appointment. I do not believe the Court sought to appoint a Receiver of Thomas Nelson, Inc.'s data assets. As Special Master, my role is that of neutral overseer for the purpose of fostering the integrity of a reasonable process and to investigate so as to advise the Court about what transpired and recommend responsive action, as needed. That's the path I've followed, and it's been a winding road.

In my role, I've principally focused on the three threshold questions, as well as examining prejudice flowing from and intent behind the discovery failures. A determination as to whether lost ESI can be restored or replaced necessitated substantial efforts to actually restore and replace the ESI because, with most sources of ESI, the tasks of finding the data and determining if it's the data you seek are inseparable. For example, restoring e-mail from a backup tape is not considerably more labor intensive or costly than generating an index of the tape; moreover, the index alone is unlikely to yield more than the name, size and last modified date of a file. For e-mail container files, restoration and processing are needed to know if the e-mail sought is housed in the container on the tape. Recovered data must then be made amenable to electronic search and reviewed for privilege or responsiveness. When, as here, the parties must turn to less accessible sources to replace lost data, the cost and time required for such efforts can be considerable.

To foster integrity of process, I required Thomas Nelson, Inc. to furnish to me unaltered counterparts of the many gigabytes of e-mail container files it was collecting from local hard drives and backup tapes. As Thomas Nelson, Inc. processed and searched data, I processed and searched the same data in my digital forensics lab in Austin and thus had the same or a superior ability to search and examine the content as that of Thomas Nelson, Inc.'s counsel. I call this "shadowing" the discovery process, and I believe it serves as an effective hedge against suspicion that information is being improperly withheld. In a sense, I am looking over counsel's shoulder at the unfiltered data.

Shadowing is not perfect. An advocate seeking to hide evidence may still succeed; though, my having access to the raw data makes data hiding a high-risk proposition. A diligent and devious party could conceivably strip every container file of adverse messages before tendering them to me. But, the party would have to insure that not a single instance of a message is overlooked—included those embedded in

14

threads or accessible using forensics—and must alter the metadata values of the files so as not to be found out. Moreover, the party must be assured that I won't acquire the concealed content via the information I personally collect or from a third-party.[32]

I saw no such efforts at concealment attempted by TNI. To the contrary, I was afforded unhindered access to any information I sought, with unflinching courtesy and cooperation, sometimes at considerable cost.

The following table sheds light on the volume of information from key custodians I've processed and searched in the shadowing process:[33]

| DATE DATA RECEIVED | ITEMS / MESSAGES | Less Immaterial | Less MD5 dedupe |
|---|---|---|---|
| 1-09-2015 | 241,666 / 78,103 | 196,392 / 78,103 | 107,863 / 75,372 |
| 1-14-2015 | 9,005 / 1,380 | 8,510 / 1,380 | 6,434 / 721 |
| 2-26-2015 | 1,138,506 / 278,551 | 553,421 / 278,551 | 319,414 / 221,644 |
| 3-09-2015 | 1,923,606 / 901,875 | 1,306,083 / 901,875 | 710,471 / 536,324 |
| 3-13-2015 | 659,426 / 201,380 | 314,827 / 201,380 | 241,611 / 182,790 |
| 4-03-2015 | 395,069 / 110,297 | 171,620 / 110,297 | 86,193 / 66,853 |
| 4-30-2015 | 96,952 / 27,804 | 46,811 / 27,804 | 28,410 / 20,024 |
| 5-19-2015 | 579,001 / 202,263 | 306,318 / 202,263 | 232,834 / 166,685 |
| 8-31-2015: | 3,225,006 / 1,119,373 | 1,676,322 / 1,119,373 | 149,282 / 114,742 |
| ALL ABOVE | 8,268,237 / 2,921,026 | 4,580,304 / 2,921,026 | 1,443,798 / 1,103,201 |
| ALL BETW 3/1/10-4/30/11 | 1,862,268 / 659,495 | 1,063,486 / 659,495 | 216,480 / 164,491 |
| ALL FOR INTERVAL & EPAC* | 32,159 / 12,845 | 22,469 / 12,845 | 6,536 / 5,097 |
| *Values on this line do not reflect resolution (e.g., OCR, decryption) of irregular items prior to search | | | |

