UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILE DIVISION

| | |
|---|---|
| EPAC TECHNOLOGIES, INC., | |
| Plaintiff/Counter-Defendant, | Case No. 3:12-cv-00463 |
| v. | Chief Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Newbern |
| HARPERCOLLINS CHRISTIAN<br>PUBLISHING, INC., f/k/a THOMAS<br>NELSON, INC., | Jury Demand |
| Defendant/Counter-Plaintiff. | |

## <u>MEMORANDUM AND ORDER</u>

What began three years ago as an effort to expedite discovery of electronically stored information (ESI) in this breach-of-contract action by appointing a special master has turned into a quagmire of adversarialism, spanning hundreds of pages of briefing that have passed through the dockets of six district judges and two magistrate judges. Now pending are the objections of Plaintiff EPAC Technologies, Inc. (EPAC) and Defendant Thomas Nelson, Inc. (Thomas Nelson) to the report and recommendation of Special Master Craig Ball, to which responses in opposition, replies, and sur-replies have been filed. (Doc. Nos. 226, 235, 241, 263, 265, 281, 285, 297.) The parties have requested the Court's *in camera* review of the materials upon which the Special Master's report relies. (Doc. Nos. 320, 321, 350, 351, 352.) The Magistrate Judge has made that review and, for the reasons that follow, ADOPTS IN PART AND REJECTS IN PART the Special Master's report. To the extent that the parties' objections are inconsistent with the findings and conclusions herein, the objections are OVERRULED.

The essential findings and conclusions made herein are summarized as follows:

1. Federal Rule of Civil Procedure 37(e) as amended on December 1, 2015 applies in this action.

2. Amended Rule 37(e) applies to sanctions for the loss of ESI in this case, but not the loss of physical evidence.

3. The Special Master was authorized to recommend sanctions for the loss of physical evidence and ESI.

4. Thomas Nelson's duty to preserve evidence arose no later than April 18, 2011, and continues to date without interruption.

5. Thomas Nelson's duty to preserve includes the ESI and physical evidence considered by the Special Master.

6. Thomas Nelson had control over EPAC2-printed books and book samples (collectively, "the books") when its duty to preserve arose.

7. Thomas Nelson negligently disposed of the books after its preservation duty was in place.

8. The books are relevant to claims and defenses in this lawsuit and EPAC is prejudiced by their loss.

9. To remedy the prejudice to EPAC from the loss of the books, the Court orders the curative measure of a jury instruction that Thomas Nelson had a duty to preserve evidence relevant to this litigation, including the books; that it breached that duty by failing to preserve the books; and that the jury may infer that, if available, the books would support EPAC's claims and be adverse to Thomas Nelson.

10. Thomas Nelson did not make reasonable efforts to preserve ESI, including warehouse data[1] and e-mails.

11. Warehouse data showing the transactional history of EPAC-printed books were lost due to Thomas Nelson's negligence and cannot be fully replaced through additional discovery.

12. EPAC is prejudiced by the loss of the warehouse data.

13. To remedy the prejudice to EPAC from the loss of the warehouse data, and subject to revision in light of further proof, the Court orders the curative measure of a jury instruction that Thomas Nelson had a duty to preserve its warehouse data as of April 18, 2011, and that such data, now lost, would have shown whether EPAC-printed books were sold or returned, the quantity and timeliness of EPAC's order fulfillment, and

---

[1] The Court uses the term "warehouse data" to refer to Thomas Nelson's ERP/WMS data regarding its receipt, processing, and disposition of books.

from what EPAC facility the books were shipped. Thomas Nelson is also precluded from offering evidence regarding any customer complaints about EPAC books.

14. Thomas Nelson negligently allowed relevant e-mails that it had a duty to preserve to be purged from its Postini e-mail archive.

15. E-mails purged because of Thomas Nelson's negligence have effectively been replaced or restored through additional discovery.

16. EPAC suffered prejudice because of Thomas Nelson's delay in producing relevant e-mails.

17. To remedy the prejudice caused by that delay, EPAC may re-depose witnesses on issues reasonably related to e-mails belatedly produced by Thomas Nelson at Thomas Nelson's expense, excluding attorney's fees.

18. Thomas Nelson shall bear 75% of the Special Master's fees and costs. EPAC shall bear the remaining 25%.

19. Thomas Nelson shall pay 50% of EPAC's reasonable costs and attorneys' fees incurred during the Special Master proceedings.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

This lawsuit arises out of a contract dispute between EPAC Technologies, Inc. (EPAC), a printing company, and Thomas Nelson, Inc. (Thomas Nelson), a publisher of religious-themed books and other literature. (Doc. No. 168, PageID# 2433, ¶ 1.) EPAC claims that Thomas Nelson entered into a multi-year contract with it in bad faith, then fabricated reasons to terminate that contract after negotiating a better deal with another printer, Lightning Source Inc. (LSI). (*Id.* at PageID# 2433–34, ¶¶ 1–3.) According to EPAC, Thomas Nelson's agreement with LSI was reached after Thomas Nelson gave LSI EPAC's confidential pricing information to incentivize a better deal. (*Id.* at PageID# 2434 ¶ 4.) EPAC claims that the resulting termination of the parties' contract cost it over $25 million in damages. (*Id.* at PageID# 2435, ¶ 5.)

The dispute extends back to 2008, when Thomas Nelson and EPAC began discussions regarding EPAC's printing services. (*Id.* at PageID# 2436–2437, ¶¶ 11–12.) Thomas Nelson hoped to expand its operations and reduce its need for warehouse space by printing smaller batches of its

titles as they were ordered; EPAC had recently developed print-on-demand technology that seemed to fit the bill. EPAC and Thomas Nelson entered into non-disclosure agreements and continued discussions through 2010. (*Id.* at PageID# 2436–2438, ¶¶ 12–17.) In these confidential negotiations, EPAC disclosed the operations of its print facilities, EPAC1 and EPAC2, and its intent to expand its EPAC2 print-on-demand operations to a new site in Fairfield, Ohio, closer to Thomas Nelson's Tennessee headquarters, to meet Thomas Nelson's high-volume demands. (*Id.* at PageID# 2438–2439, ¶ 18.)

The parties entered into a Master Services Agreement (MSA) effective August 1, 2010. (*Id.* at PageID# 2439, ¶ 20.) The MSA was for an initial five-year term that would automatically renew unless either party opted out. (*Id.* at PageID# 2439, ¶ 21.) EPAC alleges that, at the same time, Thomas Nelson was also negotiating with LSI and that Thomas Nelson continued negotiating with LSI after EPAC began increasing its operations to fulfill the terms of the MSA. (*Id.* at PageID# 2443–2445, ¶¶ 38–45.) EPAC also alleges that Thomas Nelson improperly supplied information about the MSA and EPAC's pricing to LSI. (*Id.* at PageID# 2442–2443, ¶¶ 29–36.)

EPAC alleges that it successfully met all of its obligations under the MSA. (*Id.* at PageID# 2445–2446, ¶¶ 46–48.) However, on February 3, 2011, Thomas Nelson issued a 60-day cure notice identifying numerous ways in which EPAC was allegedly failing to meet the MSA's requirements. (*Id.* at PageID# 2446–2447, ¶¶ 49–50.) EPAC terms the concerns raised in the cure notice "bogus and pretextual" and claims that Thomas Nelson's staff thought highly of EPAC's product and its performance. (*Id.* at PageID# 2447–2448, ¶¶ 50–52.) Nonetheless, EPAC assumed additional costs to address the identified shortcomings and states that, as of March 21, 2011, Thomas Nelson's staff and EPAC agreed that all had been cured. (*Id.* at PageID# 2448–2449, ¶¶ 54–56.) EPAC delivered a formal notice of remedy and cure to Thomas Nelson on March 31, 2011. (*Id.* at

PageID# 2449, ¶ 58.) On April 6, 2011, Thomas Nelson responded that deficiencies remained and terminated the MSA. (*Id.* at PageID# 2449–2450, ¶¶ 59–60.)

EPAC filed the complaint in this action on May 8, 2012 (Doc. No. 1), and amended the complaint on August 3, 2015 (Doc. No. 168). In its amended complaint, EPAC alleged breach of contract, breach of the implied covenant of good faith and fair dealing, unfair competition under the California Business and Professions Code, promissory fraud, fraud based on concealment, unfair and deceptive acts or practices under the Tennessee Consumer Protection Act, and negligence per se. (*Id.* at PageID# 2453–2463, ¶¶ 74–134.) On Thomas Nelson's motion, the Court dismissed EPAC's claims for unfair competition under California law, violation of the Tennessee Consumer Protection Act, and breach of the implied covenant of good faith and fair dealing. (Doc. No. 196.)

Thomas Nelson counterclaims that EPAC breached the MSA and committed fraudulent and negligent misrepresentation in the MSA negotiations. (Doc. No. 199, PageID# 3014–15, ¶¶ 24–40.) Thomas Nelson alleges that EPAC overstated its printing capabilities, did not have the necessary resources to meet Thomas Nelson's order demands, and was not capable of producing books that met Thomas Nelson's minimum quality standards. (*Id.* at PageID# 3010–11, ¶¶ 8, 12.) Thomas Nelson claims that the Fairfield, Ohio plant the parties had agreed would fill Thomas Nelson's orders was not operational by the time the MSA went into effect, that the Fairfield plant never met Thomas Nelson's volume needs and quality standards, and that Thomas Nelson faced higher shipping costs because EPAC shipped products from its New Jersey facility to Thomas Nelson's Tennessee headquarters instead. (*Id.* at PageID# 3012, ¶¶ 16–17.) According to Thomas Nelson, EPAC was unable to fill Thomas Nelson's orders in the last five months of 2010 and early 2011, forcing Thomas Nelson to obtain product from other printers. (*Id.* at PageID# 3013 ¶ 20.)

Thomas Nelson states that it worked with EPAC throughout the cure period, but that EPAC was never able to meet its essential obligations under the MSA. (*Id.* at PageID# 2538, ¶¶ 22–23.)

The parties' discovery issues began early in the litigation. EPAC filed its first motion to compel on December 6, 2012 (Doc. No. 16), seeking, in part, all of Thomas Nelson's internal communications about EPAC, communications with EPAC, and communications with third parties about EPAC and its performance (Doc. No. 17, PageID# 110–13). Magistrate Judge Bryant found that Thomas Nelson had already agreed to provide much of what EPAC sought to discover, but ordered Thomas Nelson to "produce all documents, records or other information relating to communications about EPAC's performance under the agreement, including but not limited to complaints about or deficiencies in EPAC's performance and any other information supporting or relating to Nelson's decision to terminate the Agreement," all nonprivileged communications between it and HarperCollins regarding this lawsuit or EPAC's claims, and any complaints it received from customers regarding EPAC's books. (Doc. No. 36, PageID# 289–91.) Magistrate Judge Bryant termed EPAC's motion to compel production from Thomas Nelson regarding its evidence preservation and maintenance of relevant documents and electronic files "premature," finding that there was nothing to suggest "that responsive information that once existed is no longer available." (*Id.* at PageID# 293.) If that were to change, EPAC could pursue targeted discovery on the issue. (*Id.*)

On December 18, 2013, EPAC notified Thomas Nelson by letter that it found the supplemental production made in response to Magistrate Judge Bryant's order deficient. (Doc. No. 68-2.) EPAC stated that Thomas Nelson had not produced responsive internal e-mails or communications regarding its contract with EPAC and argued that "[i]t is not possible that Thomas Nelson does not have responsive internal e-mails and other communications concerning the

Agreement." (*Id.* at PageID# 546.) EPAC stated that Thomas Nelson also had not produced relevant external communications or any complaints regarding EPAC-printed books. (*Id.* at PageID# 547–48.) EPAC also noted that it had produced 18,360 pages of e-mail communications between it and Thomas Nelson, while Thomas Nelson "produced one-tenth of this volume of to/from e-mail." (*Id.* at PageID# 549.) EPAC argued that this discrepancy indicated responsive e-mail had been lost and that internal communications, "as to which Thomas Nelson has produced very few documents," were also no longer available. (*Id.*) EPAC also noted that, "[e]ven as to the very few e-mails produced, Thomas Nelson produced versions of such e-mails that were not original to the e-mail sender/recipient, but rather were forwarded, suggesting that Thomas Nelson has not preserved and maintained (much less produced) information relevant to this litigation and responsive to EPAC's discovery requests." (*Id.*) Thomas Nelson's response to this letter apparently did not satisfy EPAC's concerns.

On September 18, 2014, EPAC moved for expedited appointment of a special master. (Doc. No. 68.) As the basis for its motion, EPAC cited deposition testimony from Thomas Nelson employees regarding "the existence of e-mails and other communications, includ[ing] archived e-mails, that were not searched for or were not produced;" a "recent admission by Thomas Nelson that it destroyed or discarded [] more than 48,000 allegedly defective books and samples it ordered from EPAC;" and production from LSI of relevant e-mails with Thomas Nelson that Thomas Nelson did not produce. (*Id.* at PageID# 534–535, ¶ 1.) EPAC sought a special master "to copy electronically stored information of Thomas Nelson, including backup tapes and/or archive records, to identify and produce documents responsive to EPAC's discovery requests, and to report on any spoliation of evidence by Thomas Nelson that may have occurred in this action beyond Thomas Nelson's admitted destruction or loss of books and samples." (*Id.* at PageID# 534, ¶ 2.)