To put this data in context, various sources of ESI received from Thomas Nelson, Inc. on the dates in the leftmost column were processed into an e-discovery tool called Nuix (ver. 6.2.7) so as to unpack the contents from various container file formats (e.g., .ZIP, .PST, .OST). Collectively, the extracted items and their containers comprised roughly 8.2 million items. Of these, 2.9 million items were e-mail messages sent and received by the custodians. I further processed the data to extract textual content and metadata values, populating a database with the extracted text and metadata so as to make it searchable.

I then sought to pare down volume by suppressing immaterial items, mostly containers whose complete contents had been extracted and processed. Then, because many of these custodians were party to the same e-mail exchanges, I deduplicated the collection using a cryptographic hash algorithm called MD5 to

---

[32] Here, I personally collected ESI while onsite at Thomas Nelson, Inc., from servers and from Scott Gibbs' laptop.
[33] These values do not reflect the additional million+ items processed and reviewed from my forensic imaging of Scott Gibbs' laptop, although custodial e-mail replicated on the laptop makes up part of the table values.

15

suppress duplicates and isolate a single instance of every unique item. This reduced the volume of potentially material items to 1.4 million items containing 1.1 million discrete e-mail messages.

To afford the Court some sense of temporal and topical relevance for this report, I filtered the data for items sent or received in the crucial interval March 1, 2010 to April 30, 2011 (164,491 messages) and searched the items from that interval for the term "EPAC." This resulted in identification of about five thousand messages "hitting on" the term "EPAC."

By itself, this is not a wholly sufficient method to identify the most potentially responsive communications, and the parties used other methods and queries; still, I offer it as a useful indicator of the haystack hiding the needles, that is, volume of items that must be collected, processed and searched in order to zero in on a modest volume of relevant messaging. Further, the process affords me assurance that the efforts taken to rectify the Postini purge by collection from local machines and backup media reasonably sufficed to supplant the loss of the purged data.

**Graphical Gap Analysis:** The image below depicts the distribution of the 164,491 deduplicated e-mail messages for the key custodians in this matter, with dates ranging from March 1, 2010 through April 30, 2011. Each blue dot is a single day of unique messaging—one instance only--and its size corresponds to the unique message volume on that day. The regular pairing of two- and occasionally three small dots reflect weekends and national holidays. The longer sparse stretches late in the year correspond to the Thanksgiving and Christmas holidays. Graphical gap analysis is a crude analytic technique that tends not to reveal the absence of small volumes of e-mail (as might occur by targeted deletion of a handful of



messages). Neither will it reveal much about the completeness of any individual custodian's collection within the group unless filtered by custodian. However, it can be effective in surfacing significant shortfalls across custodians for an interval (as when a week or month of messaging has been purged a source and not supplanted by messages from other sources).

- ## Sufficiency of Postini Purge Remediation

Unquestionably, much of this data, gleaned from local hard drives, data preserved for another matter and backup tapes, should have been collected and searched without the Court's intervention once the problems with the Postini collection were known. The failure to do so was negligent on the part of Thomas Nelson, Inc. and suggests some paralysis or even purposeful sluggishness in TNI's failure to act in a timely way and address serious shortcomings in its discovery responses. These actions warrant measures to defray the prejudice occasioned by needless delay and uncertainty.

But from the standpoint of invested effort, cost and diligence, the caliber of the e-mail e-discovery effort by Thomas Nelson, Inc. flowing from the Court's intervention is almost certainly equal or superior to the labors and resources that would have been expended by a party acting diligently and in good faith without such intervention.

In the final analysis, I hold the view that Thomas Nelson, Inc.'s belated efforts to restore and search e-mail have resulted in as representative and complete an exploration of potentially responsive messaging as would have been reasonably achieved by a diligent effort earlier in this lawsuit. EPAC has certainly been prejudiced by the delay in production of e-mail, but not likely deprived of e-mail so as to be materially prejudiced by the Postini purge. In terms of superior access to data, EPAC may even have benefitted somewhat from the broader, deeper efforts attendant to remediation.