EPAC identified Texas-based attorney Craig Ball as an experienced special master and offered to pay the cost of his appointment so that Thomas Nelson could "claim no prejudice from the relief EPAC seeks." (*Id.* at PageID# 536, ¶ 4.) EPAC reserved the right to shift that cost to Thomas Nelson "if it is determined that there are appreciable omissions in Thomas Nelson's document production or spoliation of evidence beyond the admitted destruction of books and samples that has already occurred." (*Id.* at PageID# 536, ¶ 3.)

Thomas Nelson opposed a special master's appointment, arguing that it should have an opportunity to continue to supplement its production in light of the revealed deficiencies and that any discovery issues could be more expediently handled by the Court. (Doc. No. 88, PageID# 973, 975.) In response to EPAC's notice of the gaps in its production, Thomas Nelson hired an e-discovery vendor to review all e-mail repositories and agreed to produce all relevant information discovered. (*Id.* at PageID# 973.) Thomas Nelson also agreed that EPAC could redepose any witness for whom unproduced relevant e-mail was found. (*Id.*) If the Court appointed a special master, Thomas Nelson argued that it should be a local attorney instead of Ball. (*Id.* at PageID# 977.)

Magistrate Judge Bryant held a hearing and ultimately determined that the "technical nature of the electronic discovery issues and the time constraints involved" indicated that appointment of a special master was appropriate. (Doc. No. 136, PageID# 2003.) The Court appointed Craig Ball as Special Master on November 18, 2014. (*Id.*)

The Court ordered that:

- The Special Master's "primary duty" was "to investigate and advise the Court concerning the nature, extent and sufficiency of the identification, preservation, collection, search, processing and production by [Thomas Nelson] of potentially responsive and relevant information, particularly electronically stored information ("ESI") as it relates to discovery in this cause;"

- The Special Master's investigation could "entail, among other things, inquiry concerning, and examination of, information systems, review of databases and e-mail stores; forensic acquisition and examination of electronic storage media; data recovery; consultation with Thomas Nelson's current and former employees, counsel and contractors; and travel to Thomas Nelson's data centers and places of business;"

- The Special Master's duties included making a recommendation as to any appropriate sanctions;

- The Special Master was "granted the full rights, powers and duties afforded by Fed. R. Civ. P. 53(c) and may adopt such procedures as are not inconsistent with that rule or with this or other Orders of the Court"; and,

- The Court would decide de novo all objections to findings of fact or conclusions of law made by the Special Master.

(*Id.* at PageID# 2003–05.)

In response to the Court's inquiry, the Special Master filed a status report on his progress on February 11, 2015. (Doc. No. 144.) The Special Master estimated that the earliest date by which he could complete his report was April 15, 2015, although he offered this date with "trepidation," noting that he would not receive necessary supplemental production from Thomas Nelson until April 7, 2015. (*Id.* at PageID# 2022.) On June 17, 2015, with no report yet produced, EPAC filed a motion to remove Ball and appoint a substitute special master, stating that it did not believe Ball could complete his duties in a reasonable time frame to maintain a 2016 trial date. (Doc. No. 155, PageID# 2068.) Thomas Nelson opposed the motion, stating that it was working productively with Ball. (Doc. No. 158, PageID# 2162.)

On July 20, 2015, EPAC moved to stay the Special Master proceedings on grounds that they had "derailed." (Doc. No. 163, PageID# 2331.) EPAC argued that "the proceedings are infected with a bias that has resulted from the current request for a substitute Special Master" and that communications had become "acrimonious and contentious," with impartiality "notably

absent." (*Id.*) Thomas Nelson opposed the motion, stating that "EPAC's request to replace the Special Master is premised on its dissatisfaction with the Special Master's determinations thus far, not his purported unavailability." (Doc. No. 169, PageID# 2467.) Magistrate Judge Bryant ordered the Special Master to file an interim status report on his progress to assist in ruling on EPAC's motions. (Doc. No. 170.)

The Special Master filed an interim report on August 20, 2015, stating that none of the assigned tasks had been completed. (Doc. No. 178, PageID# 2603.) The Special Master summarized his work up to that point, which included a site inspection of Thomas Nelson's headquarters during which he interviewed witnesses and counsel, collected electronic evidence for processing, and "forensically acquired, processed and examined the contents of electronic storage media." (*Id.*) The Special Master described his continuing receipt of data from Thomas Nelson and his "shadowing" of its efforts to restore data lost from its e-mail archive. (*Id.* at PageID# 2606–07.) The interim report also described an escalating conflict between the Special Master and EPAC regarding the Special Master's role and his work schedule, leading to EPAC's motion for his replacement. (*Id.* at PageID# 2608–11.) The Special Master estimated completing his report by November 2015. (*Id.* at PageID# 2613.) EPAC objected to the interim report, contesting the Special Master's description of his work and arguing that the report showed his bias against EPAC. (Doc. No. 182, PageID# 2640.)

The Special Master filed his Report and Recommendation on January 29, 2016 (Doc. No. 226) and Magistrate Judge Bryant subsequently denied EPAC's June 2015 motion to replace Ball and its July 2015 motion to stay the Special Master proceedings. (Doc. No. 227.)

The parties filed objections to the Special Master's Report, which are opposed and to which replies in support have been filed. (Doc. Nos. 235, 241, 263, 265, 281, 285, 297.) Magistrate Judge

Bryant held oral argument on the parties' objections on July 13, 2016. (Doc No. 304.) After oral argument, the parties submitted additional briefing. (Doc. Nos. 307, 309, 313, 314, 318.) On EPAC's motion (Doc. No. 266), the Court directed the Special Master to file the materials on which his report relied for the Court's de novo review (Doc. Nos. 308, 320). The Court has reviewed these materials *in camera*.[2] (Doc. Nos. 321, 350, 351, 352.)

## II. THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

Applying Federal Rule of Civil Procedure 37(e) as amended on December 1, 2015, the Special Master found that Thomas Nelson had negligently or with "gross inattention" failed to preserve physical evidence and ESI relevant to this litigation. (Doc. No. 226, PageID# 3807.) The Special Master addressed three types of evidence that should have been, but were not, preserved: (1) the books, (2) data from Thomas Nelson's Red Prairie Warehouse Management System, and (3) e-mail retained in Thomas Nelson's Google Postini e-mail archive. (*Id.* at PageID# 3812–19.) The Special Master made the following findings and recommendations.

### A. The Special Master's Findings of Fact

#### 1. Thomas Nelson's Duty to Preserve Evidence and Litigation Hold Implementation

• Thomas Nelson's duty to preserve evidence began on April 18, 2011. (*Id.* at PageID# 3809.) The Special Master found that there were "multiple milestone events" that could have triggered Thomas Nelson's duty to preserve evidence. (*Id.*) However, he found that EPAC's April 12, 2011 preservation demand letter after termination of the MSA was an unequivocal statement that "the matter might be heading to court." (*Id.* at PageID# 3810.) The Special Master

---

[2] Magistrate Judge Bryant retired from the bench on August 31, 2016, at which point this case was transferred to this Magistrate Judge.

afforded Thomas Nelson an additional six days from that date to implement the litigation hold. (*Id.*) The Special Master found Thomas Nelson's General Counsel Frank Wentworth's preservation instruction to George Gower, Thomas Nelson's Vice President of Inventory Management Production, on April 18, 2011, was "a compelling basis by which to conclude that Mr. Wentworth anticipated litigation and thus the need for preservation." (*Id.*)

- Wentworth's instruction to Gower was copied to Thomas Nelson's top management, including Executive Vice President and Chief Financial Officer Stuart Bitting, Vice President Tom Harris, and President and Chief Executive Officer Mark Schoenwald. (*Id.*) The Special Master found that, "although the legal hold directive of April 18, 2011, was solely targeted to George Gower, General Counsel Wentworth mistakenly believed that it also served as a legal hold directive to Messrs. Bitting, Harris and Schoenwald." (*Id.* n.6.)

- Wentworth was "obliged to inquire of the [information technology (IT)] staff what sources of data might bear on readily foreseeable claims and defenses, and what data and purge settings might apply. It behooved the legal staff to ascertain what potentially relevant data was slated for destruction and take reasonable steps to preserve it, most particularly if it might be the only readily accessible copy of such relevant information held by Thomas Nelson." (*Id.* at PageID# 3811.) Wentworth "would be expected to know that putting a legal hold in place requires [] notifying the IT department." (*Id.*) There was no timely notice given to the IT department by anyone at Thomas Nelson. (*Id.*) "Failing to notify IT was failing to act to preserve data[.]" (*Id.*) By not working with the IT department, Wentworth "didn't overlook the duty to preserve; instead, he failed to implement a preservation plan with a minimally sufficient scope." (*Id.*)

- Wentworth circulated a "broad and highly detailed legal hold directive" to Gower and other Thomas Nelson employees on January 20, 2012, after EPAC provided Thomas Nelson

with a draft of the complaint that would initiate this action. (*Id.* at PageID# 3815.) That notice directed employees "to disable automatic deletion of e-mail, to cease rotation of backup tapes and to create mirror images of personal computers and laptops." (*Id.* n.13.) The Special Master characterized this as "a boilerplate form deployed without guidance, follow up or expectation that those to whom it was directed would or could carry out the tasks required." (*Id.*) He found that it was "ignored by all recipients." (*Id.*)

### 2. Retention of EPAC2 Book Samples

- The Special Master found that, "[o]f tens of thousands of sample books supplied by EPAC to [Thomas Nelson] under the disputed arrangement, not a single instance of a misprinted or damaged book appears to have been retained." (*Id.* at PageID# 3811–12.) All of the books "were lost, sold or discarded by [Thomas Nelson] during the pendency of a litigation preservation duty." (*Id.* at PageID# 3812.)

- However, "[t]here are records of e-mail exchanges and witness observations" by which the quality of the books might be established. (*Id.*)

- The Special Master "saw no evidence that the disposition of the books was coupled with an intent to deprive EPAC of this evidence." (*Id.*) Instead, the Special Master found that "[t]he

greater weight of evidence obtained . . . points to the conclusion that tens of thousands of EPAC2 book samples were sold into the marketplace." (*Id.*)

- From the inference that all of the books were sold, the Special Master concludes "that all material defect issues affecting merchantability of the EPAC2 books had been resolved by the start of the cure period." (*Id.* at PageID# 3813.)

### 3. The Red Prairie Warehouse Management System

- In 2010 and 2011, Thomas Nelson "employed a supply chain management system called Red Prairie to track the receipt and distribution of books in its warehouse." (*Id.*) Red Prairie was managed by Thomas Nelson employee Marvin Maphet. (*Id.*)

- Maphet confirmed that the Red Prairie system would have tracked information about each order Thomas Nelson placed, including its contents, the printer, and the disposition of any full carton of books delivered to Thomas Nelson's warehouse. (*Id.*)

- The Special Master found that Red Prairie archive data from 2010 and 2011 no longer exists. (*Id.*) Data regarding incoming and outgoing shipments stayed active in the Red Prairie system for approximately two weeks. (*Id.* at PageID# 3814.) It was then copied to an archive. (*Id.*) The archive deleted transactional information after 365 days. (*Id.*) This purge process "had been running forever and never [was] turned off." (*Id.*) Relevant Red Prairie data regarding

orders placed before and during the cure period was "readily accessible until well past the April 2011 attachment of a preservation duty in this cause." (*Id.*)

- Maphet stated that he was not advised of a litigation hold on the Red Prairie data until "the first quarter of 2015." (*Id.*) He did not preserve any data before that date because no one asked him to do so. (*Id.*)

- In connection with this litigation, Maphet reviewed data from other sources to determine whether EPAC2 books were sold and whether they were returned. (*Id.*) "He found no returns and no large adjustments."be (*Id.*) In short, "he found nothing inconsistent with the conclusion that [Thomas Nelson] sold the 30,000–40,000 [print-on-demand] books it received from EPAC." (*Id.*)

- Thomas Nelson has all of its monthly sales data on tapes that it terms "sacred." (*Id.*) These archived data are retained by Thomas Nelson and were supplied to Harper Collins when it acquired Thomas Nelson. (*Id.*) The Special Master found that these data "ha[ve] migrated to formats and locations that render [them] relatively inaccessible to [Thomas Nelson]." (*Id.* at PageID# 3815.) They have "not been examined or, at least, there appears to have been no disclosure or production of any of this data to the extent it tends to confirm or refute [Thomas Nelson's] claims to have discarded most of the EPAC2 books as unsalable." (*Id.*)

### 4. The Postini E-mail Archive

- Thomas Nelson entered into an agreement with Cloud Sherpas, Inc., to use the Google Postini e-mail archival service for spam filtering and litigation holds. (*Id.*) Thomas Nelson purchased a number of Postini "seats" for ten-year retention of e-mails. (*Id.*) However, "the system was initially configured for a one year retention and purge. As the purging ceased in June 2012,

it's assumed the retention setting was changed from one year to ten years during June or July of 2012." (*Id.* at PageID# 3817.)