## Prejudice Flowing from the Postini Purge

When potentially relevant, discoverable e-mail is lost through negligence, the natural conclusion to jump to is that a smoking gun or exculpatory material is gone. Spoliation breeds mistrust and uncertainty. The negligent loss of information hurts everyone in the search for truth.

As noted, where destruction is borne of guile, the law supports a presumption that the lost evidence was unfavorable to the party who acted with intent to prevent its discovery and invites the severest sanctions. Where evil intent cannot be shown, we look instead to what steps may be taken to restore or replace the lost evidence and, if it cannot be recovered, to the nature and extent of prejudice suffered by the party deprived of its use. The measures taken to correct the loss should be no greater than those required to correct the prejudice.

Whether EPAC was prejudiced by Thomas Nelson, Inc.'s failure to initiate and maintain a legal hold on the Postini e-mail archive is answered differently at present than at the time of my appointment. Some prejudice to EPAC from loss of information must yet be rectified, but much has been cured through additional discovery.

The prejudice to EPAC yet to be addressed is that prompted by, *inter alia*:

1. Being obliged to question witnesses without reasonably complete production;

2. Delay in resolution prompted by belated production;

3. Motion practice dedicated to compelling additional discovery; and,

4. Cost of the Special Master and associated proceedings.

Its vociferous protestations notwithstanding, it is my opinion that EPAC has now secured such a reasonably complete production of key custodian e-mail for relevant periods so as to defray any significant prejudice going forward deriving from Thomas Nelson, Inc.'s negligent failure to preserve portions of the Postini archive. In fact, I believe that EPAC now has a more fulsome collection of responsive communications than EPAC would likely have secured had Thomas Nelson, Inc. fulfilled its obligation to produce responsive e-mail in a timely and competent manner.

## Numbers Do Not Tell the Whole Story

EPAC insists that because Thomas Nelson, Inc. produced a great many more items after the Court's intervention than beforehand, the before-and-after volumes are a measure of the prejudice EPAC has suffered. I believe not.

The sheer number of items produced before and after is an unreliable measure of prejudice here. Digital data replicates and proliferates in such a colossal way as to potentially mislead when parties cite massive numbers of items produced or withheld in discovery. Tendering a million documents stands for little if few of them are unique and probative. Likewise, vast volumes of belatedly produced material mean little if vastly different methodologies were employed to collect, cull and filter the items produced.

By agreement of the parties last March, a crude keyword filter coupled with little human review was employed to identify and cull messages and attachments *deemed* responsive or privileged because they contained search terms expected to appear in relevant or privileged items. The parties adopted this approach because it was hoped that a rough cull would speed production and trim the high cost of review. It was to also to have rendered the selection process more objective, in recognition of EPAC's suspicions that the defendant or its counsel were suppressing evidence. It was clearly understood by all that this approach would throw off a large number of items not actually responsive, but which happened to contain one or more search terms (so called "noise hits"). The upshot was that EPAC received a far broader swath of information than a more deliberate and exacting search and review effort might yield. Much of what EPAC received was not *truly* responsive but was *deemed* responsive by virtue of containing a keyword "hit." That outcome was by design.

So, while it is true that many more *items* were produced as responsive in 2015 than throughout the pendency of the action, it does not follow that the large number of items produced in 2015 can simply be compared to the volume produced through a more stringent review methodology or that any gross disparity stands for the proposition that many responsive items were suppressed. The gross disparity is not a fair measure of prejudice because one is apples and the other, oranges.

Yet, it is manifest that, prior to the Court's intervention, Thomas Nelson, Inc. failed to afford EPAC a reasonably complete production of unique, responsive electronic mail. Some of this shortfall flowed from an inadvertent failure to impose a proper hold upon the Postini archive and some from lax preservation and collection from other sources. Because relevance and materiality is a matter of judgment, it is impossible to state precisely how many new, relevant and material items were belatedly produced. EPAC claims too many and Thomas Nelson, Inc. acknowledges too few. Clearly, there were an ample number,

and the failure to produce these stemmed from Thomas Nelson, Inc.'s cavalier handling of discovery duties preceding the Court's intervention.