- When Rick Proctor, the head of Thomas Nelson's IT department, received Wentworth's January 20, 2012 litigation hold directive, he forwarded it to Scott Gibbs, Thomas Nelson's network administrator "charged with primary responsibility for preservation of information from e-mail systems, databases and other electronic sources," including the Postini archive. (*Id.* at PageID# 3815–16.) Gibbs did not know about any anticipated EPAC litigation or the need for a litigation hold until he received the January 20, 2012 notice. (*Id.* at PageID# 3816.)

- Gibbs responded to Proctor that he had checked the Postini system and all of the relevant e-mail accounts were already on hold. (*Id.*)

- Gibbs's check "did not extend to confirming that Postini was preserving, not purging, their e-mail" on a one-year hold schedule. (*Id.*) "Had Mr. Gibbs checked the status of the Postini system with respect to its legal hold functionality, he would have discovered that messages subject to legal hold were being purged by the tens and hundreds of thousands of messages each month. It wasn't until his October 2013 entry into the Postini archives to finally collect e-mail for this litigation that Gibbs discovered the massive purge." (*Id.*)

- "At least 750,000 messages and attachments from the interval of greatest relevance to this litigation were purged, all after a duty to preserve for this matter attached." (*Id.* at PageID#

3817.) All messages older than June or July 2011 "have purged and cannot be restored from Postini." (*Id.*)

- Gibbs discovered the purge of relevant e-mails "thirty months after a preservation duty attached, sixteen months after suit was filed, and almost a year after discovery was served." (*Id.*)

- The fault for this "resides with [Thomas Nelson], most likely in the actions of its IT personnel in setting up and/or altering retention settings and undoubtedly in its failure to competently meet and monitor its legal hold obligations with respect to the Postini archives. But, as incompetent as this was, [the Special Master] found no evidence that prompt[ed] [him] to conclude that it grew out of an intentional effort to deprive EPAC of the contents of the Postini archive for use in this litigation . . . [Thomas Nelson's] IT personnel *believed* the e-mail was being preserved until they belatedly discovered that it was not." (*Id.* at PageID# 3818.)

- Instead of intent to deprive EPAC of ESI for use in this litigation, the Special Master "discerned arrogance by management, lack of initiative by IT and a pitiable lack of legal leadership, the last at the very heart of the failure." (*Id.* at PageID# 3819.)

- However, "the caliber of the e-mail e-discovery effort by [Thomas Nelson] flowing from the Court's intervention is almost certainly equal or superior to the labors and resources that would have been expended by a party acting diligently and in good faith without such intervention . . . [Thomas Nelson's] belated efforts to restore and search e-mail have resulted in as

representative and complete an exploration of potentially responsive messaging as would have been reasonably achieved by a diligent effort earlier in this lawsuit." (*Id.* at PageID# 3823.)

**B. The Special Master's Recommendations**

Based on these findings of fact, the Special Master recommends the following remedial measures and sanctions (*Id.* at PageID# 3827):

1. Exclude documentary evidence or testimony offered or elicited by [Thomas Nelson] going to the proposition that books supplied by EPAC pursuant to the supply channel known as EPAC2 were defective in quality, durability or appearance or were otherwise not of merchantable quality as of the start of the cure period. The Court should consider an instruction to the finder of fact that the books supplied were of sufficient quality, durability and appearance to be merchantable as of the start of the cure period and were, in fact, sold by [Thomas Nelson] to its customers.

2. Tax not more than seventy-five percent (75%) of the costs expended by EPAC for the bills of the Special Master to [Thomas Nelson].

3. Permit key witnesses to be re-deposed on issues reasonably related to information belatedly produced in discovery by [Thomas Nelson], at [Thomas Nelson's] cost [exclusive of attorneys' fees].

The Special Master also offered his opinion of the parties' efforts in working with him. He praised Thomas Nelson's counsel for its "candor and cooperation . . . operating in an atmosphere of unrelenting suspicion and disparagement." (*Id.* at PageID# 3826.) In contrast, the Special Master stated that EPAC's counsel made his work "more difficult and expensive." (*Id.*) He concluded that, although EPAC "had ample cause to complain of [Thomas Nelson's] bungled discovery efforts . . . the petulant, scorched earth nature of EPAC's responses coupled with loose assertions of fact undermined the process and cannot be commended to the Court as effective or inexpensive." (*Id.* n.37.) Accordingly, the Special Master recommended "no more than a nominal award of attorney's fees" to EPAC. (*Id.*)

## III.    STANDARD OF REVIEW

The Court appointed the Special Master under authority that provides for such appointment "only to . . . address pretrial . . . matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). In the absence of an agreement of the parties otherwise, the Court decides de novo all objections to the Special Master's recommendations or findings of fact. Fed. R. Civ. P. 53(f)(3). The Court also decides de novo all objections to the Special Master's conclusions of law. Fed. R. Civ. P. 53(f)(4).

Appointment of a special master must not "displace" the court or the jury from performing their designated functions, and the Court must take particular care when matters referred may be dispositive of parties' claims or defenses that referral does not "depriv[e] the parties of a trial before the court *on the basic issues involved in the litigation.*" *In re United States*, 816 F.2d 1083, 1091 (6th Cir. 1987) (emphasis original) (quoting *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957)).[3] In this case, the Special Master was appointed "to investigate and advise the Court" regarding the sufficiency of Thomas Nelson's identification, preservation, and production of relevant discovery, particularly ESI. (Doc. No. 136, PageID# 2003.) In executing his duties, the Special Master conducted a site inspection at Thomas Nelson's headquarters, "reviewed information systems, interviewed witnesses, closely questioned counsel, collected electronic evidence for independent processing and, subsequently, forensically acquired, processed and

---

[3]    These cases addressed an earlier version of Rule 53, under which the review of trial masters' findings of fact were for clear error. Rule 53 has since been amended to reflect the increased use of special master referrals in pretrial proceedings and to specify de novo review of a master's findings of fact and conclusions of law. Fed. R. Civ. P. 53 advisory committee's note to 2003 amendment. However, even with these significant revisions, "[t]he core of the original Rule 53 remains, including its prescription that appointment of a master must be the exception and not the rule" and that a master should not usurp the core functions of the court or jury. *Id.*

examined the contents of electronic storage media." (Doc. No. 178, PageID# 2603.) The Special Master "shadow[ed]" Thomas Nelson's e-mail restoration and recovery efforts and conducted a "gap analysis" to determine the scope of the lost e-mail archive. (*Id.* at PageID# 2605–06.) The Special Master also held multiple conferences with counsel regarding his methods and the ongoing production efforts. (*Id.* at PageID# 2605–08.) In reviewing the Special Master's report, the Court takes into account the sources of information on which the Special Master relied and whether his conclusions fall within the scope and purpose of his appointment primarily to advise the Court on the aspects of ESI discovery that the Court could not effectively or efficiently determine through the normal processes of litigation.

## IV. ANALYSIS

The federal courts have at their disposal a wide array of tools to manage the discovery process, some provided by the Federal Rules of Civil Procedure, some stemming from their inherent power "to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962). Courts' power to impose sanctions for discovery abuses reflects "the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009). Spoliation, "the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction," clearly impedes that process. *See Beck v. Haik*, 377 F.3d 624, 641 (6th Cir. 2004) *overruled on other grounds by Adkins*, 554 F.3d at 652; *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003) When relevant evidence is intentionally destroyed, the jury is denied the opportunity to consider it; left unaddressed, that may skew the jury's understanding of the facts it is tasked to decide. A proper spoliation sanction thus will serve "both fairness and punitive

functions" by "leveling the evidentiary playing field" and deterring other litigants from engaging in similar conduct. *Adkins*, 554 F.3d at 652 (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)).

"Destruction of potentially relevant evidence obviously occurs along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality. The resulting penalties vary correspondingly." *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988), *overruled on other grounds by Adkins*, 554 F.3d at 652. How to address the loss of relevant evidence is, therefore, a case-specific and fact-intensive inquiry informed by the court's goals of maintaining the integrity of its proceedings and ensuring that every trial be resolved on the merits of the case. *See Adkins*, 554 F.3d at 652–53. In tailoring a remedy, a court must also take care that it does not further encumber the jury's function by drawing its attention to the parties' conduct during discovery and away from the merits of the case.

Here, the Court must determine the proper remedy to address the loss of three types of evidence: books printed by EPAC for Thomas Nelson; electronic warehouse data related to EPAC's fulfillment of Thomas Nelson's orders; and e-mail relevant to the issues raised in this case. Reviewing the parties' objections to the Special Master's report de novo, the Court finds that remedial measures and sanctions are appropriate. However, it rejects the sanctions recommended by the Special Master.

### A.    FEDERAL RULE OF CIVIL PROCEDURE 37(e)

Remedying the loss of evidence in this case is controlled by federal law. *Adkins*, 554 F.3d at 651. The failure to preserve ESI is addressed by Federal Rule of Civil Procedure 37(e). Fed. R. Civ. P. 37(e). Measures to address the loss of physical evidence e are available pursuant to a court's "broad discretion" to manage discovery. *See Adkins*, 554 F.3d at 651.

Depending on the degree of fault involved, measures to address the loss of physical evidence may range from traditional discovery remedies, to "instructing a jury that it may infer a fact based on lost or destroyed evidence," to dismissal of the case. *Id.* at 653. "An adverse inference instruction 'is appropriate if the [sanctioned party] knew the evidence was relevant to some issue at trial and . . . [its culpable] conduct resulted in its loss or destruction.'" *Ross v. Am. Red Cross*, 567 F. App'x 296, 302 (6th Cir. 2014) (quoting *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010)). To impose an adverse inference instruction, the moving party must establish:

> (1) [T]hat the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence was] destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Id.*

Finding the requisite culpable state of mind "depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction." *Beaven*, 622 F.3d at 553. It may be established by "showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it," and "even negligent conduct may suffice to warrant spoliation sanctions under appropriate circumstances." *Stocker v. United States*, 705 F.3d 225, 235 (6th Cir. 2013) (quoting *Beaven*, 622 F.3d at 554).

A different standard for imposing sanctions, set by Rule 37(e), applies when the lost information is in electronic form. *See, e.g.*, *Best Payphones, Inc. v. City of New York*, No. 1-CV-3924 (JG) (VMS), 2016 WL 792396, at *3 (E.D.N.Y. Feb. 26, 2016). This separate standard addresses the ways in which electronic information differs from physical evidence. Electronic information may be automatically purged without human cause through "the routine alteration and deletion of information that attends ordinary use." Fed. R. Civ. P. 37(e) advisory committee's note

to 2006 amendment. Electronic information may also exist identically in multiple locations and formats. A single e-mail, for example, may be retained locally by its sender and its recipients, automatically copied to a temporary digital archive, and permanently stored on system back-up tapes.

As originally adopted in 2006,[4] Rule 37(e) provided that, "[a]bsent exceptional circumstances, a court may not impose sanctions . . . on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." Fed. R. Civ. P. 37(e) (2006) (effective until Nov. 30, 2015). Rule 37(e) was amended in 2015 because courts applying it had "established significantly different standards for imposing sanctions or curative measures on parties who fail to preserve electronically stored information." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. In the interest of uniformity, amended Rule 37(e) "authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures." *Id.*

The amended rule provides:

**(e) Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it and it cannot be restored or replaced through additional discovery, the court:

**(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

**(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

---

[4]    What is now Federal Rule of Civil Procedure 37(e) was originally adopted as Rule 37(f). For the sake of clarity, the Court will refer uniformly to Rule 37(e).

**(A)** presume that the lost information was unfavorable to the party;

**(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or

**(C)** dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e) (effective December 1, 2015).

Like its predecessor, the amended rule does not create a duty to preserve ESI. It recognizes the common-law duty to preserve relevant information when litigation is reasonably foreseeable. *Id.* advisory committee note to 2015 amendment. That duty is reflected by the rule's first inquiry: whether ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it." *See* Fed. R. Civ. P. 37(e).

Recognizing that the loss of ESI is often automatic and inadvertent, Rule 37(e) requires finding a specific intent "to deprive another party of the information's use in the litigation" before its most severe sanctions of an adverse factual presumption, permissive or mandatory adverse inference jury instruction, dismissal, or default judgment can be imposed. *See* Fed. R. Civ. P. 37(e)(2). It requires no showing of prejudice where intent is found, but explicitly "rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Under the rule's amended terms, "[a] showing of negligence or even gross negligence will not do the trick" for a party seeking an adverse inference instruction. *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016).