In a 1909 lecture, Oliver Wendell Holmes, Jr. famously remarked that, "Even a dog distinguishes between being stumbled over and being kicked."[35] Justice Holmes was mulling the role intent plays in calibrating the law's response in compensation or punishment. Similarly, Fed. R. Civ. P. 37(e) requires that, before severe sanctions may be imposed, there must be a showing that the party who lost information that should have been preserved and cannot now restore it must have acted with the intent to deprive another party of the information's use in the litigation.[36]

There is much that Thomas Nelson, Inc. could and should have done to preserve and produce information in a more timely and complete way. Thomas Nelson, Inc. could have been more forthcoming about its failures to opposing counsel. It could have undertaken to rectify these failures without being compelled to do so by this Court. It could have expended a proportionate measure of the effort, and enlisted the expertise, it dedicated to ESI collection and production of information in connection with the Department of Justice investigation. Though close in time, the slapdash, D-I-Y approach to discovery seen here stands in stark contrast to the effective, professional methodologies Thomas Nelson, Inc. brought to the government inquiry. By experience, they knew what to do. They chose not to do it here.

By all indications, the IT staff were well intentioned in their effort and reasonably diligent within their limited ken; but, they were handicapped by a lack of proper training, tools, skill and oversight. To the extent counsel calling the shots grasped the distinction between competent and incompetent e-discovery processes, I saw no indication that counsel offered a modicum of guidance on appropriate procedures or any meaningful supervision. In short, e-discovery was entrusted to persons who possessed a sketchy notion of what must be done and lacked sufficient expertise and direction to do it. I have every confidence the IT personnel charged to preserve, collect and cull data did their level best; but, I cannot fathom why those in charge would have assumed their best would be up to the task.

I make this observation mindful of Thomas Nelson, Inc.'s more competent approach to preservation of ESI in a different matter—the DOJ investigation in connection with its acquisition by HarperCollins—taking

---

[35] I admire that quote, and after sharing it with counsel early in this investigation, I was mercilessly set upon by a pack of rabid 'kicked dog' references. By sharing it now, I hope I am not visiting the Curse of the Canine Colloquial upon this Court.

[36] (e) FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

   (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

   (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

      (A) presume that the lost information was unfavorable to the party;

      (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

      (C) dismiss the action or enter a default judgment.

place in the same time frame as the anticipated EPAC litigation. Though the stakes were different, the signal difference was that TNI engaged outside experts—both e-discovery counsel and an e-discovery service provider—to guide its preservation and collection efforts for the HarperCollins acquisition. Here, TNI's approach to preservation was homebrew, sluggish and sloppy; its commitment to defensible collection and search, at best, perfunctory.

Those are factual observations. Adding an impression gleaned from all I've studied, I would observe that TNI failed to take this dispute seriously until too late. Whether that course grew out of poor management, arrogance or wishful thinking, I cannot be certain; but, TNI hewed to its belief that EPAC's claims would come to naught with such conviction that its efforts mirrored expectations more than obligations.

As casual and careless as TNI was before, I would be remiss if I now failed to praise them and their counsel for the candor and cooperation shared with me to this point. I saw a genuine effort to remedy past failures. Not flawless, but sincere and diligent. Russell Taber took on an unenviable task in seeking to salvage the mess made before his involvement, operating in an atmosphere of unrelenting suspicion and disparagement. Competent counsel cannot change what came before but can serve to make the road forward an easier one. By contrast, EPAC's counsel made my work more difficult and expensive,

I cannot speak to EPAC's charges that Thomas Nelson, Inc. misled the court about discovery matters. I've not been privy to hearings and conferences. I can advise that Thomas Nelson, Inc. has not mislead me, and I am confident that the failures prompting my appointment—while significant and avoidable—were not engineered to intentionally deprive EPAC of information. They were negligent, even grossly so; but not of the devious character required for imposition of an adverse inference or dispositive sanction.