Rule 37(e) also recognizes that "electronically stored information often exists in multiple locations, [and] loss from one source may often be harmless when substitute information can be

found elsewhere." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. For that reason, after determining that a party has not taken reasonable steps to preserve ESI, a court must ascertain "whether the lost information can be restored or replaced through additional discovery." *Id.* If ESI can be replaced or restored, no remedial measures are warranted. *Id.*

If lost information cannot be replaced, and if it was not intentionally destroyed to prevent its use in litigation, Rule 37(e) directs the court to assess whether the moving party has suffered prejudice from that loss. If prejudice is shown, the court may impose measures "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Those measures may be "serious," but should not have the effect of the sanctions prescribed by Rule 37(e)(2) upon a showing of intent. *Id.* advisory committee's note to 2015 amendment.

Amended Rule 37(e) took effect on December 1, 2015, and, pursuant to Chief Justice Roberts's order, "shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." Chief Justice John G. Roberts, *Order re: Amendments to the Federal Rules of Civil Procedure* (April 29, 2015), https://www.supremecourt.gov/orders/courtorders/frcv15(update)_1823.pdf. This language mirrors the Rules Enabling Act's provision that a newly adopted rule shall not apply when, "in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies." *See* 28 U.S.C. § 2074(a). Both standards "create a presumption that a new rule governs pending proceedings <u>unless</u> its application would be unjust or impracticable." *CAT3, LLC, v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 496 (S.D.N.Y. 2016); *Richardson Elecs., Ltd. v. Panache Broad. of Pa., Inc.*, 202 F.3d 957, 958 (7th Cir. 2000) (holding, in the context of applying amended

Rule 23(f), that "[g]enerally a new procedural rule applies to the uncompleted portions of suits pending when the rule became effective").

EPAC argues that applying amended Rule 37(e) is not just and practicable in this case because it is only Thomas Nelson's "stonewalling" of discovery and the Special Master's delay in issuing his report that allowed this dispute to extend past December 1, 2015. (Doc. No. 242, PageID# 4500–01.) In EPAC's view, applying amended Rule 37(e) would give Thomas Nelson a windfall in the form of the rule's heightened intent requirement. (*Id.*) Thomas Nelson disagrees, noting that the vast majority of courts to consider the issue have applied the amended rule in proceedings pending when it became effective. (Doc. No. 261, PageID# 5360–61.) Thomas Nelson also points to an e-mail from the Special Master dated July 14, 2015, in which he advised the parties that they "should treat the amended Rules as if they were in effect now [instead] of less than five months from now, since they will be in effect [by] the time this matter is tried." (Doc. No. 264-1, PageID# 5666.)

Relevant events in this litigation fall on either side Rule 37(e)'s December 2015 enactment date. The case was filed on May 8, 2012, and the Special Master was appointed on November 18, 2014, both well before the rule was amended. (Doc. No. 1; Doc. No. 136.) The Special Master issued his report on January 27, 2016 (Doc. No. 226, PageID# 3827), nearly two months after the amended rule's effective date. The parties' briefing and argument of their objections to it have all taken place thereafter, as will the trial at which any sanctions imposed would be applied. In cases with similar timelines, most courts have applied the amended rule. *See, e.g.*, *Konica Minolta Bus. Sols., U.S.A. Inc v. Lowery Corp.*, No. 15-CV-11254, 2016 WL 4537847, at *2–4 (E.D. Mich. Aug. 31, 2016); *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2016 WL 2957133, at *3 n.40 (N.D. Cal. May 23, 2016); *Orchestratehr, Inc. v. Trombetta*, 178 F. Supp. 3d

476, 489–90 (N.D. Tex. 2016), *objections overruled,* No. 3:13-CV-2110-KS-BH, 2016 WL 5942223 (N.D. Tex. Oct. 13, 2016); *Marshall v. Dentfirst, P.C.*, 313 F.R.D. 691, 695 (N.D. Ga. 2016); *Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, No. 14-CV-62216, 2016 WL 1105297, at *3 n.1 (S.D. Fla. Mar. 22, 2016) (stating that the new rule would have been applied even if the pending motion had been filed prior to the amendment taking effect); *Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612, 618 n.6 (E.D. Pa. 2016); *Best Payphones, Inc*, 2016 WL 792396, at *3 n.2; *Nuvasive, Inc. v. Madsen Med., Inc.*, No. 13CV2077 BTM(RBB), 2016 WL 305096, at *2–3 (S.D. Cal. Jan. 26, 2016) (vacating sanctions order that was entered before amendment took effect where the sanction would be implemented in a trial taking place thereafter). *But see McIntosh v. United States*, No. 14-CV-7889 (KMK), 2016 WL 1274585, at *32 (S.D.N.Y. Mar. 31, 2016) (applying prior version of Rule 37(e) to motions briefed before rule's effective date); *Stinson v. City of New York*, No. 10 Civ. 4228 (RWS), 2016 WL 54684, at *5 n.5 (S.D.N.Y. Jan. 5, 2016) ("Since the motion was fully submitted prior to the effective date of the new Rule, and because the parties have not briefed these issues, it would not be 'just and practicable' to apply the new Rule here.").

Applying amended Rule 37(e) is just and practicable in this case as well. The parties can claim no surprise. The Special Master informed them before the rule's amendment that he intended his report to be construed under its revised terms, and the parties had ample opportunity to adjust their advocacy to the amended rule's standard before his investigation concluded.[5] Moreover, "[w]hile the language of the rules changed, the spirit and principles underlying them has not

---

[5]    Thomas Nelson notes that EPAC did not object when the Special Master first informed the parties that he intended the amended Rule 37(e) to apply to their dispute in his July 14, 2015 e-mail. (Doc. No. 261, PageID# 5362.)

materially changed in a manner adverse to [EPAC]." *Konica Minolta Bus. Sols., U.S.A. Inc.*, 2016 WL 4537847, at *3. "[E]ven under the standard applied [before Rule 37(e)'s amendment], intent was relevant," and its presence or absence would influence the severity of any sanction imposed. *See Nuvasive, Inc.*, 2016 WL 305096, at *3. Further, "because the amendment is in some respects more lenient as to the sanctions that can be imposed for violation of the preservation obligation, there is no inequity in applying it." *CAT3, LLC*, 164 F. Supp. 3d at 496.

Thomas Nelson argues that amended Rule 37(e) should apply not only to the lost ESI in this matter, but also to lost physical evidence—in this case, the books. (Doc. No. 235, PageID# 4094.) EPAC disagrees and argues that, if the Court applies the amended rule, it should apply only to ESI. (Doc. No. 265, PageID# 6078.)

Thomas Nelson's support for its argument comes from a publication analyzing the 2015 rule amendments which states that "[i]t would seem logical that the rule-based standard apply to both [physical and electronic evidence] if created under and related to the same factual context." (Doc. No. 235, PageID# 4094) (quoting Thomas Y. Allman, *Applying the 2015 Civil Rules Amendments*, Lawyers for Civil Justice 21 (Jan. 23, 2016), http://www.lfcj.com/uploads/3/8/0/5/38050985/2016applyingtherulespackage_jan23_.pdf). The article, in turn, cites *Stinson v. City of New York*, in which the court noted a potentially "thorny issue" in applying amended Rule 37(e) of "whether it would apply to a situation . . . where a party failed to preserve both ESI and hard-copy evidence." Thomas Y. Allman, *Applying the 2015 Civil Rules Amendments*, Lawyers for Civil Justice 21 (Jan. 23, 2016), http://www.lfcj.com/uploads/3/8/0/5/38050985/2016applyingtherulespackage_jan23_.pdf)

(citing *Stinson*, 2016 WL 54684, at *5 n.5). The court did not resolve the question in *Stinson*,[6] and the majority of courts to consider the issue since have distinguished between the standards applied to physical evidence and ESI. *See In re Bridge Constr. Servs. of Fla., Inc.*, No. 12-CV-3536 (JGK), 2016 WL 2755877, at *11 (S.D.N.Y. May 12, 2016) ("However, the change in Rule 37(e) applies only to ESI and therefore does not affect the standard in *Residential Funding* as it relates to this case which concerns physical evidence, namely the notebook or log book, and not ESI."); *Coale v. Metro-N. R.R. Co.*, No. 3:08-CV-01307 (CSH), 2016 WL 1441790, at *4 n.7 (D. Conn. Apr. 11, 2016); *Living Color Enters., Inc.*, 2016 WL 1105297, at *4 n.2; *United States v. Safeco Ins. Co. of Am.*, No. 3:14-CV-00190-BLW, 2016 WL 901608, at *7 n.3 (D. Idaho Mar. 9, 2016).

The Court will apply amended Rule 37(e) only to the ESI in this case. The reasons for doing so are threefold. First, by its own terms, Rule 37(e) addresses only the "failure to preserve electronically stored information." Fed. R. Civ. P. 37(e). Second, the advisory committee's notes to the rule's 2015 amendment clearly state that "[t]he new rule applies only to electronically stored information, also the focus of the 2006 rule." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Third, because Rule 37(e) is crafted to address the unique traits of electronic information, its reasoning only applies to the loss of evidence in electronic form, as this case aptly demonstrates. Physical evidence is not often duplicated across multiple locations. If it is lost in one format, it generally cannot be restored and replaced from another. And it is only in rare circumstances that physical evidence will be subject to the "routine alteration and deletion of information that attends ordinary use" that is the reason for Rule 37(e)'s focus on intent. *See id.* advisory committee's note to 2006 amendment. Because the rule does not alter a court's ability to

---

[6]     The *Stinson* court did not apply amended Rule 37(e) because the discovery issue had been fully briefed and submitted before its enactment date. *Stinson*, 2016 WL 54684, at *5 n.5

address the loss of physical evidence under existing standards, the Court finds no reason to expand its terms outside their express limitation to ESI.[7]

## B.     THOMAS NELSON'S DUTY TO PRESERVE EVIDENCE

The Court's ability to address the loss of evidence in physical or electronic form is predicated upon a party's duty to preserve that evidence because litigation is reasonably contemplated. *See* Fed. R. Civ. P. 37(e); *Beaven*, 622 F.3d at 553. "[A] party to civil litigation has a duty to preserve relevant information, including ESI, when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)); *Silvestri*, 271 F.3d at 591 (4th Cir. 2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."); *Clark Const. Grp., Inc. v. City of Memphis*, 229 F.R.D. 131, 136 (W.D. Tenn. 2005) ("The trigger date is the date a party is put on notice that it has a duty to preserve evidence."). The Special Master recommends that the Court find April 18, 2011—the date on which Thomas Nelson's General Counsel instructed its Vice President of Inventory Management Production to preserve evidence relevant to the termination of the MSA—to be "the latest date" by which Thomas Nelson was under a duty to preserve evidence. (Doc. No. 226, PageID# 3809–10.) The Court adopts this recommendation.

---

[7] This may be a more difficult question in circumstances where hard copies and electronic copies of the same data are destroyed. Here, the books and the ESI are sufficiently distinct that the considerations underlying Rule 37(e) apply only to the electronic evidence.

Thomas Nelson argues that its preservation duty began no earlier than January 20, 2012, or May 8, 2012, when it received a draft complaint and final complaint from EPAC. (Doc. No. 235, PageID# 4100.) Thomas Nelson states that it could not reasonably anticipate litigation before these dates despite EPAC's earlier litigation hold notices because of "[l]ong periods of silence from EPAC . . . , EPAC's periodic offers for reestablishing the parties' business relationship . . . , and Thomas Nelson's belief that litigation was unlikely." (*Id.*; Doc. No. 281, PageID# 6331.) Thomas Nelson cites communications dated April 21, 2011, and December 20, 2011, in which EPAC expressed a desire to continue working with Thomas Nelson. (Doc. No. 238-1, PageID# 4342, 4349; Doc. No. 281, PageID# 6331.)

Magistrate Judge Bryant addressed the question of when Thomas Nelson's duty to preserve evidence arose in his December 1, 2015 order regarding the adequacy of Thomas Nelson's privilege log. (Doc. No. 200, PageID# 3033.) In that context, and based only upon the evidence to which he had access at the time, Magistrate Judge Bryant determined that "[a]s early as April 12, 2011"—the date of EPAC's first litigation hold notice—"Thomas Nelson's in-house counsel, Mr. Wentworth, was on notice that steps should be taken to preserve records relating to Thomas Nelson's contract with EPAC." (*Id.* at PageID# 3035.) Magistrate Judge Bryant also noted that "Thomas Nelson admits that it anticipated litigation in April 2011," and found that "Thomas Nelson should have instituted its litigation hold in April 2011." (*Id.* at PageID# 3034–35.)