Though I possess no superior ability to judge intent, I've had far superior access to electronically stored information in this case than anyone. By shadowing discovery as I've described, I've seen the communications before they have been culled, filtered or redacted. I'm able to follow the evidence wherever it leads, unconstrained by keyword lists, and examine its forensic integrity, if required. I also see messages between IT personnel, internal communications between key players and communications between in-house and outside counsel. I endeavor not to seek or rely upon privileged material, but seeing it is often unavoidable. Were it to reveal a crime or a fraud upon a party or the Court growing out of destruction or concealment of evidence, I would have just cause and be ethically bound to bring it to the Court's attention. I have no cause to do so here.

I did not find evidence of intentional misconduct by Thomas Nelson, Inc. purposed to deprive EPAC of evidence for use in this litigation. The dog was stumbled over, not kicked.

Still, the dog—EPAC—was injured; more precisely, prejudiced in its ability to pursue its claims as justly, inexpensively or speedily as Fed. R. Civ. P. 1 dictates.

20

## Recommended Actions to Cure Prejudice

EPAC stridently[37] insists that Thomas Nelson, Inc. and its outside counsel engaged in an orchestrated effort to deny EPAC evidence of a conspiracy by TNI senior management to fraudulently leverage the EPAC2 POD contract so as to secure favorable pricing from an EPAC competitor. Taking no position on the merits, I can assure the Court that EPAC now possesses the salient information it needs in discovery, save for that which has been characterized as privileged, that which never existed and that which Thomas Nelson, Inc. failed to preserve after a legal preservation duty arose. With respect to the last, the prejudice occasioned by the failure to preserve can be addressed by additional discovery—much of which has already occurred—and by limiting Thomas Nelson Inc.'s ability to assert a single defensive issue about which it failed to properly preserve evidence and thereby limit Thomas Nelson, Inc.'s ability to capitalize on its botched discovery. The inherent fairness of this approach lies in the fact that the matter the Court would treat as established is also manifestly true.

Accordingly, I recommend the following measures to cure prejudice to EPAC occasioned by Thomas Nelson, Inc.'s malfeasance:

1. Exclude documentary evidence or testimony offered or elicited by Thomas Nelson, Inc. going to the proposition that books supplied by EPAC pursuant to the supply channel known as EPAC2 were defective in quality, durability or appearance or were otherwise not of merchantable quality as of the start of the cure period. The Court should consider an instruction to the finder of fact that the books supplied were of sufficient quality, durability and appearance to be merchantable as of the start of the cure period and were, in fact, sold by Thomas Nelson, Inc. to its customers.

2. Tax not more than seventy-five percent (75%) of the costs expended by EPAC for the bills of the Special Master to Thomas Nelson, Inc.

3. Permit key witnesses to be re-deposed on issues reasonably related to information belatedly produced by Thomas Nelson, Inc., at Thomas Nelson, Inc.'s cost.

In making these recommendations, I have considered the broad access to information afforded EPAC in the last year as well as the substantial sums Thomas Nelson, Inc. was required to bear for e-discovery service providers and outside counsel prompted by the need to recover and process the data supplied to EPAC and to the Special Master. Though a self-inflicted wound, it is a wound nonetheless. I have also factored in issues of proportionality and cooperation attendant to EPAC's conduct in discovery.

Thank you.

Respectfully submitted,

**Executed in Austin, Travis County,
Texas on January 27, 2016**.

Craig Ball

---

[37] EPAC embraced a style of advocacy whereby the advocate repeats assertions with escalating frequency, length and hyperbole, hoping they might be mistaken as true notwithstanding a lack of supporting evidence. Certainly EPAC had ample cause to complain of Thomas Nelson, Inc.'s bungled discovery efforts, but the petulant, scorched earth nature of EPAC's responses coupled with loose assertions of fact undermined the process and cannot be commended to the Court as effective or inexpensive. Accordingly, I suggest no more than a nominal award of attorney's fees.