The record now before the Court shows that EPAC made preservation demands on April 12, 2011; July 26, 2011; November 23, 2011; and June 12, 2012. (Doc. Nos. 241-5, 241-6, 241-7, 241-8.) EPAC made its April 12, 2011 preservation demand in the context of a letter acknowledging Thomas Nelson's termination of the MSA. (Doc. No. 241-5.) The letter states that "EPAC intends to vigorously defend its investment and its reputation against this unwarranted

attack" and "reserves all rights with regard to Thomas Nelson's actions and does not acknowledge breach or wrongdoing." (*Id*. at PageID# 4471.) It "direct[s] Thomas Nelson . . . to preserve all records in connection with this matter to avoid claims of destruction of evidence." (*Id.*) After receiving that demand, General Counsel Wentworth issued an informal litigation hold notice by e-mail to Gower on April 18, 2011, copying Thomas Nelson Chief Financial Officer Stuart Bitting, Vice President Tom Harris, and President and CEO Mark Schoenwald, on the message. (Doc. No. 226, PageID# 3810.) Wentworth's e-mail stated that EPAC "hint[s] they are considering legal action" and instructed Gower to "please be sure to preserve all documents and records in any way relating to the EPAC contract(s) and this project." (*Id.*) Gower responded, "I am keeping all communication between anyone from team [sic] in a computer folder."[8] (*Id.*)

EPAC's second notice came in an e-mail on July 26, 2011, offering "a final attempt to address [the contract termination] amicably" and serving as "another reminder to take whatever steps may be necessary to prevent the destruction of any relevant evidence." (Doc. No. 241-6.) The November 23, 2011 demand was made in the context of a settlement offer and "again advised [Thomas Nelson] to preserve all records relevant to this matter." (Doc. No. 241-7.) Finally, the June 12, 2012 notice was sent by EPAC's newly retained counsel after the initiation of this lawsuit and contained a detailed pre-discovery preservation demand. (Doc. No. 241-8, PageID# 4476–77.)

EPAC's statement in its April 12, 2011 letter that it would "vigorously defend" against the termination of the MSA and its accompanying demand for preservation of evidence leaves little argument for Thomas Nelson that it did not reasonably anticipate the parties were headed to litigation so as to trigger its preservation duty. *Compare Turner v. United States*, 736 F.3d 274,

---

[8]    This response should have alerted Wentworth that Gower was construing his litigation hold notice only to include e-mail and not the books or other evidence relevant to this litigation.

282 (4th Cir. 2013) (finding that the duty to preserve evidence was not triggered because the plaintiff had not sent a preservation demand or any other correspondence threatening litigation) *with Stevenson v. City & Cty. of San Francisco*, No. C-11-4950 MMC, 2015 WL 6177363, at *4 (N.D. Cal. Oct. 21, 2015) (quoting *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 512 (S.D.W. Va. 2014)) ("Before litigation begins, courts agree that the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim will all trigger the duty to preserve evidence."), *and Sampson v. City of Cambridge, Md.*, 251 F.R.D. 172, 181 (D. Md. 2008) ("It is clear that defendant had a duty to preserve relevant evidence that arose no later than June 26, 2006, when plaintiff's counsel sent the letter to defendant requesting the preservation of relevant evidence, including electronic documents."). The Special Master affords Thomas Nelson six days after it received the April 12, 2011 preservation demand because "there must nonetheless be a reasonable time to get the notice, read it, assess its impact and initiate a hold." (Doc. No. 226, PageID# 3810.) The Court finds this grace period generous. However, as the Special Master found, Wentworth's instruction to Thomas Nelson's leaders on April 18, 2011, to "preserve all documents and records in any way relating to the EPAC contract(s)" is an "unequivocal indication" that Thomas Nelson reasonably anticipated litigation and recognized its duty to preserve relevant evidence as of that date. (*See id.*)

That duty did not "later dissipat[e] due to EPAC's long periods of silence and continued offers of reestablishing a business relationship." (*See* Doc. No. 281, PageID# 6331.) EPAC made its first preservation demand in April 2011 and repeated it in July 2011 and November 2011. It

gave Thomas Nelson a draft complaint in January 2012. Instead of long periods of silence, EPAC regularly reaffirmed over a nine-month period that litigation over the MSA was likely.[9]

Nor do e-mail exchanges regarding the possibility of continued business between EPAC and Thomas Nelson support a finding that Thomas Nelson should no longer have reasonably anticipated litigation. The cited e-mails, sent between April 2011 and December 2011, address the possibility of Thomas Nelson working with EPAC on opportunities other than those covered by the MSA. (Doc. No. 238-1.) As the Special Master noted, EPAC and Thomas Nelson did business outside of the context of their EPAC2 print-on-demand agreement before this litigation. (Doc. No. 226, PageID# 3810 n.3.) While these e-mails suggest EPAC's willingness to pursue other business opportunities with Thomas Nelson, they do not address or otherwise indicate that litigation regarding termination of the EPAC2 contract was no longer contemplated. This is particularly true given that EPAC was making continued preservation demands throughout this time period.

The Court thus finds that Thomas Nelson's duty to preserve evidence was triggered on April 18, 2011, and has continued to date without interruption.

Once the preservation duty was triggered, Thomas Nelson was obligated not to destroy evidence relevant to any potential claim or defense in this litigation. "While a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the

---

[9]    In support of its claim of "long periods of silence," Thomas Nelson cites an e-mail exchange between its counsel and EPAC's counsel regarding setting the time for a conference call that begins on August 31, 2011, and is resumed on November 4, 2011. (Doc. No. 238-1, PageID# 4345–47.) The subject of the planned call is not stated, nor is the reason for the delay. (*Id.*) Thomas Nelson apparently hangs its hat on an inquiry from its counsel as to why EPAC wanted to discuss the topic—whatever it might have been—"after all this time." (*See id.* at PageID# 4344.) In context, that statement is unconvincing.

discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Kemper Mortg., Inc. v. Russell*, No. 3:06-CV-042, 2006 WL 2319858, at *2 (S.D. Ohio Apr. 18, 2006) (quoting *William T. Thompson Co. v. Gen. Nutrition Corp.*, 593 F. Supp. 1443, 1445 (C.D. Cal. 1984)). It is an attorney's responsibility to advise its client of the scope of its preservation duty. *John B. v. Goetz*, 879 F. Supp. 2d 787, 868 (M.D. Tenn. 2010) (citations omitted). That duty extends to all "unique, relevant evidence that might be useful to an adversary." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). In the context of ESI, this means that, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Id.* at 218. Because "there are many ways to manage electronic data, litigants are free to choose how this task is accomplished," so long as a "complete set of relevant documents" is retained. *Id.*

Thomas Nelson argues that, even if its preservation duty began on April 18, 2011, its scope could not reasonably have been understood to include the books and some aspects of the warehouse data. (Doc. No. 281, PageID# 6331–32.) It further argues that Magistrate Judge Bryant's order recognizing the duty as beginning on April 12, 2011 "did not address the scope of that duty" and that EPAC did not request some of the subject information in discovery until August 2014, which justified Thomas Nelson's exclusion of that information from its "core preservation efforts." (*Id.*) Thomas Nelson's argument rests on a faulty premise. The scope of a party's preservation duty is not defined by a demand letter or court order. *John B.*, 879 F. Supp. 2d at 868. The duty to preserve is defined by what information is relevant to anticipated claims and defenses. *Id.* And "the obligation to preserve relevant evidence exists whether or not the evidence has been specifically requested in a demand for discovery." *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378,

409 (S.D.N.Y. 2010) (quoting *Scalera v. Electrograph Sys., Inc.*, 262 F.R.D. 162, 171 (E.D.N.Y. 2009)).

By the time Thomas Nelson's duty to preserve was indisputably in place, it knew that it had terminated the MSA on the stated basis that EPAC had misrepresented its ability to meet the MSA's terms and delivered subpar product. Specifically, as set out in Thomas Nelson's April 2011 termination letter, EPAC's "examples of product presented [during the cure period] was an insufficient sample and . . . the product and other deficiencies . . . have not been cured." (Doc. No. 264-2.) In its pleadings, Thomas Nelson states that EPAC breached the MSA when it failed "to provide product manufactured at the Fairfield, Ohio facility of the proper quality and quantity and within the necessary delivery timeframe." (Doc. No. 5, PageID# 44, ¶ 34–38; Doc. No. 199, PageID# 3015, ¶¶ 35–40.) Any evidence relevant to the quality, quantity, and delivery of books printed at the EPAC2 facility, the books' disposition, the MSA and its termination, and the relationship between EPAC and Thomas Nelson was therefore subject to the preservation duty, including the books, warehouse data, and e-mail that are the subject of the Special Master's report.

### C.    THOMAS NELSON'S STATE OF MIND

Because fault falls along a spectrum to which the court must calibrate the severity of its remedy, determining the culpable party's state of mind is essential to addressing the loss of evidence in both physical and electronic form. The Special Master found that the loss of evidence in this case was caused by Thomas Nelson's "negligence and gross inattention" and not its intent to deprive EPAC of evidence for use in this litigation. (Doc. No. 226, PageID# 3807–3808.) The Special Master described Thomas Nelson's actions as, variously: "fail[ing] to meet minimum standards of diligence and competence;" "culpable instances of incompetence, misinformation and lack of diligence;" "arrogance by management, lack of initiative by IT and a pitiable lack of legal

leadership;" "casual and careless;" showing "paralysis or even purposeful sluggishness;" "homebrew, sluggish and sloppy; its commitment to defensible collection and search, at best, perfunctory;" and "negligent, even grossly so." (Doc. No. 226, PageID# 3807–26.) However, the Special Master ultimately—and explicitly—found that, from his review of the information available to him, he could not conclude that Thomas Nelson's actions were motivated by an intent to deprive EPAC of information to use in this litigation. (*Id.* at PageID# 3826.) The Special Master also specifically found that Thomas Nelson's actions were not "of the devious character required for imposition of an adverse inference or dispositive sanction" under amended Rule 37(e). (*Id.*)

EPAC contests that conclusion, arguing that what the Special Master describes crosses the line from negligence to intent and that the Special Master erred by assuming that intent must be proved by direct evidence. (Doc. No. 242, PageID# 4501–4502; Doc. No. 265, PageID# 6077.) EPAC cites the following incidents as circumstantial evidence of bad-faith conduct that mandates a finding of intent: (1) that Thomas Nelson had not identified any effort to examine or preserve the Red Prairie data before 2015; (2) that Thomas Nelson did not make a good faith search for responsive e-mails until October 15, 2013; and (3) that, during this time, Thomas Nelson continuously objected to discovery requests, produced little discovery, and represented to the Court that it had not spoliated evidence. (Doc. No. 285, PageID# 6540.) Thomas Nelson disagrees, arguing that the Special Master correctly found no evidence, circumstantial or direct, of its intent to deprive EPAC of evidence for use in this litigation. (Doc. No. 261, PageID# 5359–5360; Doc. No. 281, PageID# 6326.)

Rule 37(e)(2)'s drafters included its intent standard with a specific purpose: to reject cases that had authorized an adverse-inference instruction "on a finding of negligence or gross negligence." Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment. As the

Advisory Committee found, "[n]egligent or even grossly negligent behavior does not logically support [an] inference" that lost evidence would have been adverse to the spoliating party's position. *Id.* The amended rule thus preserves "for [] negligent or grossly negligent loss of electronically stored information . . . a broad range of measures to cure prejudice caused by its loss, but [limits] the most severe measures to instances of intentional loss or destruction." *Id.* It also prevents the factfinder's role from being overtaken by an adverse-inference instruction where one may not be warranted.

The Court accepts the Special Master's conclusion that Thomas Nelson's actions do not support a finding of intent. First, the Special Master has had the broadest access to information regarding the state of mind of those who allowed the loss of evidence in this matter, including interviewing Thomas Nelson's employees and its counsel and reviewing thousands of internal and third-party communications. The Court therefore gives great weight to his assessment of the parties' motives in this context.

Second, the Court's own review of the record supports the Special Master's conclusion. What the Special Master's findings document are halfhearted attempts by Thomas Nelson to impose a litigation hold that was not implemented with sufficient guidance or monitored by counsel. Thomas Nelson "fail[ed] to take its preservation obligations seriously," allowing evidence to be lost that should have been preserved. *See Stinson*, 2016 WL 54684, at *5. But the Special Master's findings do not show, directly or by inference, that Thomas Nelson intended to deprive EPAC of evidence for use in this litigation. EPAC insists that Thomas Nelson's "willful blindness" is the equivalent of intent in this context.[10] (Doc. No. 242, PageID# 4484, 4502 n.26.) But the line

---

[10]     To support its equation of "willful blindness" with intent, EPAC cites *Brookshire Brothers, Ltd. v. Aldridge*, 438 S.W. 3d 9, 36 (Tex. 2014) (holding that "'intentional' encompasses the

38

between negligence and intent under Rule 37(e) is sharper than EPAC's arguments recognize; it plainly separates negligence and even gross negligence from the intent to prevent the use of evidence in litigation. *See* Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment. On the "continuum of fault—ranging from innocence through the degrees of negligence to intentionality," Thomas Nelson's actions fall short of that intent with regard to the loss of both physical and electronic evidence. *See Welsh*, 844 F.2d at 1246.

This finding does not mean that Thomas Nelson's conduct was harmless. Its expansive negligence and reluctance to admit fault once lost evidence was discovered must be addressed by corresponding remedial measures. Those measures cannot include sanctions reserved for intentional conduct regarding lost ESI under Rule 37(e)(2). However, the same restrictions do not apply to Thomas Nelson's conduct with regard to physical evidence.

### D.     THE BOOKS

As a threshold matter, Thomas Nelson argues that the Court appointed the Special Master only to review the production of ESI and that he exceeded his charge by making findings about EPAC-printed books. (Doc. No. 237, PageID# 4302–03.) Thomas Nelson is correct that the focus of the Special Master's appointment was not physical evidence. EPAC's motion for appointment of a special master sought a report "on any spoliation of evidence by Thomas Nelson that may have occurred in this action beyond Thomas Nelson's admitted destruction or loss of books and samples . . . ." (Doc. No. 68, PageID# 537.) Magistrate Judge Bryant's order appointing the Special

---

concept of 'willful blindness' in which a party does not directly destroy evidence known to be discoverable, but nevertheless 'allows for its destruction'"). This case specifically interprets and expands upon prior decisions of the Texas Supreme Court applying Texas evidentiary standards. *Id.* at 18. It does not consider the concept of intent under amended Rule 37(e) or federal common law and is not persuasive on that question.

Master is somewhat broader and set his primary duty as "investigat[ing] and advis[ing] the Court concerning the nature, extent and sufficiency of the identification, preservation, collection, search, processing and production by Thomas Nelson . . . of potentially responsive and relevant information, particularly electronically stored information ("ESI") as it relates to discovery in this cause." (Doc. No. 136, PageID# 2003–04, ¶¶ 2–5.)

Although the focus of Magistrate Judge Bryant's appointment order was ESI discovery, it left the door open for the Special Master to report on the preservation and production of other "responsive and relevant information." (*See id.* at PageID# 2003, ¶ 2.) Under those terms, and because the books and their loss are central to this litigation, it was appropriate for the Special Master to investigate and consider their disposition. However, the Special Master's investigation regarding the books' preservation and disposition did not require his expertise regarding ESI discovery; his findings are based on statements made in witness interviews and e-mail communications that a jury could easily consider. Accordingly, the Court accepts the Special Master's findings regarding the preservation of the books in discovery but rejects his conclusions that extend to the merits of the claims and defenses in this action. Those findings exceed the Special Master's role and should be left to the jury.

To reiterate, the Court has broad discretion to create a remedy that adequately addresses the loss of physical evidence. *Adkins*, 554 F.3d at 652. To impose an adverse inference instruction, the Court must find that (1) Thomas Nelson had control over the books at the time they were lost, (2) it allowed the books to be lost with a culpable state of mind, and (3) the books were relevant to a claim or defense in the action. *See Ross*, 567 F. App'x at 302. Negligence may provide the requisite state of mind in appropriate circumstances.

The Special Master found that, "[o]f the tens of thousands of sample books supplied by EPAC to [Thomas Nelson] under the disputed arrangement, not a single instance of a misprinted or damaged book appears to have been retained." (Doc. No. 226, PageID# 3811–12.) The Special Master found that, in the last quarter of 2010, EPAC had supplied between 30,000 and 40,000 books to Thomas Nelson. (*Id.* at PageID# 3813.) Witness statements support a finding that at least some of those books remained in Thomas Nelson's possession in April 2011, and Thomas Nelson does not argue otherwise.[11] (*See* Doc. No. 71, PageID# 599–605.)

The Special Master correctly categorized the books as "tangible . . . evidence of matters [Thomas Nelson] expected to assert as grounds for termination or as grounds for its counterclaims." (*See id.* at PageID# 3811.) Because one of Thomas Nelson's stated reasons for terminating EPAC's contract was that EPAC provided an inferior product, they are relevant to EPAC's claims that it performed as the contract specified and Thomas Nelson's counterclaims that it did not. (Doc. No. 168, PageID# 2446, 2454, ¶¶ 47, 82; Doc. No. 199, PageID# 3011–13, 3015, ¶¶ 12, 19, 23, 35–40.)

The only question that remains, therefore, is whether Thomas Nelson allowed the books to be sold or destroyed with a culpable state of mind. The Special Master found "no evidence that the disposition of the books was coupled with an intent to deprive EPAC of this evidence" and "nothing to suggest an effort to dispose of the books tied in any way to frustrating EPAC's claims in this litigation." (Doc. No. 226, PageID# 3812.) The Court's review of the record leads it to the same conclusion.

---

[11]    Thomas Nelson does note that the Special Master did not make any finding as to how many of those books were sold or destroyed before April 18, 2011. (Doc. No. 235, PageID# 4100.)

Thomas Nelson should have taken steps as of April 18, 2011, at the latest, to ensure that it preserved existing evidence of the defects in quality it asserted in terminating the MSA—the books themselves being primary among that evidence. Gower did not construe the April 18, 2011 litigation hold email from Wentworth to include anything other than "communications." (*See id.* at PageID# 3810.) Wentworth did not correct that impression, although it was his duty to do so. *See Huntsville Golf Dev., Inc. v. Brindley Const. Co., Inc.*, No. 1:08-00006, 2011 WL 3420602, at *20 (M.D. Tenn. Aug. 4, 2011) (noting counsel's obligation to monitor litigation hold and educate client as to its scope). No one else considered preserving the books until after this lawsuit was filed. In the interim, the remaining books were discarded or sold.

This was glaring incompetence in implementing a litigation hold. However, it appears that, instead of destroying the books to prevent their use in this lawsuit, no one at Thomas Nelson thought of the books at all. Certainly no one, including its counsel, considered the books' relevance or the fact that they might fall under a litigation hold until it was too late. That is gross negligence, but it is not intent.

Having found that the books were relevant evidence and Thomas Nelson negligently failed to preserve them, the Court must fashion a remedy that levels the evidentiary playing field for EPAC and punishes Thomas Nelson for its breach. *See Adkins*, 554 F.3d at 652. Relevant considerations include the level of Thomas Nelson's culpability, the prejudice to EPAC's ability to litigate caused by the missing evidence, and whether less severe sanctions are appropriate. *See Pollard v. City of Columbus, Ohio*, No. C2-11-CV-0286, 2013 WL 5334028, at *6 (S.D. Ohio Sept. 23, 2013); *Barrette Outdoor Living, Inc. v. Mich. Resin Representatives*, No. 11-13335, 2013 WL 3983230, at *17–19 (E.D. Mich. Aug. 1, 2013); *Jain v. Memphis Shelby Cty. Airport Auth.*, No. 08-2119-STA-DKV, 2010 WL 711328, at *2–3, 5 (W.D. Tenn. Feb. 25, 2010); *Adkins*, 554

F.3d at 652–53. The Court must also consider "whether the non-offending party bears any responsibility for the prejudice from which [it] suffers." *Driggin v. Am. Sec. Alarm Co.*, 141 F. Supp. 2d 113, 122 (D. Me. 2000).

The Special Master recommends a twofold sanction. First, he recommends that the Court exclude all evidence and testimony offered by Thomas Nelson in support of "the proposition that books supplied by EPAC pursuant to the supply channel known as EPAC2 were defective in quality, durability or appearance or were otherwise not of merchantable quality as of the start of the cure period." (Doc. No. 226, PageID# 3827.) Second, he recommends that the Court consider instructing the jury "that the books supplied were of sufficient quality, durability and appearance to be merchantable as of the start of the cure period and were, in fact, sold by Thomas Nelson, Inc. to its customers." (*Id.*) This recommendation is driven in large part by the Special Master's factual conclusion "that tens of thousands of EPAC2 book samples were sold into the marketplace" and that none of the books "[was] returned or prompted complaints of defect from customers." (*See id.* at PageID# 3812.) From these findings, the Special Master concludes that "all material defect issues affecting merchantability of the EPAC2 books had been resolved by the start of the cure period." (*Id.* at PageID# 3813.)

The Court does not adopt the Special Master's factual conclusion regarding the quality, durability, appearance, and merchantability of the books. By making that inference, the Special Master reaches one of the ultimate conclusions of this litigation. The conclusion is not related to his designated task of investigating evidence preservation and strays from his intended role into the province of the jury. The Court accepts the Special Master's findings as to whether and how the books were (or were not) preserved.

The Court also rejects the Special Master's proposed sanctions. First, excluding all proof of book quality does not serve the interests of the litigation. There is little doubt that EPAC has been prejudiced in its ability to pursue its claims because Thomas Nelson did not retain any of the books it now claims were defective. The books would have been the most direct evidence to support both parties' arguments as to whether or not EPAC's product met the terms of the MSA. Without them, EPAC cannot have an expert evaluate the printing or show the jury what it will now have to describe.

However, the books themselves are not the only proof of the quality of EPAC's product and Thomas Nelson's evaluation of it. As the Special Master notes, "[t]here are records of e-mail exchanges and witness observations, as well" regarding the books' quality and what role it played in Thomas Nelson's decision to stop working with EPAC.[12] (*Id.* at PageID# 3812.)  EPAC thus has not been deprived of "the only evidence from which it could develop its defenses [or claims] adequately." *See Arch Ins. Co. v. Broan-NuTone, LLC*, 509 F. App'x 453, 458 (6th Cir. 2012) (quoting *Silvestri*, 271 F. 3d at 593–94). Nor are the books "the single piece of evidence that was essential to determining" EPAC's case. *See Byrd v. Alpha All. Ins. Corp.*, 518 F. App'x 380, 387 (6th Cir. 2013). Indeed, some of the evidence that remains available may be better proof of what prompted Thomas Nelson's decision to terminate the MSA than the books themselves. The Court must consider the availability of this other proof in determining the proper remedy for Thomas Nelson's negligence.[13]

---

[12]     Contrary to the Special Master's finding, Thomas Nelson has shown that that at least one photograph—or scan—of the books does exist. (Doc. No. 235-1, PageID# 4113.)

[13]     Thomas Nelson argues that the Court must also consider that EPAC also did not retain any of the books in question. (Doc. No. 263, PageID# 5577.) There is some factual question as to whether EPAC retained samples of the books it sent to Thomas Nelson or whether it delivered all

Second, although the mandatory adverse inference recommended by the Special Master is available upon a finding of negligence in this context, what the Special Master recommends also has the effect of a dispositive sanction. A finding that the books were merchantable is a determination in part of both EPAC's claim that Thomas Nelson fabricated the basis for terminating the contract and Thomas Nelson's counterclaims of misrepresentation and breach of contract. A sanction of that nature is generally appropriate upon a finding of intentional destruction of evidence. *See Byrd*, 518 F. App'x at 387.

"When . . . a plaintiff is unable to prove an essential element of [its] case due to the negligent loss or destruction of evidence by an opposing party, . . . it is proper for the trial court to create a rebuttable presumption that establishes the missing elements of the plaintiff's case that could only have been proved by the availability of the missing evidence." *Rogers v. T.J. Samson Cmty. Hosp.*, 276 F.3d 228, 232 (6th Cir. 2002) (quoting *Welsh*, 844 F.2d at 1248)). Here, EPAC is not unable to prove that the books were of good quality, but that proof has become significantly more difficult because of Thomas Nelson's actions. Although Thomas Nelson's conduct was not intentional, its blatant failure to implement or monitor an effective litigation hold falls on the more culpable side of the negligence spectrum. Because Thomas Nelson's fault is strong and the prejudice to EPAC is significant, a rebuttable adverse inference is appropriate and effectively serves the dual objectives of fairness and punishment in this case. *See Arch Ins. Co.*, 509 F. App'x at 457. It also recognizes the Court's strong preference that all cases be decided on their merits to the greatest extent possible.

---

of its product in an effort to perform under the MSA. (*See* Doc. No. 265-1, PageID# 6093.) While the Court considers the fact that EPAC likely had some opportunity to retain copies of the books in question, that is of minimal relevance in considering Thomas Nelson's preservation of the books it received, which are the stated basis for its termination of the MSA.

The Court finds that the parties may introduce available evidence regarding the quality of the books leading up to the termination of the MSA. The Court will instruct the jury that Thomas Nelson had a duty to preserve evidence relevant to this litigation; that it breached that duty by negligently allowing the books in its control to be sold, lost, or destroyed; and that the jury may infer that, if available, the books would support EPAC's claims and be adverse to Thomas Nelson's arguments.

To ensure that this sanction serves its intended purpose of levelling the evidentiary playing field, EPAC must also have access to all remaining information regarding the books' quality, including evidence regarding their disposition, to the fullest extent possible. The Court addresses this further below and will consider this objective central to any future discovery disputes regarding the production of such evidence.

### E.        ELECTRONICALLY STORED INFORMATION

Counsel must take an active and primary role in implementing a litigation hold to ensure "(1) that all relevant information (or at least all sources of relevant information) is discovered, (2) that relevant information is retained on a continuing basis; and (3) that relevant non-privileged material is produced to the opposing party." *Huntsville Golf Dev., Inc.*, 2011 WL 3420602, at *20 (quoting *Zubulake,* 229 F.R.D. at 432). Thomas Nelson's counsel did not, and what minimal efforts he did take immediately went awry. Wentworth did not consult Thomas Nelson's IT staff to determine "what sources of data might bear on readily foreseeable claims and defenses, and what data retention and purge settings might apply." (Doc. No. 226, PageID# 3811.) The Special Master found that "there was no timely notification of IT by anyone," despite the fact that, as "a key player in setting data retention schedules . . . [Wentworth] should have known that, unless steps were taken to preserve e-mail, it would purge automatically in six months." (*Id.*) When Wentworth

finally did inform IT of the litigation hold in January 2012, the department's response with regard to preserving e-mail was wholly inadequate, largely because it had "little or no guidance or direction from counsel." (*Id.* at PageID# 3819 n.31.) There was apparently no consideration that Red Prairie system should have been part of the litigation hold until three years later in 2015. (*Id.* at PageID# 3814.) By that time, relevant data was long deleted from its archives.

It is hard to imagine a circumstance in which Thomas Nelson's steps to preserve ESI would have been considered reasonable. Further, Thomas Nelson's meticulous preservation of information during a concurrent Department of Justice (DOJ) investigation for which it hired e-discovery counsel and an e-discovery service provider shows that it "knew what to do" and "chose not to do it here."[14] (*Id.* at PageID# 3825.) Thomas Nelson failed to take reasonable steps to preserve both the warehouse data and the Postini e-mail archive.

### 1. The Warehouse Data

The Red Prairie Warehouse Management System, used by Thomas Nelson in 2010 and 2011, tracked the receipt and distribution of books in its warehouse. (*Id.* at PageID# 3813.) When cartons of books arrived, they were scanned into the Red Prairie system. (*Id.*) The system logged information about the order, its contents, the printer, and its ultimate disposition. (*Id.*) Data for full cartons of EPAC-printed books that would have tracked the identity of the supplying printer were accessible in the system during 2010 and 2011. (*Id.*) The data remained active in the system for

---

[14]     Thomas Nelson takes issue with the Special Master's criticism of Thomas Nelson's preservation efforts here compared to Thomas Nelson's diligent efforts in connection with the DOJ investigation. (Doc. No. 235, PageID# 4102.) Thomas Nelson argues that the amounts in controversy in each action make the preservation standards in each action drastically different. (*Id.*) The Court cites the DOJ investigation not as a template for what Thomas Nelson should have done in this case, but as an indication that its failures here do not stem from a lack of sophistication in preserving ESI.

two weeks and were then transferred to an archive, retained for a year, then automatically purged. (*Id.* at PageID# 3813–14.) Thus, a full record of EPAC's shipments and sales from July 2010 through April 2011 was available until mid-July 2011, with a partial record remaining through mid-April 2012. (*Id.* at PageID# 3814.)

The Special Master interviewed Marvin Maphet, who managed the Red Prairie system during the relevant time period. Maphet stated that there was no effort made to preserve the Red Prairie archive data before 2015.[15] (*Id.*) He stated that he attempted to recover purged data in 2015 when he learned about the litigation hold, but was not able to do so. (*Id.* at PageID# 3813.) Maphet also stated that Thomas Nelson maintains a full record of its monthly sales data in an archive it refers to as "sacred." (*Id.* at PageID# 3814.) That archive is maintained in Thomas Nelson's Nashville offices and was supplied to Harper Collins when it obtained Thomas Nelson. (*Id.*)

EPAC and Thomas Nelson vigorously dispute what information the warehouse data originally contained and what of it can be or has been reproduced from other sources, as documented by the parties' supplemental filings.[16] (Doc. Nos. 307-3, 309, 313, 318.) Perhaps not surprisingly, EPAC asserts that the lost warehouse data would have proved nearly every aspect of its case. Relying on the declaration of a proposed expert witness,[17] EPAC asserts that Thomas

---

[15]    Thomas Nelson states that Maphet was advised of the litigation hold by e-mail on February 26, 2013. (Doc. No. 235-1, PageID# 4114.)

[16]    Much of the parties' argument in these filings addresses whether or not Thomas Nelson had a duty to preserve the warehouse data. As the Court has previously determined, it did.

[17]    EPAC submitted a declaration from Timothy M. Opsitnick, the Senior Partner and General Counsel of a technology consulting service provider, to offer an opinion as to the customary use of ERP/WMS systems in corporations and the type of information that Thomas Nelson's ERP/WMS system would be expected to have contained if it had been preserved and produced. (Doc. No. 241-1, PageID# 4440, ¶ 14.) Opsitnick reviewed the Special Master's report,

Nelson's warehouse data could be expected to have included twenty-three categories of information.[18] (Doc. No. 241-1, PageID# 4440, ¶ 14.) EPAC argues that this information is necessary to "prove that EPAC accepted and fulfilled all orders that Thomas Nelson sent to it in 2010 and 2011" and that Thomas Nelson placed orders with other vendors. (Doc. No. 313, PageID# 7101.) EPAC also finds the information it believes to be contained in the warehouse data "key" to the majority of its claims and defenses. (Doc. No. 307-3, PageID# 7004.)

Thomas Nelson, on the other hand, minimizes what information the warehouse data contained and argues that most of it has been produced from other sources. Thomas Nelson confirms that "much of" the Red Prairie data were transferred to an archive referred to as the ERP database before being automatically purged. (Doc. No. 309, PageID# 7034.) Thomas Nelson states that it produced "certain information" from the ERP database in March 2015 that "provides detail about the disposition of the book titles ordered from EPAC, and provides the total receipts, receipts

_____

interviewed EPAC's CEO and President, and reviewed "seven documents setting forth the EDI specifications that are relevant" in this suit. (*Id.* ¶ 15.) According to Opsitnick, Thomas Nelson's ERP/WMS data would be expected to provide twenty-three categories of transactional information. (*Id.* at PageID# 4443–44, ¶ 26.) As Opsitnick did not have an opportunity to personally observe Thomas Nelson's actual ERP/WMS data or systems and as Opsitnick did not identify the specific documents he reviewed, his declaration is given little weight insofar as it speculates as to the specific information that Thomas Nelson's ERP/WMS systems contain.

[18]     Those categories are: when books were ordered, what was ordered, when an order was requested to be shipped, whether large orders were rejected, whether any orders were rejected, whether orders were reprinted, when an order shipped, from where an order shipped, when an ordered was received, how many books were destroyed, when books were destroyed, how destroyed books were accounted for, whether an order was rejected and returned, how much was charged for the books, how much was charged for shipping, whether the order was paid and when payment was made to EPAC, what was ordered by an "ultimate customer," when an order was shipped to the ultimate customer, whether an order was rejected and returned by the ultimate customer, how many orders for fewer than 1501 books were placed and fulfilled by any printers during the MSA contract period, whether other printers rejected orders, and whether orders with other printers were rejected or returned. (Doc. No. 307-3, PageID# 7005.)

from EPAC, sales by volume and dollar amount, returns by volume and dollar amount, adjustments to inventory, workorders and remainder sales." (*Id.* at PageID# 7035.) Thomas Nelson also states that it has produced "detailed information about its orders with EPAC, including the date of purchase order, product ordered, date product was received and quantity of product received." (*Id.* at PageID# 7036.) It has also produced "invoices from EPAC that list the titles ordered, quantity ordered and amount charged." (*Id.*) Thomas Nelson concedes that "the Red Prairie database contained fields that may have (1) identified the printer of each book and (2) showed that certain books were sold" and that those fields have been lost. (*Id.*)

Rule 37(e) requires the Court to ask as the first step in its inquiry whether relevant information can be restored or replaced before it considers whether remedial measures can be imposed. Fed. R. Civ. P. 37(e). The Special Master short-circuited that inquiry by recommending that the Court instruct the jury that EPAC's books were of sufficient quality and were sold by Thomas Nelson, finding that "[t]he failure to preserve warehouse management data for relevant periods is of little import if no party need demonstrate whether the bulk of sample books were sold or whether any were returned as defective." (*See* Doc. No. 226, PageID# 3808.) But EPAC's arguments regarding the warehouse data include more than just its relevance to finding whether or not the books were sold. Even accepting that the books were sold (which Thomas Nelson does not seriously contest in its briefing), EPAC argues that the warehouse data would provide information relevant to its capabilities and its performance under the MSA. As EPAC sees it, the warehouse data "would reflect all of the details regarding when the EPAC books were ordered, when they were shipped, whether they were returned, and how they were disposed of as well as when and under what conditions Thomas Nelson purchased books from other suppliers"—information that is relevant not only to the question of whether the books were merchantable, but also to the other

grounds on which Thomas Nelson terminated the MSA. (Doc. No. 242, PageID# 4496–98.) The Court must therefore conduct the Rule 37(e) analysis that the Special Master sidestepped.

It appears that some of what EPAC seeks from the warehouse data has been or can be produced from other sources. Thomas Nelson states that it has produced substantial data that were transferred from the Red Prairie system to its ERP system in the regular course of business. (Doc. No. 261, PageID# 5366–70; Doc. No. 264, PageID# 5658, ¶ 2; Doc. No. 281, PageID# 6329–31; Doc. No. 309, PageID# 7034–35, ¶ 1.) These data include: "the date of purchase order, product ordered (with product number, title, book type, page count, and trim size), quantity ordered, date product was received, and quantity of product received," similar data for orders placed with other printers, and invoices reflecting the titles ordered, the quantity ordered, and the amount charged. (Doc. No. 261, PageID# 5367; Doc. No. 264, PageID# 5658–59, ¶ 3.) Thomas Nelson also claims that it produced information about the disposition of EPAC-printed books, including "total receipts, receipts from EPAC, sales by volume and dollar amount, returns by volume and dollar amount, adjustments to inventory, workorders and remainder sales." (Doc. No. 261, PageID# 5367; Doc. No. 264-7, PageID# 5698–99; Doc. No. 309, PageID# 7035, ¶ 3.) Thomas Nelson concedes that, even with this additional production, two fields of data from the Red Prairie records have been lost and not restored from other sources: the identity of the printer in the sales records and information showing that "certain books were sold." (Doc. No. 309, PageID# 7035–36, ¶ 4.) With regard to customer quality complaints, Thomas Nelson states that "[i]t is not clear if this information ever existed in Thomas Nelson's databases."[19] (Doc. No. 281, PageID# 6330.)

---

[19] The Court has previously ordered Thomas Nelson to "produce to EPAC any complaints that Nelson received from a customer regarding books printed by EPAC." (Doc. No. 36, PageID# 291.) Thomas Nelson did not produce any complaints in response to that order.

EPAC asserts that the "centrality" of the warehouse data "cannot be overstated" and that it has "made clear" that it "sought the data far more than it sought any sanctions." (*Id.* at PageID# 4498 n.20.) EPAC disputes, however, that Thomas Nelson has restored or replaced the warehouse data in any meaningful way. It cites missing data it believes would have shown "(1) the quality of EPAC's books was good and the books were merchantable; (2) EPAC fulfilled all of Thomas Nelson's orders; and (3) EPAC delivered all orders on time," and that "Thomas Nelson's orders were primarily fulfilled from EPAC's Fairfield, Ohio facility . . . [,] that Thomas Nelson never paid any shipping costs for any of its orders, and Thomas Nelson's argument regarding where the books were shipped from is simply another smokescreen." (Doc. No. 285-2, PageID# 6593, ¶ 5.) EPAC specifically argues that warehouse data "that addressed the quality of books, orders being delivered on time, every quantity of orders accepted, where the orders were shipped from, and who bore the costs of shipping was not preserved or produced" has not been replaced. (Doc. No. 285, PageID# 6531–32.) EPAC protests that Thomas Nelson has not provided any evidence of what data existed in 2011 to support its statement that "only two fields" of warehouse data are not able to be reproduced. (Doc. No. 313, PageID# 7099.) It argues that Thomas Nelson's production is "woefully inadequate as 'substitute' evidence" because it did not include descriptions of the sources from which the information was obtained or an explanation of other data available. (Doc. No. 313, PageID# 7098–99.)

Some of the data produced by Thomas Nelson from other sources may fill these gaps, but it appears that the full extent of warehouse data relevant to EPAC's claims has not been restored. That information was relevant to EPAC's claims and its defenses to Thomas Nelson's counterclaims, and EPAC is prejudiced by its loss. However, the Court cannot determine with precision the extent of that prejudice on the record it has before it.

Although the parties provided supplemental briefing on what of the warehouse data has been lost and what has been replaced, their filings talk past each other. Further, the Court cannot determine from this record what remains of the full "sacred" archive of Thomas Nelson's order and return data.[20] (*See* Doc. No. 226, PageID# 3814.) The Special Master found that "[t]his data has not been examined or, at least, there appears to have been no disclosure or production of any of this data to the extent it tends to confirm or refute Thomas Nelson, Inc.'s claims to have discarded most of the EPAC2 books as unsalable." (Doc. No. 226, PageID# 3815.) The Special Master recommended that the archive not be produced, finding "no point in prompting further delay to obtain data that bears on an issue that really shouldn't be a matter of good faith contention: *Thomas Nelson, Inc. sold the EPAC2 books, and there is no credible evidence to support a claim that they were unacceptable to the customers who purchased them.*" (*Id.*) (emphasis original).

Thomas Nelson now states that, contrary to the information provided by Maphet, it did not transfer the archive in full to Harper Collins and, specifically, that the relevant sales history descriptions were not transferred. (Doc. No. 239-9.) This information does exist on the backup tapes Thomas Nelson has retained, but that it has "no in-house means of restoring and reading the contents of the tapes." (*Id.*) It believes the expense of restoring the tapes elsewhere would outweigh any benefit because the sales descriptions are associated only with book titles and not with a particular printer. (*Id.*) The Court does note that Thomas Nelson states it has produced "certain mainframe backup tapes" to EPAC and that the parties have "exchanged proposals for EPAC to bear the related costs to retain a third-party specialist to undertake the restoration of the tapes."

---

[20]      Maphet states that he uploaded this archive and transferred it to Harper Collins at the time of Thomas Nelson's sale. (*Id.* at PageID# 3814–15; Doc. No. 339-3, PageID# 7889:4–21.) Maphet confirmed that the archive would contain "the data you need [to] refute the claim of sales or confirm the sales data." (Doc. No. 339-3, PageID# 7891.)

(Doc. No. 235-1, PageID# 4116, ¶ 11.) It is not apparent from the parties' briefing whether the "certain mainframe backup tapes" are the ERP "sacred" archive.

The Special Master did not use the power of his investigation to determine what warehouse data was preserved, what was lost, and what can be restored with any specificity. And, again, the parties' filings provide more argument than information. Accordingly, the Court will determine its remedy based on what it can determine from the record as it stands now, subject to the parties' future proof that relevant information has or has not been restored or reproduced.

Remedial measures imposed under Rule 37(e)(1) must not have the effect of the sanctions permitted under Rule 37(e)(2) only upon a finding of intent. The Special Master's recommended measures cross that line. The Advisory Committee Notes to Rule 37(e) consider "precluding a party from offering any evidence in support of[ ] the central or only claim or defense in the case" an inappropriate sanction under Rule 37(e)(1), and contrast that with a measure to exclude "a specific item of evidence to offset prejudice caused by failure to preserve other evidence that might contradict the excluded item of evidence." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. The Special Master's recommended sanction that Thomas Nelson be prohibited from offering any evidence or testimony that the EPAC-supplied books were not merchantable as of the start of the cure period precludes Thomas Nelson from introducing evidence in support of a central defense and counterclaim. Likewise, a jury instruction that the books were sold and not returned is an adverse-inference instruction.

The Special Master's proposed remedy is inappropriate, and the Court finds that different measures better meet Rule 37(e)'s terms. Based on the record currently presented, the Court will instruct the jury that Thomas Nelson had a duty to preserve its warehouse data as of April 18, 2011, and that such data, now lost, would have shown whether EPAC-printed books were sold or

returned, whether Thomas Nelson received customer complaints about EPAC-printed books, the quantity and timeliness of EPAC's order fulfillment, and from what EPAC facility the books were shipped. Thomas Nelson is also precluded from offering evidence regarding any customer complaints about EPAC-printed books.

## 2. The Postini E-mail Archive

In July 2010, Thomas Nelson began using the Google Postini e-mail archiving service, which allowed it "to effectuate a legal hold on e-mail accounts of selected employees by replicating their mail in the Cloud." (Doc. No. 226, PageID# 3815.) During the time period relevant to this litigation, Thomas Nelson's Postini service could archive ten unique e-mail accounts for up to ten years. (*Id.*). When Thomas Nelson's counsel circulated a detailed litigation hold on January 20, 2012, its IT chief forwarded a copy of the hold to Scott Gibbs, a network administrator in charge of preservation of information who oversaw the Postini archive. (*Id.* at PageID# 3815–16.) The Special Master interviewed Gibbs, who stated that he did not have notice of any potential litigation or need for a litigation hold on e-mail until that date. (*Id.* at PageID# 3816.) When he received the January 20, 2012 directive to put certain accounts on hold, he responded, "I went ahead and checked. All of them are already on legal hold." (*Id.*)

However, when Gibbs went to retrieve relevant e-mail from the Postini archive in October 2013, he found that the system was set to purge e-mail subject to legal holds on a one-year cycle,

not the ten-year cycle Gibbs presumed.[21] (*Id.* at PageID# 3817.) In all, nearly 1.5 million e-mails were purged between February 2011 and June 2012.[22] (*Id.* at PageID# 3816.)

The Special Master devoted the majority of his efforts to determining whether the e-mail lost in the Postini purge could be restored or replaced. This included processing and searching the "unaltered counterparts" of e-mail container files recovered from Thomas Nelson's local hard drives and backup tapes. (*Id.* at PageID# 3820.) The Special Master described this as "looking over counsel's shoulder at the unfiltered data." (*Id.*) Those data included over 8.2 million e-mails that the Special Master filtered to 164,491 deduplicated e-mail messages from key custodians during the March 1, 2010 to April 30, 2011 timeframe. (*Id.* at PageID# 3821–22.)

The Special Master is somewhat equivocal, however, as to whether the lost Postini e-mails have been "restored or replaced" for purposes of the Rule 37(e) analysis. The Special Master states that Thomas Nelson's "belated efforts to restore and search e-mail have resulted in as representative and complete an exploration of potentially responsive messaging as would have been reasonably achieved by a diligent effort earlier in this lawsuit." (*Id.* at PageID# 3821.) He concludes that EPAC "has certainly been prejudiced by the delay in production of e-mail, but not likely deprived of e-mail so as to be materially prejudiced by the Postini purge." (*Id.*) In fact, the

---

[21]    Whether this configuration was the fault of Thomas Nelson or the third-party with whom it contracted for this service is not resolved. Regardless, Thomas Nelson did not discover this omission until far later than it should have with the implementation of a litigation hold.

[22]    The Special Master determined that the Postini account was originally set on a one-year purge cycle and was changed to a ten-year purge cycle during June or July of 2012. (Doc. No. 226, PageID# 3817.) Thomas Nelson states that it produced more than 9,000 e-mails from the Postini archive dated between January 1, 2011 and May 31, 2011. (Doc. No. 235-1, PageID# 4113.) The Court previously found that e-mail from December 2011 through the fall of 2012 were lost. (Doc. No. 200, PageID# 3036.)

Special Master found that "EPAC may even have benefitted somewhat from the broader, deeper efforts attendant to remediation." (*Id.*)

It appears, therefore, that the e-mail lost in the Postini purge has been restored through additional discovery. The Rule 37(e)(1) analysis stops at that conclusion. The Special Master continued on, however, to find that there is prejudice to EPAC from the Postini purge that has not yet been addressed, including "being obliged to question witnesses without reasonably complete production;" "delay in resolution prompted by belated production;" "motion practice dedicated to compelling additional discovery;" and "cost of the Special Master and associated proceedings." (*Id.* at PageID# 3823–24.)Thomas Nelson argues that this is not "prejudice . . . from loss of the information," as addressed by Rule 37(e)(1), but rather prejudice from the delay in its production. (Doc. No. 235, PageID# 4096–97.)

The Court need not resolve whether or not this prejudice is "from loss" of relevant e-mail in this case. The Court's ability to order additional discovery and to allocate its cost under Rule 16 and Rule 26 is not displaced by the amended Rule 37(e), and the Court would impose the same remedy under those rules to address Thomas Nelson's conduct in this litigation as it would to cure prejudice under Rule 37(e)(1). The Court adopts the Special Master's recommendation that EPAC be permitted to re-depose key witnesses on issues reasonably related to information belatedly produced by Thomas Nelson at Thomas Nelson's expense, excluding attorney's fees.

## F.    ADDITIONAL REMEDIES

EPAC asks the Court to go beyond the Special Master's recommendations and impose additional sanctions to address what it sees as Thomas Nelson's bad faith and obstruction of discovery. (Doc. No. 241-4, PageID# 4465–70.) Much of what EPAC seeks amounts to little more than asking the Court to endorse the arguments about Thomas Nelson's conduct that it has made

throughout discovery. It also asks the Court to find specific facts, including: that "EPAC's Electronic Data Interchange worked," that EPAC "shipped all of Thomas Nelson's orders on time," that EPAC "provided all services and produced all books in accordance [with] the terms of the [MSA]," and that "[t]he calculation of orders under 1,501 books that would have been ordered over the course of the [MSA] by Thomas Nelson . . . proffered by EPAC's experts is a fair and appropriate estimation of the orders that EPAC would have received over the course of the [MSA] if it would not have been terminated by Thomas Nelson." (*Id.* at PageID# 4468–69, ¶¶ 2, 3, 9, 11.) EPAC also asks the Court to allocate all of the Special Master's fees to Thomas Nelson, to order that Thomas Nelson pay all of EPAC's fees and expenses in discovery since December 2012, and preclude Thomas Nelson from pursuing any further fact discovery. (*Id.* at PageID# 4470, ¶¶ 1–3.) Finally, EPAC asks the Court to reject the Special Master's commentary regarding its behavior in this litigation and "commend" EPAC "for its unwillingness to let Thomas Nelson's litigation tactics bury the truth." (*Id.* at PageID# 4467.) For its part, Thomas Nelson submits an appendix of factual findings and conclusions of law from the Special Master's report that it finds erroneous. (Doc. No. 235-1.) The Court has addressed those points that it finds relevant in its analysis.

Having found prejudice to EPAC, but not an intent to deprive EPAC of evidence, any curative measures the Court enters must be "no greater than necessary to cure the prejudice." *See* Fed. R. Civ. P. 37(e)(1). The additional sanctions EPAC requests far exceed what is necessary to cure the prejudice it has suffered and are not reasonably related to the substance of the Special Master's inquiry. The Court declines to adopt them.

## III. ALLOCATION OF FEES AND COSTS

The Court must allocate payment of the Special Master among the parties "after considering the nature and amount of the controversy, the parties' means, and the extent to which

any party is more responsible than other parties for the reference to a master." Fed. R. Civ. P. 53(g)(3). In its motion for the Special Master's appointment, EPAC agreed to pay the costs, but reserved the right to transfer costs to Thomas Nelson upon a finding of omissions in Thomas Nelson's document production or spoliation "beyond the admitted destruction of books and samples that has already occurred." (Doc. No. 68, PageID# 536, ¶ 3.) The Court finds that the loss of evidence discovered by the Special Master and the delays in production by Thomas Nelson that occasioned the Special Master's appointment warrant imposing on it a substantial share of the associated costs.

The allocation suggested by the Special Master is appropriate. The claims and counterclaims raised in this litigation are not particularly complicated, but Thomas Nelson's preservation and production deficiencies have turned it into a seemingly endless marathon of discovery about discovery. Measures to deter such conduct are necessary. The Court does not adopt the Special Master's findings about the parties' conduct in the proceedings before him. However, the Court finds that EPAC should also shoulder some of the expense of the Special Master, who was appointed at its request.

The Court therefore adopts the Special Master's recommendation that 75% of his fees and costs be paid by Thomas Nelson. EPAC shall pay the remaining 25%. To the extent that the Special Master's fees and costs have already been paid by EPAC, Thomas Nelson shall reimburse EPAC within twenty-eight days of the date of this order consistent with these allocations.

The Special Master also recommended awarding EPAC only nominal attorneys' fees because "the petulant, scorched earth nature of EPAC's responses coupled with loose assertions of fact undermined the process and cannot be commended to the Court as effective or inexpensive." (Doc. No. 226, PageID# 3827 n. 37.) Thomas Nelson opposes the Special Master's suggestion that

any of EPAC's attorneys' fees be shifted to Thomas Nelson. (Doc. No. 235, PageID# 4108.) EPAC seeks to shift to Thomas Nelson all the fees and costs incurred by EPAC in discovery since December 2012. (Doc. No. 241-4, PageID# 4470, ¶ 2.)

Rule 37(a)(5) provides for the payment of attorneys' fees and expenses where a court grants a motion to compel or the non-movant produces the requested discovery after a motion to compel is filed. Fed. R. Civ. P. 37(a)(5)(A). Production of Postini and Red Prairie data from other sources as a result of the Special Master's involvement in this case is akin to discovery being produced after a motion to compel. The Court has not found that Thomas Nelson acted in bad faith. However, had Thomas Nelson complied with basic data retention protocols or owned up to the loss of evidence more readily, both parties likely would not have incurred what are surely significant fees and expenses. Because they did, Thomas Nelson must shoulder some of that burden. The Court also takes into account EPAC's role in initiating the Special Master proceedings and the fact that it would have incurred some portion of these fees in the normal course of litigation.

The Special Master's recommendation that EPAC be awarded nominal attorneys' fees is therefore adopted in part. Thomas Nelson is assessed fifty percent of the reasonable costs and attorneys' fees incurred by EPAC during the Special Master proceedings.

Within twenty-eight days from entry of this order, EPAC shall submit an itemized schedule of the reasonable costs and attorneys' fees it incurred in connection with the Special Master proceedings. The reasonableness of the attorneys' fees shall be supported by proof, such as affidavits or declarations from practitioners in this district. Thomas Nelson may respond within fourteen days of EPAC's filing. EPAC may file a reply, limited to five pages, within seven days of Thomas Nelson's response.

## IV. CONCLUSION

For the foregoing reasons, the Court ADOPTS IN PART and REJECTS IN PART the Special Master's report and recommendation. To the extent the parties' objections are contrary to the Court's opinion, they are OVERRULED. The Court's findings made in this order will be applied as relevant in any future discovery disputes that may arise in this litigation.

It is so ORDERED.

ALISTAIR E. NEWBERN
United States Magistrate Judge