| | | |
|---|---|---|
| EPAC TECHNOLOGIES, INC., | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:12-cv-00463** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| HARPERCOLLINS CHRISTIAN | ) | |
| PUBLISHING, INC., f/k/a THOMAS | ) | |
| NELSON, INC., | ) | |
| | ) | |
|     **Defendant.** | | |

## ORDER AND MEMORANDUM OPINION

This case is set for a jury trial beginning on **January 8, 2019, at 9:00a.m.** The Court held a final pretrial conference on **January 4, 2019**. For the reasons given at that conference, as well as the reasons stated below, the Court rules as follows:

1. ## EPAC's Motions In Limine

    A. **EPAC's Motion In Limine No. 1**

Before the Court is EPAC's Motion *In Limine* No. 1: To Preclude All Evidence Regarding EPAC's Performance And/Or Ability To Perform After April 6, 2011. (Doc. No. 811.) Thomas Nelson has filed a response in opposition (Doc. No. 811), to which EPAC has replied (Doc. No. 904). For the following reasons, EPAC's Motion *In Limine* No. 1 will be denied.

This is a simple contract dispute with the main issue being whether Thomas Nelson had cause to terminate the Master Services Agreement ("MSA") with EPAC. (Doc. No. 737.) After Thomas Nelson hired EPAC to print books using EPAC2 technology at the Fairfield, Ohio facility. (Doc. No. 647 at 2, 4.) During the cure period, EPAC printed books using the EPAC2 technology, mostly at a facility in New Jersey, inspected the books, and sent the books to Thomas Nelson.

(Doc. No. 647 at 12.) Thomas Nelson destroyed the books that were not good quality. (Doc. No. 435 at 5.) Thomas Nelson then terminated the contract, alleging that (1) the books were not good quality; (2) EPAC did not use the correct facility to ship the books; and (3) the EPAC2 facility could not produce a sufficient quantity of books to keep pace with Thomas Nelson's demand. (Doc. Nos. 491-2, 491-3.) Thomas Nelson instead contracted with Lightning Source, Inc. ("LSI") to print its books, and EPAC subsequently sold its interest in the EPAC2 technology and its Fairfield, Ohio facility to LSI. (Doc. No. 586 at 8.)

EPAC moves to preclude Thomas Nelson from offering any evidence or argument regarding EPAC's ability to fulfill its obligations under the MSA after April 6, 2011 (the last day the MSA was operative). (Doc. No. 811 at 1.) EPAC first argues that such evidence is irrelevant and inadmissible because EPAC's ability to fulfill its obligations under the MSA, after the agreement was no longer operative, is not a fact of consequence at trial, and, therefore, such evidence is inadmissible. (Id. at 4.) EPAC acknowledges that this Court previously permitted discovery regarding this issue but argues that the standard for seeking discovery ("reasonably calculated to lead to the discovery of admissible evidence") is much broader than the standard for admissible evidence (admissible evidence must have a "tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence.") (Id. at 4.) EPAC maintains that any evidence regarding the quality of books not covered by the express terms of the MSA, including those produced under other contracts or after the MSA was terminated, is irrelevant. (Id. at 5.)

Next, EPAC seeks exclusion of evidence because Thomas Nelson anticipatorily breached the MSA, and, as a result, EPAC's ability to tender performance of its obligations under the MSA, post-breach, is irrelevant. (Id. at 6-7.) Moreover, EPAC asserts that, even if such evidence was

relevant, its introduction would mislead and confuse the jury by shifting the jury's attention from the quality of books EPAC produced under the MSA. (Id. at 7.) EPAC concludes that to permit post-termination evidence "would be as prejudicial as trying to hold Ford liable because its cars were not Chevys." (Id.) Finally, EPAC argues that such evidence would (1) lack a proper foundations under Fed. R. Evid. 602; and (2) require improper lay opinion testimony under Fed. R. Evid. 701. (Id. at 8-9.)

Thomas Nelson first responds that the post-termination evidence is relevant because it demonstrates why termination of the MSA was justified. (Doc. No. 858 at 1.) Thomas Nelson argues that, because manufacturing systems tend to improve over time, a reasonable juror could infer that the EPAC2 system's inability to produce quality books at the required volume in the months after April 2011 supports a conclusion that the EPAC system also performed poorly prior to the MSA's termination. (Id. at 2.) Regarding EPAC's anticipatory repudiation argument, Thomas Nelson contends that it does nothing to refute the clear relevance of EPAC's ability, after the MSA's termination, to produce books meeting the MSA's prior specifications. (Id.) Further, Thomas Nelson contends that the inferences to be drawn from EPAC's post-termination inabilities, and the weight to give those inferences, are decisions for the jury. (Id. at 3-5.)

Pre-trial motions *in limine* are a method to exclude irrelevant and overly prejudicial evidence and "a method of 'narrow[ing] the evidentiary issues for trial and . . . eliminat[ing] unnecessary trial interruptions.'" See Louzon v. Ford Motor Co., 718 F.3d 556, 561 (6th Cir. 2013) (quotation omitted). The ruling is a "preliminary determination in preparation for trial" and "will

be reversed only where the court abuses its discretion." <u>Pigott v. Battle Ground Acad.</u>, No. 3:11-CV-0764, 2013 WL 1775068, at *1 (M.D. Tenn. Apr. 25, 2013).[1]

First, the Court finds that evidence and argument regarding EPAC's ability to fulfill its obligations under the MSA after April 6, 2011 is relevant. Under Federal Rule of Evidence 401, evidence is relevant if (1) it has any tendency to make a fact more or less probable than it would be without the evidence; and (2) the fact is of consequence in determining the action. Here, showing that EPAC and LSI had at least some difficulties with its EPAC2 system after the MSA's termination is circumstantial evidence that tends to show that EPAC's ability to produce books within the MSA's specifications while the agreement was operative is less probable. Further, this is a fact of consequence because this entire case concerns whether Thomas Nelson was or was not justified in terminating the MSA. Accordingly, the Court finds the evidence relevant. The Court rejects EPAC's argument that, because Thomas Nelson anticipatorily breached the MSA, EPAC's ability to tender performance of the MSA is irrelevant. This argument simply has no bearing on whether the post-termination abilities of EPAC tends to make it less probable that EPAC was sufficiently fulfilling the MSA's terms at the time the agreement was operative.

The Court also finds that such evidence will not unfairly prejudice EPAC, nor will it confuse the jury. <u>See</u> Fed. R. Evid. 403. The evidence has probative value, and the Court does not believe that there is any significant danger that such evidence will unfairly prejudice EPAC or mislead the jury. <u>Id.</u> Thus, for the reasons outlined above, EPAC's Motion In Limine No. 1: To Preclude All Evidence Regarding EPAC's Performance And/Or Ability To Perform After April 6, 2011 is **DENIED**.

---

[1] The Court notes that the above-referenced general law applies to each of EPAC's individual motions *in limine*.

## B.    EPAC's Motion In Limine No. 2

Before the Court is EPAC's Motion *In Limine* No. 2: To Preclude All Evidence Regarding The LSI Acquisition. (Doc. No. 812.) Thomas Nelson has filed a response (Doc. No. 858), to which EPAC has replied (Doc. No. 904). For the following reasons, EPAC's motion in limine will be denied.

In its motion, EPAC argues that Thomas Nelson should be prevented from offering any evidence or argument regarding non-party Lightning Source, LLC's ("LSI") acquisition of EPAC's EPAC2 system assets. (Doc. No. 812 at 1.) EPAC argues that such evidence is irrelevant and inadmissible because it concerns activity that occurred after Thomas Nelson anticipatorily breached the MSA. (Id. at 3.) Again, EPAC relies upon the doctrine of anticipatory breach to conclude that the non-repudiating party (in this case EPAC) is not required to prove its ability to perform in the future. (Id.) Moreover, EPAC maintains that even if such evidence has probative value, it will mislead and confuse the jury regarding EPAC's damages. (Id. at 4.)

Thomas Nelson responds that EPAC's post-termination transaction with LSI is relevant evidence concerning EPAC's mitigation of damages and its inability to perform. (Doc. No. 858 at 7.) Thomas Nelson argues that, by its very nature, evidence of mitigation of damages occurs post-breach, and, therefore, EPAC's argument that such evidence is irrelevant is nonsensical. (Id.) Thomas Nelson also asserts that EPAC's anticipatory-repudiation argument is wrong as a matter of law because the Court is not required to ignore events that occur post-termination. (Id.) Citing New York Trust Co. v. Island Oil & Transport Corp., 34 F.2d 653, 654 (2d 1929), Thomas Nelson explains that damages can never do more than restore the injured party to the position he would have been in, had the non-breaching party performed. (Id. at 7-8.)

Here, the Court believes that evidence/argument related to EPAC's transaction with LSI is relevant and admissible. EPAC's sale of the EPAC2 system to LSI has relevance on EPAC's alleged breach of contract and fraudulent concealment claims. Therefore, the Court will permit evidence regarding the LSI acquisition of the EPAC2 system, consistent with the Federal Rules of Evidence. EPAC's Motion *In Limine* No. 2: To Preclude All Evidence Regarding The LSI Acquisition is **DENIED**.

### C.     EPAC's Motion In Limine No. 3

Before the Court is EPAC's Motion *In Limine* No. 3: To Preclude All Evidence Regarding The "Stress Test," Or, In The Alternative, To Preclude Testimony of LSI Representatives As Cumulative And Redundant. (Doc. No. 813.) Thomas Nelson has filed a response (Doc. No. 858), to which EPAC has replied (Doc. No. 904). For the following reasons, EPAC's motion in limine will be denied.

As part of its purchase of the EPAC2 assets, LSI conducted a "stress test" of the EPAC2 system. (Doc. No. 813 at 2-3.) In the instant motion, EPAC seeks to suppress any evidence or argument regarding LSI's stress test, arguing that the evidence is irrelevant and inadmissible. (Id. at 3.) EPAC argues that the LSI stress test did not test EPAC's capacity to manufacture books according to Thomas Nelson's specifications but, rather, tested the EPAC2 system's ability to print files and bar codes according to LSI's specific customer specifications. (Id. at 3-4.) Because of this significant variation, EPAC contends that the LSI stress test is irrelevant. (Id. at 4.)

EPAC also argues that the LSI stress test is "experimental evidence" and, as such, it is not "substantially similar" to the conditions and circumstances in which EPAC produced Thomas Nelson's books under the MSA. (Id. at 4-5.) EPAC believes that evidence regarding the LSI stress test will mislead and confuse the jury by creating the false impression that the "stress test"

replicated EPAC's manufacture of books for Thomas Nelson under the MSA. (Id. at 6.) In the alternative, EPAC argues that any evidence of the LSI stress test should be limited to the testimony of LSI representative John Secrest because testimony from other LSI representatives would be cumulative and redundant. (Id. at 6-7.)

Thomas Nelson responds that the Court has already found the LSI stress test relevant in a prior order. (Doc. No. 858 at 2.) Further, Thomas Nelson argues that the inferences to be drawn from the LSI stress test and the weight to give those inferences are decisions for the jury. (Id. at 3-4.) Thomas Nelson also contends that the LSI stress test was conducted under sufficiently similar conditions because LSI conducted the test using EPAC's own EPAC2 facility. (Id. at 4 n.3.) Finally, Thomas Nelson asserts that multiple LSI representatives, including those who conducted the stress test, should be allowed to testify because the probative value of these witnesses' testimony is high, their testimony will not be cumulative, and the value of the testimony will not be substantially outweighed by any countervailing factors. (Id. at 6.)

First, the Court notes that, as to Thomas Nelson's contention that the LSI stress test was already deemed relevant in a prior order, Thomas Nelson is mistaken. In the cited order, the Court merely noted that, to the extent Thomas Nelson sought information about the EPAC2 technology on the date EPAC sold its interest in the technology to LSI, such discovery was relevant. (See Doc. No. 753 at 2.) The Court did not make any finding that such evidence, if discovered, would be relevant at trial.

Second, the Court finds that the results of the LSI stress test are relevant because it constitutes circumstantial evidence. Although the purpose of the LSI stress test was not to measure EPAC's ability to produce books according to Thomas Nelson's specifications, the LSI stress test measured, at least in part, the EPAC2 system's speed and capacity at that point in time. (See Doc.

No. 813-1 at 12.) Thus, the LSI stress test is relevant because it tends to make a fact of consequence in the action (i.e., the general capabilities and problems regarding the EPAC2 system) more or less probable. See Fed. R. Evid. 401.

To the extent that EPAC categorizes the LSI stress test as "experimental evidence," the Court disagrees. The Sixth Circuit has held that "[e]xperimental evidence is admissible so long as the evidence is relevant and probative, and experimental evidence is deemed to have probative value if the conditions of the experiment were identical with or similar to the conditions of the transaction in litigation." Crown Cork & Seal Co. v. Morton Pharm., Inc., 417 F.2d 921, 926 (6th Cir. 1969). The conditions of the experiment must be "substantially similar" to those of the event at issue, but "[a]dmissibility . . . . does not depend on perfect identity between actual and experimental conditions." Persian Galleries, Inc. v. Transcon. Ins. Co., 38 F.3d 253, 258 (6th Cir. 1994) (citation and quotation marks omitted). Where the conditions are substantially similar, "dissimilarities affect the weight of the evidence, not its admissibility." Id. (citation and quotation marks omitted).

The cases considering "experimental evidence" generally involve experiments conducted by parties for the purposes of litigation, which are subsequently sought to be introduced at trial. See United States v. Baldwin, 418 F.3d 575, 579 (6th Cir. 2005) ("The video reenactment, made for the purpose of demonstrating that Baldwin was physically capable of unzipping his pants while allegedly bound in his car, is a form of experimental evidence."); Persian Galleries, Inc., 38 F.3d at 257 ("Defendant next argued that the district court erred in admitting evidence of a videotaped reenactment of the alleged theft."). Here, the LSI stress test was conducted as part of the sale of the EPAC2 system to LSI. The test was not performed with any eye towards litigation. The Court concludes that evidence related to the LSI stress test is not subject to the "substantial similarity"

test outlined by the Sixth Circuit. Nonetheless, in any event, the Court concludes that the LSI stress test was substantially similar to the process by which EPAC used the EPAC2 system to produce books for Thomas Nelson and any discrepancies between the processes affects the weight, rather than the admissibility, of this circumstantial evidence. See Persian Galleries, Inc., 38 F.3d at 258 ("Ordinarily, dissimilarities affect the weight of the evidence, not its admissibility.") (quoting Champeau v. Fruehauf Corp., 814 F.2d 1271, 1278 (8th Cir. 1987).

Finally, the Court may allow testimony from multiple LSI representatives, subject to any proper objection under the Federal Rules of Evidence, including cumulative testimony. See Fed. R. Evid. 403. Accordingly, EPAC's Motion *In Limine* No. 3: To Preclude All Evidence Regarding The "Stress Test," Or, In The Alternative, To Preclude Testimony of LSI Representatives As Cumulative And Redundant is **DENIED**.

### D.     EPAC's Motion In Limine No. 4

Before the Court is EPAC's Motion *In Limine* No. 4: To Preclude Evidence That EPAC's Work Product Did Not Conform to EPAC's Limited Warranty Under The Master Services Agreement. (Doc. No. 814.) Thomas Nelson has filed a response (Doc. No. 859), to which EPAC has replied (Doc. No. 905). For the following reasons, EPAC's motion in limine will be denied.

EPAC seeks to exclude any evidence or argument that the Work Product ordered by Thomas Nelson and delivered by EPAC did not conform to the limited warranty contained in the MSA. (Doc. No. 814 at 1.) EPAC argues that any non-conforming Work Product did not constitute a breach of the MSA as long as (1) EPAC replaced the non-conforming Work Product; and (2) the percentage of non-conforming Work Product did not exceed a predetermined threshold. (Id. at 4-5.) Because Thomas Nelson was required to return the non-conforming Work Product and provide a written explanation of the alleged non-conformity, EPAC argues that Thomas Nelson did not

reject, let alone return, any of the Work Product produced under the MSA. (Id.) Rather than rejecting and returning the allegedly non-conforming Work Product, Thomas Nelson either sold or destroyed it. (Id.) Thus, Thomas Nelson accepted the Work Product as a matter of law. (Id. at 6.) As a result, any evidence or argument regarding the allegedly non-conforming Work Product has no probative value and is irrelevant. (Id.) Alternatively, EPAC maintains that, even if such evidence has probative value, it would mislead and confuse the jury. (Id.)

Thomas Nelson disagrees because EPAC's limited warranty argument presupposes that the MSA's limited warranty provisions (Sections 3(f) and 6(a)) became operative. (Doc. No. 859 at 1.) Thomas Nelson asserts that these provisions never became operative because EPAC and Thomas Nelson's arrangement never extended past the "testing phase." (Id.)

"[M]otions in limine are not proper procedural devices for the wholesale disposition of theories or defenses." SPX Corp. v. Bartec USA, LLC, No. 06–14888, 2008 WL 3850770, at *3 (E.D. Mich. Aug.12, 2008); see also ABC Beverage Corp. & Subsidiaries v. United States, No. 1:07–cv–051, 2008 WL 5424174, at *2 (W.D. Mich. Dec. 4, 2008) (noting that motions in limine are not "substitutes for dispositive motions."); Goldman v. Healthcare Mgmt. Sys., Inc., 559 F. Supp. 2d 853, 871 (W.D. Mich. 2008) (collecting cases). "Orders in limine which exclude broad categories of evidence should rarely be employed." Sperberg v. Goodyear Tire & Rubber Co., 519 F.2d 708, 712 (6th Cir. 1975) (involving a situation where the parties conducted a trial under an order prohibiting references to three pending cases involving the same plaintiff and three other similarly situated defendants). Accordingly, "[w]here . . . the motion in limine is no more than a rephrases summary-judgment motion, the motion should not be considered. Louzon, 718 F.3d at 563.

Here, the Court finds that EPAC is essentially attempting to reassert its summary judgment arguments in the instant motion. In its previous summary judgment order, the Court specifically noted that EPAC's breach of contract claims involved disputed issues of fact, including whether EPAC was able to "consistently make quality books at the volumes required." (Doc. No. 737 at 2.) EPAC's instant motion also seeks to exclude broad swaths of relevant evidence and the Court is disinclined to grant this request. See Sperberg, 519 F.2d at 712. Moreover, Thomas Nelson's Cure Letter makes references to EPAC's failure to test a "24-hour turn of the product" and "failure to provide any satisfactory Work Product in the form of test runs." (Doc. No. 491-1 at 2-3.) Accordingly, EPAC's Motion In Limine No. 4 is **DENIED**.

### E.        EPAC's Motion In Limine No. 5

Before the Court is EPAC's Motion In Limine No. 5: To Preclude Evidence of Any Alleged Breach of the Master Services Agreement by Plaintiff Other Than EPAC's Alleged Breach of its Limited Warranty. (Doc. No. 815.) Thomas Nelson has filed a response (Doc. No. 859), to which EPAC has replied (Doc. No. 905). For the following reasons, EPAC's motion in limine will be denied.

EPAC seeks to prevent Thomas Nelson from offering any evidence or argument regarding EPAC's alleged breach of the MSA other than those alleged in the "Notice and Cure Letter" Thomas Nelson sent, notifying EPAC that they were in violation of the MSA's limited warranty provisions. (Doc. No. 815 at 3.) EPAC assumes that Thomas Nelson will claim that the limited warranty never came into operation and that its allegations in the Notice and Cure Letter regarding quality strictly relate to sample books produced during the "testing phase." (Id. at 3-4.) EPAC asserts that such evidence and argument is improper because the MSA specifically provided for a notice and right to cure and Thomas Nelson's termination and repudiation of the MSA can only

be justified by the alleged breaches included in the Notice and Cure Letter. (<u>Id.</u> at 5.) Therefore, Thomas Nelson cannot rely on any other alleged breach of the MSA and is limited to presenting argument and evidence of the alleged breaches contained in the Notice and Cure Letter. (<u>Id.</u>)

Indeed, Thomas Nelson responds that (1) the MSA's limited warranty provisions never became operative because the arrangement between the parties never progressed past the MSA's testing phase; and (2) EPAC mischaracterizes the Notice and Cure Letter. (Doc. No. 859 at 2-5.) Thomas Nelson argues that the Notice and Cure specifically references EPAC's failures during the testing phase, and, in any event, the question of whether the notice is sufficient is a question of fact for the jury. (<u>Id.</u> at 3-4.)

As with EPAC's Motion in Limine No. 4, the Court finds that EPAC is essentially attempting to reassert its summary judgment argument in the instant motion. <u>Louzon</u>, 718 F.3d at 563; <u>ABC Beverage Corp. & Subsidiaries</u>, 2008 WL 5424174 at *2. Further, taking the parties' arguments at face value, there are significant unresolved factual issues, including (1) whether there was a "testing period" under the MSA; and (2) if so, whether this "testing phase" ended before Thomas Nelson's termination of the MSA. Moreover, Thomas Nelson's Cure Letter contains explicit references to a testing phase. (Doc. No. 491-1 at 2-3.) Because resolving these factual issues is necessary to deciding the instant motion and resolving any factual issue on a motion in limine is inappropriate, EPAC's Motion in Limine No. 5 is **DENIED**. <u>Goldman</u>, 559 F. Supp. 2d at 871.

F.    **EPAC Motion In Limine No. 6**

Before the Court is EPAC's Motion In Limine No. 6: To Preclude Testimony of Witnesses Disclosed for the First Time After the Close of Written Discovery. (Doc. No. 816.) Thomas Nelson

has filed a response (Doc. No. 860), to which EPAC has replied (Doc. No. 905). For the following reasons, EPAC's motion in limine will be denied as moot.

Thomas Nelson notes that it is not calling Charles Marshall or Mark Harris to testify at trial. Additionally, the Court previously addressed EPAC's "future affiliates" damages theory in Thomas Nelson's Motion In Limine No. 1. (Doc. No. 941.) The Court granted Thomas Nelson's Motion In Limine No. 1 and, and in granting the motion, excluded any discussion, argument, or evidence related to EPAC's alleged lost profits based on book orders by HarperCollins Publishers L.L.C., The Zondervan Corporation L.L.C., Vida Publishers LLC or any other future affiliates of Thomas Nelson. (Id. at 5.) Therefore, because no evidence will be presented on EPAC'S "future affiliates" damages theory, the only issue Nevins was set to testify about, EPAC's Motion In Limine No. 6 is **DENIED AS MOOT**.

### G. EPAC Motion In Limine No. 7

EPAC's Motion In Limine No. 7 (Doc. No. 817) is addressed in a separate section below.

### 2. <u>Thomas Nelson's Motions in Limine</u>

### A. Thomas Nelson's Motion In Limine No. 3

Before the Court is Thomas Nelson's Motion In Limine No. 3: To Exclude Evidence of EPAC's Alleged Lost Profits Based on Sales After March 21, 2012. (Doc. No. 792.) EPAC has filed a response in opposition (Doc. No. 871), to which Thomas Nelson has responded (Doc. No. 909). For the following reasons, Thomas Nelson's Motion in Limine No. 3 will be denied.

Thomas Nelson moves to exclude any discussion, argument or evidence related to EPAC's supposed "lost profits" based on "lost" sales after March 21, 2012, the date on which EPAC sold its EPAC2 system to Lightning Source, Inc. ("LSI"). (Doc. No. 792 at 1.) Previously, the Court, on summary judgment, allowed EPAC's post-March 2012 damages theory to proceed because

there was no evidence that EPAC would have closed/sold the EPAC2 system to LSI but for Thomas Nelson's termination of the MSA. (See Doc. No. 737 at 6-7). In its motion in limine, Thomas Nelson argues that this ruling was incorrect because the reason EPAC closed and sold the EPAC2 business is not legally relevant. (Doc. No. 792 at 1.) Essentially, Thomas Nelson argues that: (1) under New York law, that EPAC could no longer produce EPAC2 books after March 21, 2012 prevents any claim for "lost sales" of EPAC2 books after that date; and (2) the reason EPAC sold its EPAC2 assets (even if such sale was the result of Thomas Nelson's termination of the MSA) is legally irrelevant. (Id. at 1-2.) Thomas Nelson notes that, if its termination of the MSA was the reason EPAC sold the EPAC2 assets to LSI, the proceeds from that sale ($40+ million) should be deducted from EPAC's alleged damages. (Id. at 2-3.)

EPAC first responds that Thomas Nelson's instant arguments were squarely addressed and rejected on summary judgment, and, therefore, Thomas Nelson's attempt to reiterate these arguments in its motion in limine is procedurally improper. (Doc. 871 at 3-4.) On the merits, EPAC argues that it is entitled, under New York law, to seek lost profits based on sales it would have made after March 21, 2012 because, as the non-terminating party, it does not need to prove its ability to perform its obligations under the MSA after Thomas Nelson's repudiation. (Id. at 4-5.) EPAC asserts that because the MSA had already been terminated when it sold the EPAC2 business to LSI, the proceeds from the sale were not attributable to the events surrounding the MSA. (Id. at 6.) Therefore, EPAC maintains that the proceeds from that sale are wholly irrelevant to the calculation of profits EPAC would have earned and seeks to recover from Thomas Nelson. (Id.)

The Court is persuaded that the issues raised by Thomas Nelson in its motion in limine were directly addressed by the Court in its previous summary judgment ruling. (See Doc. No. 737 at 6.) "Where, as here, the motion in limine is no more than a rephrased summary-judgment

motion, the motion should not be considered." <u>Louzon</u>, 718 F.3d 556, 563 (6th Cir. 2013). Further, the Court notes that significant factual questions surround this issue, including EPAC's reasons for selling the EPAC2 system. Moreover, as an evidentiary matter, EPAC is entitled to put on evidence for the entirety of the original 5-year term on the MSA. <u>See</u> <u>American List Corp. v. U.S. News & World Report</u>, 75 N.Y. 2d 38, 44 (Ct. App. N.Y. 1989) ("[A] wrongful repudiation of the contract by one party before the time for performance entitles the non-repudiating party to immediately claim damages for a total breach.") Accordingly, the Court will not again consider Thomas Nelson's argument regarding the sale of the EPAC2 system to LSI. Thomas Nelson's Motion In Limine No. 3: To Exclude Evidence of EPAC's Alleged Lost Profits Based on Sales After March 21, 2012 (Doc. No. 792) is **DENIED**.

### B.      Thomas Nelson's Motion In Limine No. 4

Before the Court is Thomas Nelson's Motion In Limine No. 4: To (A) Limit Evidence of Disclosures of "The Terms, Conditions, Or Other Facts" Of The Parties' Relationship To Alleged Disclosures That Pre-Date April 29, 2009 And (B) To Exclude Any Talk Or Evidence Concerning Thomas Nelson's "Code Of Ethics." (Doc. No. 794.) EPAC has filed a response in opposition (Doc. No. 872), to which Thomas Nelson has responded (Doc. No. 909). For the following reasons, Thomas Nelson's Motion In Limine No. 4 is will be granted.

EPAC asserts several breach of contract claims, including a claim that Thomas Nelson breached a contractual non-disclosure agreement (the "CNDA") by providing LSI with certain information about EPAC's pricing and other confidential contractual terms in June 2010. (Doc. No. 794 at 1.) Thomas Nelson argues that the CNDA expired in April 2009, and, therefore, any evidence of improper disclosures after April 2009, such as the ones that are alleged to have occurred in June 2010, are immaterial and can only mislead and confuse the jury. (<u>Id.</u> at 1-2.)

Thomas Nelson also asserts that any testimony or other evidence related to its "Code of Ethics" is legally irrelevant, unduly prejudicial, and should be excluded from trial. (Id. at 2-3.) EPAC, of course, disagrees.

As background, the Court considered EPAC's CNDA claim on summary judgment. (Doc. No. 737 at 2.) At summary judgment, the Court determined that it was "disputed whether Thomas Nelson disclosed confidential pricing information to Lightning Source, LLC." (Id.) Therefore, given that there were "questions of fact for the jury, including Thomas Nelson's disclosure of confidential information," the Court denied summary judgment on EPAC's CNDA breach of contract claim. (Id. at 2-3.) The Court agrees with EPAC that it is entitled to present evidence of any violation of the CNDA, but only for the life of the agreement, which expired on April 29, 2009. (See Doc. No. 173 at 3.) Accordingly, the Court **GRANTS** Thomas Nelson's motion to the extent it seeks to exclude evidence related to any post-April 29, 2009 violations of the CNDA. However, EPAC may present argument or evidence regarding any violation that occurred during the operation of the CNDA.

The Court also agrees with Thomas Nelson that introduction of evidence relating to its "Code of Ethics" would likely confuse the jury. See Fed. R. Evid. 403. Thomas Nelson's alleged breach of the CNDA is a separate and distinct issue from whether such actions violated the company's own "Code of Ethics." The Court is convinced that introduction of Thomas Nelson's Code of Ethics, whether in relation to EPAC's breach of contract, fraudulent concealment, or other associated claims, would cause the jury to conflate the "Code of Ethics" with the CNDA. See Fed. R. Evid. 401, 403. Therefore, the Court **GRANTS** Thomas Nelson's motion in limine to the extent it seeks exclusion of evidence relating to its "Code of Ethics."

## C.    Thomas Nelson's Motion In Limine No. 5

Before the Court is Thomas Nelson's Motion In Limine No. 5: To Exclude Evidence of Claimed Damages Based On Unjust Enrichment. (Doc. No. 795.) EPAC has filed a response in opposition (Doc. No. 873), to which Thomas Nelson has responded (Doc. No. 909). For the following reasons, Thomas Nelson's Motion in Limine No. 5 will be granted in part and denied in part.

Thomas Nelson moves to exclude any discussion, argument or evidence related to "damages" based on any alleged unjust enrichment resulting from Thomas Nelson's termination of the MSA. (Doc. No. 795 at 1.) Thomas Nelson argues that this discussion, argument, and evidence should be excluded because: (1) EPAC abandoned any unjust enrichment damages claim at summary judgment; and (2) EPAC's remaining breach of contract and fraudulent concealment claims do not provide for damages based on a theory of unjust enrichment. (Id. at 2-3.) In response, EPAC argues that: (1) it did not abandon its right to present unjust enrichment damages because fraudulent concealment provides for them; and (2) evidence of Thomas Nelson's unjust enrichment is relevant to its compensatory and punitive damages theories. (Doc. No. 873 at 1-4.)

The Court agrees that EPAC abandoned any standalone damages theory based on unjust enrichment during summary judgment, but it nonetheless maintained that "the amount of profit that Thomas Nelson realized because of its wrongful termination and breach of the MSA is relevant to and a part of EPAC's damages analysis." (Doc. No. 503 at 18.) The Court's statement in its Memorandum Opinion that "EPAC responds that it is not seeking unjust enrichment damages" meant just that—EPAC had abandoned any standalone damages theory based on unjust enrichment. (Doc. No. 737 at 6.) However, EPAC may seek such damages if legally allowable under another theory of recovery. This motion will be **GRANTED IN PART** and any evidence

for unjust enrichment based on an unjust enrichment theory of recovery will be excluded, but **DENIED IN PART** if EPAC asserts a separate theory of recovery that entitled them to unjust enrichment.

### D.     Thomas Nelson's Motion In Limine No. 6

Before the Court is Thomas Nelson's Motion In Limine No. 6: To Exclude Testimony of Sasha Dobrovolsky About Events That Occurred Between June 1, 2009 and March 1, 2011 (Doc. No. 796.) EPAC has filed a response in opposition (Doc. No. 874), to which Thomas Nelson has responded (Doc. No. 909). For the following reasons, Thomas Nelson's Motion In Limine No. 6 will be denied.

Thomas Nelson moves to exclude testimony by Sasha Dobrovolsky, EPAC's CEO, about events that occurred between June 1, 2009 and March 1, 2011, (Doc. No. 796 at 1.), because Mr. Dobrovolsky left his employment as EPAC CEO during the relevant period, he lacks the requisite personal knowledge to give such testimony. (Id. at 1-2.) EPAC explains that Dobrovolsky remained on EPAC's board during the relevant period, attended board meetings (either in person or by phone), and had meetings with other EPAC personnel. (Doc. 874 at 2.) Further, EPAC maintains that Dobrovolsky is the person most knowledgeable about EPAC and its capabilities to perform under the MSA. (Id. at 3-4.)

It appears that Dobrovolsky had sufficient involvement with EPAC during the relevant period. Although he was not EPAC's CEO and spent significant time in Australia, Dobrovolsky attended board meetings and other investment meetings and communicated with other EPAC personnel. (See Doc. Nos. 791-1, 874-1, 874-2, 874-3.) As a result, these interactions may have provided Dobrovolsky with sufficient personal knowledge such that he can testify about events that occurred at EPAC between June 1, 2009 and March 1, 2011. See Fed. R. Evid. 602 ("A witness

may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); <u>United States v. Harris</u>, 200 F. App'x 472, 489 (6th Cir. 2006) ("the threshold for admitting testimony under Rule 602 is low"); <u>Jain v. Memphis Shelby Cty Airport Auth.</u>, Case No. 08-2119-STA-dkv, 2010 WL 711311, at *2 (W.D. Tenn. Feb. 25, 2010) ("The Court should only exclude testimony for lack of personal knowledge where no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that [he] testifies about.")

Thomas Nelson's Motion *In Limine* No. 6: To Exclude Testimony of Sasha Dobrovolsky About Events That Occurred Between June 1, 2009 and March 1, 2011 is **DENIED**. Sasha Dobrovolsky will be allowed to testify consistent with the Federal Rules of Evidence.

### E.     Thomas Nelson's Motion In Limine No. 7

Before the Court is Thomas Nelson's Motion In Limine No. 7: To Exclude Evidence of Thomas Nelson's Alleged Email "Spoliation." (Doc. No. 797.) EPAC has filed a response in opposition (Doc. No. 875), to which Thomas Nelson has responded (Doc. No. 909). For the following reasons, Thomas Nelson's Motion In Limine No. 7 will be granted.

Thomas Nelson moves to exclude any discussion, argument, or evidence related to its alleged email spoliation. (Doc. No. 797 at 1.) Thomas Nelson argues that, as acknowledged in this Court's prior order, it has "effectively replaced or restored" any of the archived emails that may have been lost and that this Court has previously stated that such information is "not relevant to the parties' claims and defenses." (<u>Id.</u>) Accordingly, Thomas Nelson requests that EPAC be precluded from introducing any discussion, argument, or evidence regarding the alleged email spoliation because such information is irrelevant and would confuse the jury. (<u>Id.</u>) In response, EPAC maintains that the circumstances surrounding Thomas Nelson's email purge are relevant

because the alleged purge occurred during "the critical period between February 2011 and June 2012." (Doc. No. 875 at 3-4.) EPAC asserts that, although the Court declined to issue an adverse spoliation instruction or impose spoliation sanctions, such rulings do not preclude the Court from allowing spoliation evidence to be introduced at trial. (Id. at 2-3.)

Previously, the Court has found that (1) Thomas Nelson "effectively replaced or restored" any of the lost emails; (2) the loss of these emails was due to Thomas Nelson's negligence, rather than any intentional action; and (3) information regarding the loss/failure to preserve the emails "is not relevant to the parties' claims and defenses." (Doc. Nos. 435 at 8-9, 727 at 4.) Accordingly, no factual issues remain, and the Court finds that any such discussion, argument, or evidence relating to the alleged email spoliation would be irrelevant and likely confuse the jury. See Fed. R. Evid. 401, 403.

Thomas Nelson's Motion In Limine No. 7: To Exclude Evidence of Thomas Nelson's Alleged Email "Spoliation" is **GRANTED**. Accordingly, the Court **EXCLUDES** any discussion, argument or evidence related to Thomas Nelson's alleged email "spoliation."

### F.     Thomas Nelson's Motion In Limine No. 8

Before the Court is Thomas Nelson's Motion In Limine No. 8: To Exclude Evidence of Non-Party Kohlberg & Co., LLC's Purchase And Sale of Thomas Nelson To HarperCollins Publishers LLC. (Doc. No. 804.) EPAC has filed a response in opposition (Doc. No. 876), to which Thomas Nelson has responded (Doc. No. 909). For the following reasons, Thomas Nelson's Motion In Limine No. 8 will be granted in part and reserved in part.

Thomas Nelson moves to exclude any discussion, argument or evidence concerning the purchase and sale by non-party Kohlberg & Co. LLC ("Kohlberg") of its interest in Thomas Nelson and any profits Kohlberg made from the sale. (Doc. No. 804.) Thomas Nelson argues that: (1)

Kohlberg's purchase and sale of its interest in Thomas Nelson are irrelevant to EPAC's remaining breach of contract and fraudulent concealment claims; and (2) any evidence or argument about Kohlberg's purchase and sale of its interest in Thomas Nelson will mislead the jury, confuse the issues, and waste time. (Id. at 2-6.) Specifically, Thomas Nelson reasons that evidence regarding Kohlberg's sale of its interest in Thomas Nelson does not tend to make the breach of contract or fraudulent concealment claims at issue more or less probable, rendering such evidence irrelevant. (Id. at 3.) Further, Thomas Nelson notes that evidence of a defendant's financial condition, and by extension a non-party's financial condition, is inadmissible if it does not relate directly to the plaintiff's claims. (Id. at 3-4.) Accordingly, Thomas Nelson contends that Kohlberg's profits from its sale of Thomas Nelson to HarperCollins Christian Publishing cannot be relevant to EPAC's theory of damages. (Id. at 4.) Thomas Nelson also asserts that, even if EPAC is entitled to punitive damages, the financial condition of Kohlberg, as a non-party, is irrelevant to such a calculation. (Id. at 4-5.) Alternatively, Thomas Nelson argues that, even if the evidence is relevant, it should excluded under Federal Rule of Evidence 403 because (1) it would improperly encourage the jury to decide the case based on the size of Kohlberg's purported profits from the transaction; and (2) it would confuse the jury by allowing complicated issues and argument concerning ownership, financial performance, debt structure, and ancillary transactions to predominant. (Id. at 5-6.)

EPAC responds that the evidence and argument regarding Kohlberg's purchase and sale of its interest in Thomas Nelson is relevant to the calculation of how much Thomas Nelson profited from its fraudulent concealment. (Doc. No. 876 at 1-2.) Further, EPAC asserts that the evidence is relevant to the jury's determination on the proper award of punitive damages. (Id. at 3-5.) Finally, EPAC asserts that such evidence is not overly prejudicial because EPAC has hired an expert to provide testimony on its damages calculation. (Id. at 5.)

First, the Court agrees with Thomas Nelson that such evidence is irrelevant to the alleged breach of contract and fraudulent concealment claims. Kohlberg's purchase and subsequent sale of its controlling interest in Thomas Nelson has no connection with substantive allegations surrounding EPAC's claim. Indeed, EPAC does not argue that the identified evidence is relevant to its substantive claims. (See Doc. No. 876 at 1-5.) Rather, EPAC contends that the evidence is relevant to (1) its calculation of damages as to its fraudulent concealment claim; and (2) punitive damages calculation. (Id.) Accordingly, such argument or evidence will be excluded as to the liability phase of trial.

However, the Court notes that evidence and argument regarding Kohlberg's purchase and sale of its interest in Thomas Nelson may be relevant to the calculation of how much Thomas Nelson profited from its alleged fraudulent concealment. Therefore, Thomas Nelson's Motion In Limine No. 8: To Exclude Evidence of Non-Party Kohlberg & Co., LLC's Purchase And Sale of Thomas Nelson To HarperCollins Publishers LLC is **GRANTED IN PART AND RESERVED IN PART**. Accordingly, the Court will exclude any discussion, argument or evidence, at the liability phase of trial, related to the purchase and sale by non-party Kohlberg & Co. LLC ("Kohlberg") of its interest in Thomas Nelson and any profits Kohlberg made from the sale. The Court **RESERVES** decision on the admissibility of such evidence at the damages phase of trial.

### G.      Thomas Nelson's Motion In Limine No. 9

Before the Court is Thomas Nelson's Motion In Limine No. 9: To Exclude Discussion, Argument, or Evidence About Thomas Nelson's Alleged "Spoliation." (Doc. No. 806.) EPAC has filed a response in opposition (Doc. No. 877), to which Thomas Nelson has replied (Doc. No. 909). For the following reasons, Thomas Nelson's Motion In Limine No. 9 will be granted.

Thomas Nelson moves to exclude any discussion, argument, or evidence related to its alleged spoliation of evidence. (Doc. No. 806 at 1.) Thomas Nelson argues that issues relating to spoliation are for the Court—not the jury—to decide. (Id.) Moreover, Thomas Nelson asserts that EPAC has repeatedly mischaracterized the Special Master's and the Court's rulings related to the alleged spoliation, and, barring action from the Court, EPAC will likely present these improper spoliation allegations to the jury. (Id.) Thomas Nelson concludes that permitting EPAC to mischaracterize the Court's ruling and to usurp the Court's role in determining the proprietary of the spoliation allegations would ultimately confuse the jury and inject unfair prejudice into the trial. (Id.)

EPAC responds that it is entitled to present evidence on Thomas Nelson's spoliation at trial. (Doc. No. 877 at 2.) EPAC notes that this Court, in a previous order, found that Thomas Nelson failed to preserve certain evidence, including EPAC2-printed books and book samples (collectively "the books") and transactional warehouse data ("warehouse data"). (Id.) As a result, this Court ordered that EPAC was entitled to curative jury instructions regarding Thomas Nelson's failure to preserve this evidence. (Id. at 2-3.) Having already made these determination, EPAC now argues that it is entitled to place evidence in front of the jury regarding Thomas Nelson's actions to provide context for the already-ordered curative instructions. (Id. at 3.)

The Court has considered this issue previously and determined that:

4. Thomas Nelson's duty to preserve evidence arose no later than April 18, 2011 and continues to date without interruption.

5. Thomas Nelson's duty to preserve includes the ESI and physical evidence considered by the Special Master.

6. Thomas Nelson had control over EPAC2-printed books and book samples (collectively, "the books") when its duty to preserve arose.

7. Thomas Nelson negligently disposed of the books after its preservation duty was in place.

8. The books are relevant to claims and defenses in this lawsuit and EPAC is prejudiced by their loss.

9. To remedy the prejudice to EPAC from the loss of the books, the Court orders the curative measure of a jury instruction that Thomas Nelson had a duty to preserve evidence relevant to this litigation, including the books; that it breached that duty by failing to preserve the books; and that the jury may infer that, if available, the books would support EPAC's claims and be adverse to Thomas Nelson.

10. Thomas Nelson did not make reasonable efforts to preserve ESI, including warehouse data and e-mails.

11. Warehouse data showing the transactional history of EPAC-printed books were lost due to Thomas Nelson's negligence and cannot be fully replaced through additional discovery.

12. EPAC is prejudiced by the loss of the warehouse data.

13. To remedy the prejudice to EPAC from the loss of the warehouse data, and subject to revision in light of further proof, the Court orders the curative measure of a jury instruction that Thomas Nelson had a duty to preserve its warehouse data as of April 18, 2011, and that such data, now lost, would have shown whether EPAC-printed books were sold or returned, the quantity and timeliness of EPAC's order fulfillment, and from what EPAC facility the books were shipped. Thomas Nelson is also precluded from offering evidence regarding any customer complaints about EPAC books.

(Doc. No. 379 at 2.)

The Court finds that the adverse inference instruction provides sufficient context from which the jury may make a permissive inference. Therefore, Thomas Nelson's Motion *In Limine* No. 9: To Exclude Discussion, Argument, or Evidence About Thomas Nelson's Alleged "Spoliation" is **GRANTED**.

### 3. Thomas Nelson's Sanctions Motions and EPAC Motion in Limine No. 7

EPAC moves to preclude Thomas Nelson from offering any evidence or argument regarding any purported spoliation of evidence by EPAC because there has been no judicial finding

that EPAC engaged in spoliation of evidence. (Doc. No. 817 at 1.) EPAC acknowledges that Thomas Nelson has filed several spoliation motions, which remain pending before the Court. (Id. at 2-5.) EPAC asserts that there is no basis for any spoliation sanctions, and because no spoliation has been found, any reference to EPAC's alleged spoliation would be irrelevant and unduly prejudicial. (Id. at 7.)

Thomas Nelson responds that EPAC's motions is premature because, as noted, the Court has yet to rule on its pending spoliation motions. (Doc. No. 861 at 1.) Thomas Nelson, relying on its pending spoliation motions, argues that EPAC has engaged in spoliation regarding (1) database information for its EPAC2 printing system; (2) specific relevant emails concerning the EPAC2 system's capabilities; and (3) relevant financial data. (Id. at 2-3.)

A series of motions and supplemental filings made by Thomas Nelson alleges such spoliation by EPAC. (Doc. Nos. 398, 401, 434, 474, 531, 572, 629, 776.) Specifically, they allege that (1) EPAC failed to preserve electronic records of the EPAC2 production system when it transferred servers containing those data to LSI as part of the asset purchase agreement and that the data are now lost (Doc. Nos. 398, 401, 434, 474); (2) EPAC failed to preserve or produce relevant emails that Thomas Nelson obtained from other sources (Doc. No. 572); and (3) EPAC failed to produce its 2010 and 2011 tax returns and financial statements, as the Court had ordered it to do (Doc. No. 776). Referral of the pending motions (Doc. Nos. 398, 572, 853, 967) to the Magistrate Judge is **WITHDRAWN** and the motions ripe for decision.

## I.    Relevant Factual Background

### A. Alleged Spoliation of EPAC2 Production Data (Doc. No. 398)

Thomas Nelson first claims that EPAC has spoliated evidence by allowing electronic production data showing the capacity of its EPAC2 production facilities to be lost or destroyed

when it transferred the servers holding that data to third-party LSI as part of the March 2012 asset purchase agreement. This issue first came before the Court as the subject of Thomas Nelson's February 10, 2016 motion to compel (Doc. No. 232), in which Thomas Nelson sought production of information showing the capabilities of the EPAC2 technology. Specifically, Thomas Nelson asked EPAC to "[i]dentify the total number of books that each EPAC facility was capable of printing using EPAC2 technology, by month from January 1, 2010 through August 1, 2015." Thomas Nelson also sought that information categorized by customer and production facility.

Magistrate Judge Bryant found this information "undoubtedly" relevant to determining "whether EPAC's pre-contract representations about its capabilities matched its actual capabilities once the agreement was underway" and ordered that it be produced within twenty-one days of his July 6, 2016 order. (See Doc. No. 305.) EPAC sought review of that order, arguing for the first time that "[t]he data sought by these requests will constitute tens of millions of records" and production was therefore unduly burdensome. (Doc. No. 315.) Judge Todd Campbell found no basis to modify or set aside Magistrate Judge Bryant's order. (See Doc. No. 336.)

EPAC supplemented its response to Thomas Nelson's discovery requests, stating, in relevant part:

> Finally, with respect to documents reflecting the actual production volumes (and any records that may exist regarding capacity) of the facilities that were sold to LSI, EPAC does not have any such records in its possession, custody or control. Nonetheless, EPAC is issuing a subpoena to LSI, which took possession of such records as part of the asset purchase in 2012, as well as records generated thereafter. To the extent that LSI produces such documentation, EPAC will endeavor to review that information and seasonably provide a supplemental response if necessary.

(Doc. No. 361-6.)

EPAC subpoenaed this information from LSI on September 29, 2016, and LSI objected to the subpoena on October 13, 2016. (Doc. No. 346-1). LSI objected on grounds of burden and

irrelevance, but did not state that it did not possess the requested information. (Id. at 1-2.) LSI offered an in-person meeting with its in-house counsel to resolve the objections. (Id.) Although EPAC's counsel now states that several meetings followed, EPAC did not file a motion to compel or otherwise raise the issue of LSI's compliance with the subpoena to the Court.

Thomas Nelson also issued a subpoena to LSI on February 16, 2016, in which it sought "documents sufficient to identify the total number of books that each LSI facility was capable of printing using EPAC2 technology from January 1, 2012 through August 1, 2015, by month and facility." (Doc. No. 512-4.) A letter from LSI's counsel to Thomas Nelson's counsel dated August 3, 2016, states that, after meeting with Thomas Nelson's counsel, LSI understood the subpoena to be "now focused on LSI's operational due diligence of EPAC 2's print capabilities" in the context of its purchase of the EPAC2 technology and apparently produced documents directed only to that inquiry and not including the production data. (Doc. No. 512-5.)

In support of its motion for sanctions, Thomas Nelson obtained the declaration of Phil Clark, LSI's "CTO." (Doc. No. 470-2.) Clark stated that two servers that LSI obtained from EPAC in 2012 were returned to EPAC in 2015 and that LSI did not remove any "legacy data"[2] on the servers and did not "retain or possess the information contained in the servers in electronic format." (Id.) In response, EPAC produced the declarations of EPAC employees Anne-Sophie Gombart and Branden Siu. (See Doc. Nos. 512-1, 512-2). Gombart stated that LSI returned nine servers used from the Edison, New Jersey plant to EPAC in 2015 and that she and other EPAC employees found the servers "not in a usable state because data/software was missing and the servers only contained data fragments." (Doc. No. 512-1 at 3-5.) Gombart also stated her understanding that LSI retained "historic EPAC2 data" and did not produce it to EPAC because "it was commingled

---

[2]       Neither Clark nor Thomas Nelson defines this term.

with LSI data." (Id.) It is Gombart's understanding that the data remained with LSI. (Id.) Gombart also stated that she performed a search for responsive information on the returned servers and found none. (Id.) Siu states that he imaged the nine servers when EPAC received them from LSI in 2015. (Doc. 512-2 at 2-4.) Those images remain in EPAC's custody and Siu searched them for responsive information, also finding none. (Id.)

EPAC also points to a provision in the asset purchase agreement between it and LSI that it argues placed a duty on LSI to maintain all the transferred data for five years after the transaction. The Court's review of the asset purchase agreement shows that it required EPAC and LSI to provide to the other party upon reasonable notice "records and other data directly relevant to the . . . EPAC2 Business" for purposes including "facilitating the preparation for or the prosecution, defense or disposition" of any legal proceeding. Asset Purchase Agreement, Article VII, Section 7.3 (Access to Records Subsequent to Closing).

Thomas Nelson noticed LSI's Rule 30(b)(6) deposition to take place on August 13, 2018. (Doc. No. 702-1.) The deposition noticed included as a topic "[t]he capabilities and capacity of EPAC2 when LSI acquired it from EPAC" and requested production of "[a]ll documents evidencing the capabilities of the EPAC2 system as of the time before LSI made any changes or modifications to the EPAC2 system" and "[a]ll documents evidencing LSI's printing of books using EPAC2 until the point in time that LSI made any change to the EPAC2 system." (Id. at 4-5.) Thomas Nelson has filed the transcripts of the Rule 30(b)(6) depositions of LSI representatives Brian Dauphin and John Secrest, taken on August 13, 2018. It does not appear that the servers or the EPAC2 production data were addressed in either deposition. Finally, EPAC states that it recently learned that LSI maintained the requested EPAC2 production data through an "Order

Management" database portal. EPAC has obtained more than four million production records from this database and produced them to Thomas Nelson.

Thomas Nelson asks the Court to enter (1) "[a]n order precluding EPAC from introducing evidence that the EPAC2 platform was capable of consistently filling production orders as required by the Master Services Agreement dated August 1, 2010" and (2) "[a]n order precluding EPAC from offering the testimony of Charles R. Mahla at trial or any other evidence concerning lost profits from anticipated book sales." (See Doc. No. 398.)

### B. Alleged Spoliation of Emails (Doc. No. 572)

Thomas Nelson next alleges that EPAC has not produced "many important emails" between it and Thomas Nelson or LSI that Thomas Nelson or LSI did produce. (See Doc. No. 572.) Thomas Nelson argues that the discovery of these unproduced emails raises the question of what other unknown emails EPAC has not turned over and that it is prejudiced by this open question. (Id. at 1-2.) It seeks an adverse inference jury instruction that "(1) EPAC had a duty not to lose or destroy emails about whether the EPAC2 platform could consistently fulfill orders on a high-volume basis in a manner that met Thomas Nelson's quality standards; (2) EPAC lost these emails; and (3) the jury may presume that, in the lost emails, EPAC admitted that the EPAC2 platform could not meet the quality and volume production requirements of the MSA." (Id. at 2.) EPAC does not contest that it did not produce the emails Thomas Nelson identified in support of its motion, but, rather, argues that Thomas Nelson possessed and used these emails well before it sought sanctions and, therefore, has not suffered any prejudice. (See Doc. No. 895.)

### C. Alleged Spoliation of Financial Statements (Doc. No. 776)

Finally, in a "supplement" to its prior motions, Thomas Nelson argues that EPAC has also spoliated its financial data. (Doc. No. 776.) In her August 17, 2018 order, the Magistrate Judge

compelled EPAC to produce its financial statements from 2010 to 2015. (Doc. No. 727.) Although EPAC objected to the production of these statements, it did not argue at that time that they did not exist. In later communications to Thomas Nelson, EPAC stated that it did not create annual financial statements in the regular course of business, but would create comparable statements based on its financial data. EPAC also stated that it had not retained financial data for 2010 and 2011. It produced recreated financial statements for 2012 through 2015 and later produced a partial statement for 2010 based on "extrapolated" data.

Thomas Nelson finds it beyond credulity that a corporation like EPAC that receives venture capital funding and has shareholders and a board of directors would not create annual financial statements. It also points to emails referencing an earnings statement for EPAC's Fairfield, Ohio plant and EPAC's "2011 Capital Budget."[3] EPAC again asserts that it does not create annual financial statements and that it cannot produce what it does not have. It states that it has attempted to provide all relevant financial data available to it in documents created for this production. (See Doc. No. 776.)

## II.    Legal Standard

Federal Rule of Civil Procedure 37(e) governs the imposition of sanctions for the failure to preserve electronically stored information (ESI) like email, the EPAC2 production data, and electronically stored financial data. Fed. R. Civ. P. 37(e). The Rule provides that,

> [i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it and it cannot be restored or replaced through additional discovery, the court:
>
>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

---

[3] Thomas Nelson cites an email attached as "Exhibit 9" to its motion for this detail. Its motion, however, contains only eight exhibits. The attached exhibits also do not contain the proforma financial statements referenced in Thomas Nelson's motion. (Doc. No. 776.)

>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>>
>>> (A) presume that the lost information was unfavorable to the party;
>>>
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>>
>>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

The Rule thus establishes a multi-step inquiry. First, the Court must determine if there was a duty in place to preserve the ESI in question. "[A] party to civil litigation has a duty to preserve relevant information, including ESI, when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" John B. v. Goetz, 531 F.3d 448, 459 (6th Cir. 2008) (quoting Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001)). Next, the Court must ask if the party took reasonable steps to preserve the ESI and whether it can be obtained from another source. If the answer to both these inquiries is no, the Court may determine whether the party seeking the ESI has suffered prejudice from its loss and craft a remedy "no greater than necessary" to cure any resulting prejudice. Fed. R. Civ. P. 37(e)(1). The more severe sanctions available under Rule 37(e)(2), including an adverse inference jury instruction, may be imposed only on a finding of specific intent "to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). "A showing of negligence or even gross negligence will not do the trick." Applebaum v. Target Corp., 831 F.3d 740, 745 (6th Cir. 2016).

### III. Analysis

#### A. Thomas Nelson's Motion for Sanctions Regarding EPAC2 Production Data (Doc. No. 398)

Thomas Nelson has not established a record on which the Court could impose the dispositive sanctions it seeks with regard to the EPAC2 production data. Thomas Nelson alleges that EPAC lost the production data when it transferred its EPAC2 servers to LSI as part of the March 2012 asset purchase agreement. There is no question that EPAC reasonably anticipated this litigation at the time of the sale—this case was filed less than three months thereafter—and was therefore under a duty to preserve ESI that could be relevant to its claims or defenses. John B., 531 F.3d at 459. Although EPAC argues that any preservation duty it had did not include production data regarding its clients other than Thomas Nelson, it is at least arguable that its duty would extend to data showing the EPAC2 system's capabilities generally. Thomas Nelson's proof falls short, however, on the next steps of the Rule 37(e) inquiry.

Thomas Nelson argues that EPAC did not take reasonable steps to preserve the production data because it did not keep a copy of that information when it transferred its servers to LSI. In support of that argument, Thomas Nelson cites ILWU-PMA Welfare Plan Board of Trustees and ILWU-PMA Welfare Plan v. Connecticut General Life Insurance Company, No. C 15-02965 WHA, 2017 WL 345988, at *1 (N.D. Cal. Jan. 24, 2017). There, the Northern District of California found that a party did not take reasonable steps to preserve ESI when it sold its servers to another company and did not keep a copy of its data, despite the inclusion of a data preservation clause in the sales agreement. Id. at *5. The court declined to adopt a rule "that 'it is per se unreasonable for a party with a duty to preserve to fail to make any copies of [electronically stored information] before selling the systems and servers on which such [information] is housed and to depend solely on a third party to retain and preserve such [information].'" Id. at *6. Based upon the non-moving

party's admission that at least some portion of the ESI was "either irretrievably lost or susceptible to only limited reconstruction from other sources," the court found that "at least some prejudice" had been established. Id. However, the court further found that the parties had not established how the loss of ESI happened, who was responsible, or whether the ESI could be replaced from other sources. Id. As a reasonable sanction crafted to address the facts of that case, the court ordered additional discovery to address those questions at the expense of the party with the duty to retain the ESI. Id. at *7.

On the record as it now stands, there is fault to be levied on both parties, but not to warrant the sanctions under Rule 37(e) that Thomas Nelson seeks. The clause of the asset purchase agreement on which EPAC hangs its hat does not transfer responsibility to LSI as clearly as EPAC would have the Court believe. Although the clause requires EPAC and LSI to provide each other access to relevant data for five years after the transaction, it does not contain the type of explicit data retention provision referenced, for example, in the ILWU-PMA case. See ILWU-PMA, 2017 WL 345988, at *2 (noting that the sale agreement in question "provided that both parties would retain each other's business information and, until the sixth anniversary of the agreement, not destroy any such information without first notifying the other party and giving it a reasonable opportunity to take possession, at its own expense, of the information to be destroyed").

Although EPAC argues strenuously that LSI still retains the production data, it appears to have abandoned its 2016 subpoena of that information. However, EPAC states that, through its continued efforts, it has recovered the requested EPAC2 production data from a cloud portal maintained by LSI and has produced more than four million records from that cache to Thomas Nelson. (Doc. No. 895 at 7.) EPAC states that these data appear to be "a mirror copy of information that would have been transferred to or created by" LSI from January 2010 through 2012. (Doc.

No. 855-5 at 1.) Although Thomas Nelson disputes the format and comprehensiveness of this production, it does not dispute that it contains some portion of the requested data.[4]

Thomas Nelson, for its part, apparently both believes that at least some portion of these data sets are held by LSI and has forfeited its opportunities to obtain them. In August 2016, after EPAC had asserted that LSI retained this information, Thomas Nelson narrowed the scope of a request for production of documents made to LSI from one that would have included the production data to one that focused only on LSI's "operational due diligence of EPAC2's print capabilities." In 2018, Thomas Nelson noticed the Rule 30(b)(6) depositions of two LSI corporate representatives and issued subpoenas that included EPAC2's capabilities as deposition topics and, again, would have included production of these records. (Doc. No. 702.) It appears that Thomas Nelson did not pursue any questioning about the EPAC2 production data or the requested documents in either deposition. (Doc. No. 984.)

Finally, Thomas Nelson has made no showing of EPAC's intent to prevent the use of the production data in this litigation. Thomas Nelson bases its argument that EPAC acted with such intent on a statement made in EPAC's 2016 briefing on the original motion to compel the production of these data in which it stated that production would include "tens of millions of records." If EPAC had the tens of millions of records in 2016 so as to make that argument, Thomas Nelson argues, it must have destroyed them to avoid their production. It appears to the Court,

_____

[4] In a letter from EPAC's counsel to Thomas Nelson regarding this production, EPAC's counsel states that "the information reflections the orders for only five of over 4,000 publishers who ultimately used the EPAC2 facilities in Edison, New Jersey and Farfield, Ohio, and even for these customers it does not reflect any orders placed through LSI's separate ordering system for customers that would have been used from 2012-2015." (Doc. No. 855-5 at 1-2.) It is not clear to the Court whether the referenced 4,000 customers were EPAC's customers during the relevant 2010–2012 timeframe—in which case, 5 would be a very small percentage of the whole—or all of the customers of EPAC and LSI who ultimately used the EPAC2 technology.

however, that EPAC's statement reflects carelessness and puffery in its litigation of this case and not an intent to spoliate evidence.[5]

Thomas Nelson has not established the necessary proof to warrant the dispositive sanction it seeks of preventing EPAC from claiming lost profits damages or introducing the testimony of its expert witness, Dr. Mahla. Thomas Nelson has not shown that the data cannot be obtained from another source, including the portal data EPAC has recently produced, and has apparently waived its opportunities either to replace the data or make that argument conclusively. At best, the Court could impose a remedy of additional discovery to determine if LSI has retained the production data and its role in removing the data from the servers returned to EPAC. But Thomas Nelson has had that opportunity at least twice in this litigation already and has not taken advantage of it. On this record, therefore, no Rule 37(e) sanction is warranted. The motion (Doc. No. 398) is **DENIED**.

### B. Thomas Nelson's Motion for Sanctions Regarding Spoliation of Emails (Doc. No. 572)

Thomas Nelson bases its second motion for spoliation sanctions under Rule 37(e) on an argument that EPAC "has failed to preserve many important emails (or has chosen not to produce them in defiance of Court orders)." (Doc. No. 572.) Thomas Nelson states that it has found "dozens" of emails in its productions and LSI's productions that should have been produced by EPAC—it cites four examples—and that this creates an inference that "there are necessarily an unknown number of underlined internal EPAC emails and emails with LSI that EPAC has lost and not produced." (Id.) Thomas Nelson also questions EPAC's 2016 assertion that it performed a manual

---

[5] EPAC confirmed in the December 27, 2018 hearing before the Magistrate Judge that it did not have the production data when it made this statement.

review of its email production for responsiveness (Doc. No. 575-1).[6] Thomas Nelson seeks an adverse inference jury instruction under Rule 37(e)(2) that EPAC lost email it had a duty to preserve and that the jury may therefore presume that, "in the lost emails, EPAC admitted that the EPAC2 platform could not meet the quality and production requirements of the MSA." (Doc. No. 572 at 1-2.)

In response, EPAC states that Thomas Nelson has had the emails on which it bases its argument since "a[t] least as early as 2015," yet did not make its spoliation argument until the eve of trial. (Doc. No. 614.) Although EPAC does not dispute that it did not produce the four emails in question, it argues that those emails do not create an inference that EPAC failed to produce other communications of the damning nature that Thomas Nelson alleges. (Id. at 3-8.) Finally, EPAC argues that Thomas Nelson cannot make a prima facie case under Rule 37(e) because the emails have been obtained from other sources. (Id.)

The fact that Thomas Nelson has identified at least four apparently relevant emails that EPAC failed to produce is troubling. That fact alone, however, does not support the conclusion of spoliation that Thomas Nelson asks the Court to reach. Finding such intent under Rule 37(e)(2) requires more.[7] See Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 427 (S.D.N.Y. 2004) (finding willful spoliation and inferring a body of unproduced email based on one recovered

---

[6] Although Thomas Nelson states that EPAC produced only 69 pages of email containing 13 distinct email chains, that is not the extent of EPAC's email production, which it has previously represented contained at least 18,360 pages of production. (Doc. No. 68-2.)

[7] For example, the proof on which Magistrate Judge Bryant appointed the Special Master to investigate possible spoliation in this case included deposition testimony from Thomas Nelson employees as to email archives that were not searched and the existence of specific unproduced communications, in addition to emails produced to EPAC by LSI that should also have been produced by Thomas Nelson. (Doc. No. 68.) On that record and the proof developed by the Special Master, the Court still did not find intentional spoliation.

unproduced email, references made to other unproduced correspondence, and "extensive proof" that employees were deleting relevant emails). Further, it appears that Thomas Nelson has obtained the emails EPAC did not produce from other sources. That fact ends the Court's Rule 37(e) inquiry.[8] Thomas Nelson also makes no showing of the intent required to reach the adverse inference instruction it seeks under Rule 37(e)(2). Thomas Nelson's motion (Doc. No. 572) is therefore **DENIED**.

### C. Supplemental Motion for Spoliation of Financial Data (Doc. No. 776) and EPAC Motion In Limine No. 7 (Doc. No. 817)

Finally, Thomas Nelson asks that EPAC be precluded from introducing any evidence of lost profits at trial based on its failure to produce its financial statements for 2010 through 2015. (Doc. No. 776.) Again, it is troubling that EPAC did not argue in response to Thomas Nelson's motion to compel production of these statements that it did not create them in the regular course of business, coming to that argument only after the deadline for the statements' production. While Thomas Nelson protests the format of the production and its disbelief that EPAC did not create financial statements in its regular course of business, it does not dispute that it has received this information. It appears that the majority of the relevant data have been reproduced and provided to Thomas Nelson. To the extent Thomas Nelson questions EPAC's financial practices or the provenance of these data, it may explore those topics and challenge EPAC's proof of damages at trial. A Rule 37(e) sanction of excluding all proof of lost profit damages, however, is not warranted on this record. The supplemental motion (Doc. No. 776) is **DENIED**. Accordingly, because there

---

[8] Thomas Nelson does not argue that it has been prejudiced by a delay in production of these emails, the basis on which the Court imposed a remedy under Federal Rule of Civil Procedure 16 in EPAC's favor in its ruling on the Special Master's Report and Recommendation. (Doc. No. 435.)

has been no judicial finding that EPAC engaged in spoliation, its Motion In Limine No. 7 (Doc. No. 817) is **GRANTED**.

**4.  Thomas Nelson's Contempt Motions**

Thomas Nelson asks the Court to order EPAC to show cause why it should not be found in contempt for failure to comply with the Magistrate Judge's order compelling EPAC and Thomas Nelson to produce additional discovery (Doc. No. 727). Specifically, Thomas Nelson cites EPAC's (1) failure to produce production order data in an "intelligible" format; (2) failure to produce documents regarding testing of the EPAC2 technology; (3) failure to produce the full asset purchase agreement between EPAC and LSI; (4) failure to produce EPAC's tax returns for the years 2010 and 2011; and (5) failure to produce any financial statements for the years 2010 through 2015. (Doc. No. 853.) Thomas Nelson also asks for leave to file a motion for the Court to order EPAC to show cause why it should not be held in contempt for failure to produce email from the Gmail accounts of its former employees Scott Andersen and Greg Vincent. (Doc. No. 967.) The contempt motions will be denied.

**I.        Legal Standard**

"In order to hold a litigant in contempt, the movant must produce clear and convincing evidence that shows that he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." Elec. Workers Pension Tr. Fund of Local Union 58, IBEW v. Gary's Elec. Serv. Co., 340 F.3d 373, 379 (6th Cir. 2003). Willfulness or intent to disobey the court are not elements of civil contempt. Rolex Watch USA, Inc. v. Crowley, 74 F.3d 716, 720 (6th Cir.1996). A party's showing that it took all reasonable steps to achieve substantial compliance or that compliance with the court's order is impossible will avoid a contempt judgment. IBEW, 340 F.3d at 379.

## II.    Analysis

The record now before the Court does not warrant an order that EPAC show cause why it should not be found in contempt on the bases raised by Thomas Nelson. While EPAC's compliance with the Court's orders compelling discovery has not been exemplary, it appears that EPAC has taken reasonable steps to comply with those orders.

### A.  Thomas Nelson's Motion Regarding EPAC's Production of Compelled Discovery

Thomas Nelson finds fault in EPAC's production of five categories of discovery compelled by the Magistrate Judge's order (Doc. No. 727). First, Thomas Nelson claims that the production data EPAC has provided is gibberish. In its motion to compel, Thomas Nelson attached print-outs of the data showing incomprehensible chains of letters and numbers. The Court agreed that it could not interpret these data and ordered EPAC to produce the information "in its native format or 'a reasonably usable form,'" in compliance with Rule 34(b)(2)(E). (Doc. No. 727.) EPAC now states that the data have been provided in their native electronic data interchange (EDI) format, which "is for computers, not humans" and "is the very data, per Thomas Nelson's specifications, that was sent by Thomas Nelson to EPAC as the order for books." (Doc. No. 895.) Thomas Nelson has not challenged this statement or stated that it does not have the ability to process data in EDI format.

Second, EPAC confirmed in the December 27, 2018 hearing before the Magistrate Judge that three categories of discovery sought by Thomas Nelson are not available to it and therefore not able to be produced. First, EPAC stated that it has no documents reflecting any testing of the EPAC2 system in its possession. Second, EPAC stated that its accountant retained its tax returns only for a four-year period and that its 2010 and 2011 returns are therefore no longer available. Finally, EPAC has repeatedly represented to the Court that it did not regularly create financial statements and that it has provided the relevant financial data that would be contained in such

statements to Thomas Nelson. EPAC's compliance with the Court's order thus appears to be as comprehensive as possible given the records in its control.

### B. Thomas Nelson's Motion for Leave to File a Motion Addressing Production of the Andersen and Vincent Corporate Gmail Accounts

Thomas Nelson argues that EPAC has failed to comply with the Magistrate Judge's order that it produce the contents of corporate Gmail accounts maintained by its former employees Scott Andersen and Greg Vincent. In the December 27, 2018 hearing before the Magistrate Judge, EPAC stated that it has accessed and reviewed Andersen's account and found no relevant emails to produce. EPAC stated that it has unsuccessfully attempted to obtain the password to Vincent's account from Vincent and from Google.

While the parties' focus on this issue has been diverted to EPAC's quest to obtain the passwords to these accounts, that appears to be something of a wild goose chase. In an August 16, 2018 hearing before the Magistrate Judge, counsel for LSI produced what it represented to be the contents of these Gmail accounts to the Magistrate Judge in hard copy for its *in camera* review. (Doc. No. 739.) Based on the *in camera* review, the Magistrate Judge ordered EPAC to produce the email accounts' contents to Thomas Nelson. After the August 16, 2018 conference, LSI produced the hard copy of the emails to EPAC. Thomas Nelson also subpoenaed the accounts' contents to be produced at their depositions; neither Andersen nor Vincent moved to quash those subpoenas. Thomas Nelson therefore also had the opportunity to obtain this information from Andersen and Vincent directly and to address it in their depositions. Moreover, the relevant contents of the Gmail accounts that were the subject of the Magistrate Judge's order exist in hard copy and were produced to EPAC in hard copy by LSI.[9]

---

[9] The password issue may have arisen because EPAC interpreted the Magistrate Judge's August 20, 2018 order (Doc. No. 739) to require production of more than what it was given by

### III.    Conclusion

For these reasons, Thomas Nelson's motion for an order to show cause (Doc. No. 853) and motion for leave to file a motion for an order to show cause (Doc. No. 967) why EPAC should not be found in contempt of court are **DENIED**.

**5.** **Thomas Nelson's Motion to Exclude the Proposed Testimony of Plainitff's Damages Expert, Vic Alexander (Doc. No. 805)**

Pending before the Court is Thomas Nelson's "Motion to Exclude The Proposed Testimony Of Plaintiff's Damages Expert, Vic Alexander." (Doc. No. 805.) Thomas Nelson has responded in opposition. (Doc. No. 878.) For the following reasons, Thomas Nelson's motion will be granted.

### A. Alexander's Report

EPAC engaged Vic Alexander, a Certified Public Accountant, as an expert witness to calculate Thomas Nelson's gain, or "profit realized," resulting from:

> Thomas Nelson's [alleged] fraudulent, unfair, and deceptive actions in negotiating with EPAC to enter into, and Thomas Nelson's subsequent efforts to avoid its obligations under a multi-year requirements contract with EPAC by fraudulently asserting fabricated and bogus breaches of such agreement by EPAC.

(Doc. No. 717 at 2.)

In connection with this undertaking, Alexander reviewed the pleadings, other expert reports, the Master Service Agreement ("MSA"), Statement of Work, and other ancillary documents. (Id. at 19.) The majority of Alexander's expert report concerns the financial gains that non-party Kohlberg & Company ("Kohlberg") realized following their acquisition and subsequent

---

LSI. The reference to "any remaining unproduced" email, however, addressed the fact that Andersen was expected to produce the contents of his email account at his deposition taking place the following morning.

sale of Thomas Nelson. (See id. at 7-14.) Ultimately, in Alexander's "Summary of Findings and Opinions," he opines that he "was not provided sufficient information to compute the gains realized by Thomas Nelson resulting from the alleged breach as the various EPAC agreements, and the alleged fraud by Thomas Nelson beginning in August 2010." (Id. at 14.) Nonetheless, Alexander's report contains two subsidiary conclusions: (1) Thomas Nelson's enterprise value increased $92.8 million from its debt restructuring transaction in June 2010 to its acquisition by HarperCollins in October 2011; and (2) Kohlberg realized a gain of $51.6 million from its original investment in Thomas Nelson in 2009 to its ultimate sale to HarperCollins in October 2011. (Id.)

### B. Thomas Nelson's Motion to Exclude Alexander's Proposed Testimony

Thomas Nelson then filed its instant motion to exclude Alexander's proposed testimony. (Doc. No. 805.) Thomas Nelson argues that Alexander's expert opinions are irrelevant, unreliable, and prejudicial. (Id. at 3.) Thomas Nelson notes that Alexander's report "offers far-flung opinions about purported increased in Thomas Nelson's value and alleged profits realized by a non-party [Kohlberg] from an unrelated transaction." (Id. at 4.) Thomas Nelson argues that under New York law, which governs the MSA, and the MSA's express terms, EPAC's alleged damages are tied to its own losses, not the gains of Thomas Nelson or Kohlberg. (Id.) Thus, Thomas Nelson concludes that Alexander's opinions do not "fit" the relevant law and must be excluded. (Id. at 4-5.)

Second, Thomas Nelson argues that, even if EPAC was entitled to incorporate Thomas Nelson and Kohlberg's gains into its damages calculation, Alexander's report does not provide it with a basis to do so. (Id. at 5.) Alexander's report does not connect his financial analysis to the alleged misconduct or explain how it is relevant to calculating EPAC's damages. (Id.) Moreover, Alexander's report "acknowledges that it does not rely upon sufficient facts or data," and, therefore, it must be excluded. (Id. at 6.) Finally, Thomas Nelson argues that Alexander's

testimony would be unfairly prejudicial, confuse the issues, mislead the jury, and waste time. (<u>Id.</u> at 8-9.)

EPAC responds that, although Alexander was unable to provide a damages calculation, Thomas Nelson's untimely and flawed production of data and Kohlberg's refusal to produce documents were to blame for Alexander's inconclusive report. (Doc. No. 878 at 2.) EPAC argues that Alexander essentially seeks to "find the amount in which Thomas Nelson profited from its fraud," which necessarily requires calculation of the gains Thomas Nelson, and its shareholders (i.e., Kohlberg), received. (<u>Id.</u> at 4-5.) Further, EPAC contends that, because these damages are related to its fraud claim, Thomas Nelson's arguments regarding New York contract law and the MSA are inapposite. (<u>Id.</u>)

EPAC next asserts that Thomas Nelson cannot wrongfully withhold data and then attack Alexander's inconclusive report on that basis. (<u>Id.</u> at 5.) EPAC argues that it has filed additional discovery motions to obtain the necessary data but those motions either (1) have not been complied with (in regards to data held by Thomas Nelson); or (2) are awaiting the Court's ruling (in regards to data held by Kohlberg). (<u>Id.</u> at 5-6.) Finally, EPAC contends that Alexander's expert opinion is not overly prejudicial and will not confuse the jury. (<u>Id.</u> at 7.) EPAC requests that Thomas Nelson's Motion to Exclude Alexander's Proposed Testimony be denied, or, in the alternative, stayed until such a time that Alexander is provided the data he needs and supplements his report. (<u>Id.</u>)

### C. <u>Applicable Law</u>

Federal Rule of Evidence 702 governs the admissibility of an expert witness's testimony at trial. <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 589 (1993). Under Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

"[T]he trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable." Palatka v. Savage Arms, Inc., 535 Fed. Appx. 448, 453 (6th Cir. 2013) (quotation omitted). The court's task is to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592–93.

The district court acts as the "gatekeeper" on opinion evidence, Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997), and must exercise its gatekeeping function "with heightened care." United States v. Cunningham, 679 F.3d 355, 380 (6th Cir. 2012). The court will not exclude expert testimony "merely because the factual bases for an expert's opinion are weak." Andler v. Clear Channel Broad., Inc., 670 F.3d 717, 729 (6th Cir. 2012).

Rule 702 does not "require anything approaching absolute certainty." Tamaraz v. Lincoln Elec. Co., 620 F.3d 665, 671–72 (6th Cir. 2010) (citing Daubert, 509 U.S. at 590). Under Daubert, experts are "permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable basis in the knowledge and experience of the discipline." Dilts v. United Grp. Servs., LLC, 500 Fed.Appx. 440, 445 (6th Cir. 2012) (quoting Daubert, 509 U.S. at 592). "Daubert and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of the case at hand, not that they know the answer to all the questions a case presents[.]" Jahn v. Equine Servs. PSC, 233 F.3d 382, 390 (6th Cir. 2000). By the same token, "the

'knowledge' requirement of Rule 702 requires more than subjective belief or unsupported speculation." Tamraz, 620 F.3d at 670 (quoting Daubert, 509 U.S. at 590). Lastly, the "party proffering expert testimony must show by a preponderance of the evidence that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000) (citing Daubert, 509 U.S. at 592 n.10).

### D. **Analysis**

Here, the Court concludes that Alexander's opinion lacks sufficient facts and data, and, therefore, Alexander's proposed testimony must be excluded pursuant to Federal Rule of Evidence 702. Alexander's report fully acknowledges that he was unable to calculate Thomas Nelson's gain resulting from the alleged breach as to the various EPAC agreements and alleged fraud. (Doc. No. 717 at 14.) Therefore, Alexander's report necessarily lacks sufficient facts or data. See Fed. R Evid. 702. The only issue before the Court is whether Thomas Nelson and Kohlberg's alleged wrongful withholding of certain data requires a denial of its instant motion.

As noted, EPAC maintains that, but for Thomas Nelson and Kohlberg's wrongful withholding of data, Alexander would be able to complete his report. (Doc. 878 at 5-7.) EPAC argues that it has filed a Motion to Compel Thomas Nelson (Doc. No. 749) to produce this data, and this motion is pending before the Court. (Id. at 6.) EPAC also acknowledges that it is in a discovery dispute with Kohlberg over the needed data. (Id. at 6-7.) EPAC argues that Alexander's admission that he cannot complete his calculations makes him "more reliable, not less." (Id. at 7.)

First, as to EPAC's Motion to Compel, that motion contains no specific argument regarding the precise documents Kohlberg possesses that are necessary to complete Alexander's report. (See Doc. No. 749.) Moreover, in any event, EPAC's Motion to Compel has been denied. (Doc. No.

962.) Further, Alexander's report was filed in August 2018, and, to date, EPAC has made no attempt to revise or otherwise update the report. The Court considers Alexander's report as is and concludes that Alexander's expert opinion is not based on sufficient data or facts. See Fed. R. Evid. 702. Accordingly, Thomas Nelson's Motion to Exclude The Proposed Testimony Of Plaintiff's Damages Expert, Vic Alexander (Doc. No. 805) is **GRANTED**.

## 6. **EPAC's Motion to Exclude Opinions of Defendant's Expert John J. Conley (Doc. No. 819)**

Pending before the Court is EPAC's "Motion to Exclude Opinions of Defendant's Expert John J. Conley." (Doc. No. 819.) Thomas Nelson has responded in opposition. (Doc. No. 862.) For the following reasons, EPAC's motion will be denied.

### A. **EPAC's Motion To Exclude Conley Testimony**

EPAC first argues that Conley is not qualified to provide expert testimony on the manufacturing of on-demand print books (Doc. No. 819 at 5.) EPAC asserts that Conley's background includes no education or experience related to the manufacturing of on-demand print books or that qualifies him to provide an expert opinion on book manufacturing. (Id. at 6.) EPAC next argues that Conley's methodology is not sufficiently reliable. (Id.) Specifically, EPAC claims that Conley's expert opinion and report (Doc. No. 819-1) relies on information derived from LSI's "stress test" performed on the EPAC2 system; that LSI's "stress test" is irrelevant because the test was conducted after Thomas Nelson's repudiation of the MSA, and, therefore, Conley's opinion is based on irrelevant evidence. (Id. at 7-8.) Allowing Conley's opinion based on LSI's "stress test" would "mislead the jury into thinking that if the EPAC2 system did not satisfy LSI's stress testing then Thomas Nelson had a right to terminate the MSA and did not breach the agreement." (Id. at 8.)

EPAC also contends that Conley failed to review certain evidence related to EPAC's allegedly successful performance under the MSA, including emails related to EPAC's performance, books produced under the MSA, and other production data. (<u>Id.</u> at 9.) Further, EPAC argues that Conley's conclusion—that EPAC could not have performed its obligations under the MSA due to capacity issues—is based on flawed methodology that is not accepted in the relevant industry. (<u>Id.</u> at 10.) Moreover, EPAC claims that Conley, in reviewing the LSI "stress test" information, selectively interpreted the information to fit his narrative. (<u>Id.</u> at 10-11.) Finally, EPAC asserts that, even taking Conley's opinion at face value, the opinion does not assist the trier of fact because it is based on evidence that is within the purview of a lay person. (<u>Id.</u> at 11-12.)

Thomas Nelson responds that Conley is qualified to testify consistent with his report and this testimony will help the jury understand the complicated issues in this case. (Doc. No. 862 at 1.) First, Thomas Nelson contends that Conley has relevant expertise because: (1) he worked in the Book Group of R.R. Donnelly & Sons for 28 years; (2) he designed and installed automated in-line books production systems involving digital presses; (3) he worked for Xerox for a number of years helping implement digital books manufacturing solutions; and (4) currently works for his own consulting firm focused on the strategic needs of the printing and book-publishing industry. (<u>Id.</u> at 1-2.) Next, Thomas Nelson argues that Conley's testimony will help explain the basic components of an automated digital book manufacturing operation, such as the EPAC2 system, and factors that can affect capacity and quality. (<u>Id.</u> at 2.) Thomas Nelson argues that EPAC's specific criticisms of Conley's report and testimony go to the weight, rather than the admissibility, of the testimony. (<u>Id.</u> at 3.) Finally, Thomas Nelson notes that EPAC does not contest a key part of Conley's report, namely that EPAC never produced case-bound books using its EPAC2 digital

printing system. (Id. at 4.) Accordingly, Thomas Nelson requests that the Court deny EPAC's instant motion. (Id. at 5.)

**B. Applicable Law**

Federal Rule of Evidence 702 governs the admissibility of an expert witness's testimony at trial. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993). Under Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

"[T]he trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable." Palatka v. Savage Arms, Inc., 535 Fed. Appx. 448, 453 (6th Cir. 2013) (quotation omitted). The court's task is to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592–93.

The district court acts as the "gatekeeper" on opinion evidence, Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997), and must exercise its gatekeeping function "with heightened care." United States v. Cunningham, 679 F.3d 355, 380 (6th Cir. 2012). The court will not exclude expert testimony "merely because the factual bases for an expert's opinion are weak." Andler v. Clear Channel Broad., Inc., 670 F.3d 717, 729 (6th Cir. 2012). Indeed, rejection of expert testimony is the exception rather than the rule—the gatekeeping function established by Daubert was never

"intended to serve as a replacement for the adversary system." See Rose v. Matrixx Initiatives, Inc., 2009 WL 902311, at *7 (W.D. Tenn. 2009) (citing Fed. R. Evid. 702 advisory committee's note).

Rule 702 does not "require anything approaching absolute certainty." Tamaraz v. Lincoln Elec. Co., 620 F.3d 665, 671–72 (6th Cir. 2010) (citing Daubert, 509 U.S. at 590). Under Daubert, experts are "permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable basis in the knowledge and experience of the discipline." Dilts v. United Grp. Servs., LLC, 500 Fed.Appx. 440, 445 (6th Cir. 2012) (quoting Daubert, 509 U.S. at 592). "Daubert and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of the case at hand, not that they know the answer to all the questions a case presents[.]" Jahn v. Equine Servs. PSC, 233 F.3d 382, 390 (6th Cir. 2000). By the same token, "the 'knowledge' requirement of Rule 702 requires more than subjective belief or unsupported speculation." Tamraz, 620 F.3d at 670 (quoting Daubert, 509 U.S. at 590). Lastly, the "party proffering expert testimony must show by a preponderance of the evidence that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000) (citing Daubert, 509 U.S. at 592 n.10).

**C. Analysis**

First, the Court finds that Conley is a qualified expert in the subject of book manufacturing. For the past thirty-plus years, Conley has served in various positions in R.R. Donnelley and Xerox, all involving the manufacture and production of books. (See Doc. No. 819-1 at 12.) Conley has extensive experience with digital print systems and agreements related to the production of books

using a digital and other print systems. (Id.) Conley has developed several digital print solutions and previously served as the Vice President of Digital Print, leading application of the first digital print technology at R.R. Donnelley. (Id. at 13.) Based on Conley's extensive experience, the Court finds him a qualified expert on book manufacturing, notwithstanding his original degree in political science. See Mackenzie v. JLG Inuds., 2014 WL 7375546, at *5 (W.D. Ky. Dec. 29, 2014) ("[S]uch an educational requirement would violate the rule that an expert may be qualified on experience alone.")

As to EPAC's arguments that Conley's methodology is unreliable, the Court finds that EPAC's arguments essentially challenge the LSI "stress test" data itself, rather than Conley's methodology. To the extent that EPAC argues the LSI "stress test" data is "irrelevant evidence," those arguments are more appropriate in a motion in limine, and, indeed, EPAC has filed a motion in limine on this very subject, which has been denied. (See Doc. No. 813.) Further, this argument goes to the factual basis of Conley's opinion and "mere weakness in the factual basis of an expert witness's opinion bear[s] on the weight of that evidence rather than its admissibility." McClean v. Ontario LTD., 224 F.3d 797, 801 (6th Cir. 2000). EPAC's additional arguments that Conley failed to review other relevant information and ignored crucial facts also bear on the factual basis for Conley's opinion, and, therefore, affect the weight, rather than the admissibility, of Conley's testimony. Id.; see also Daubert, 509 U.S. at 596 (stating that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are still available). Finally, although EPAC attacks Conley's methodology and conclusion, those arguments do not show that Conley's opinion is "so fundamentally unsupported that it can offer no assistance to the jury." See Hartley v. Dillard's, Inc., 310 F. 3d 1054, 1061 (8th Cir. 2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not

the admissibility . . . [o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

Finally, contrary to EPAC's assertion, the Court concludes that Conley's expert opinion is based on evidence that is outside the purview of a lay person. Conley's opinion is replete with technical observations and conclusions regarding the EPAC2 system, including the system's robust maintenance requirements (starting/stopping and "buffering" issues) and alleged quality and consistency issues (trimming, binding, halftone quality). (See Doc. No. 819-1 at 3-9.) The Court finds that these matters are beyond the understanding of the average lay person and Conley's proffered expert testimony will generally help the jury. United States v. Frazier, 387 F. 3d 1244, 1262-63 ("[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person."). Moreover, the Court is convinced that Conley's opinion offers an independent evaluation of the capacity and capabilities of the EPAC2 system and is not merely a regurgitation of the LSI "stress test" data. See In re Longtop Fin. Tech. Ltd. Securities Litig., 32 F. Supp. 3d 453, 460 ("[A]n expert may not offer testimony that simply regurgitates what a party has told him or constructs a factual narrative based on record evidence."). Consequentially, the Court concludes that Conley's expert report and proffered testimony satisfy the standards set out in Fed. R. Evid. 702 and Daubert.

### D. Conclusion

For the reasons set out above, EPAC's "Motion to Exclude Opinion of Defendant's Expert John J. Conley" (Doc. No. 818) is **DENIED**.

### 7. EPAC's Motions for Leave to File Motion to Exclude Opinions of Defendant's Expert Christopher M. Lovin and Charles Baum (Doc. Nos. 1015, 1016)

Before the Court are EPAC's Motions for Leave to File Motions to Exclude Opinions of Defendant's Experts Christopher M. Loving and Charles Baum. (Doc. Nos. 1015, 1016.) Thomas

Nelson has responded in opposition. (Doc. No. 1019.) The Court agrees with Thomas Nelson that these motions are futile. The Court set an August 31, 2018 deadline for motions in limine and "any motions objecting to expert testimony." (Doc. No. 445 at 2.) EPAC's proposed motions are well outside this deadline and EPAC offers nothing to explain its late filing. Therefore, EPAC's Motions for Leave to File Motions to Exclude Opinions of Defendant's Expert Christopher M. Loving and Charles Baum are **DENIED**.

### 8. EPAC's Motions to Continue (Doc. Nos. 971, 1009)

Before the Court is EPAC's Motion to Continue Trial. (Doc. No. 971.) EPAC has also filed a Motion to Supplement its Motion to Continue Trial, to which Thomas Nelson has responded (Doc. No. 1020) and EPAC has replied (Doc. No. 1021). EPAC seeks a continuance to allow sufficient time to process and incorporate the Delta Set documents and ERP/WMS tapes into its trial strategy. (Doc. No. 1021 at 2.) Thomas Nelson argues that it has complied with all its discovery obligations and requests that EPAC's motion to continue be denied. (Doc. No. 1020 at 1-4.) The Court acknowledges that the Delta Set and ERP/WMS processes will extend to trial. However, this is not a sufficient reason to continue this 2012 case. The parties have had ample time to engage in discovery. There is no good cause to continue trial of this 2012 case. To the extent that EPAC seeks to present such documents at trial, it may request permission to present those documents to its proof. Accordingly, EPAC's Motions to Continue (Doc. Nos. 971, 1009) are **DENIED**. Finally, to the extent that the parties wish to file a Motion to Review of the Magistrate Judge's privilege log and Delta Set protocol order, any such motion must be filed by **January 5, 2019 at 11:59p.m.**, and any response must be filed by **January 6, 2019 at 11:59p.m.** No replies will be allowed.

**9. Thomas Nelson's Motion for Leave to File Thomas Nelson's Rule 26(a)(3)(B) Motion (Doc. No. 991.)**

Thomas Nelson seeks leave to file its Rule 26(a)(3)(B) Motion. (Doc. No. 991.) Thomas Nelson argues that EPAC's amended Exhibits List (Doc. No. 982), which consists of 1,101 items, is, in actuality, a staff-generated list of deposition exhibits and other documents compiled during the life of the case. (Doc. No. 991-1.) Accordingly, Thomas Nelson contends that good cause exists, pursuant to Federal Rule of Civil Procedure 26(a)(3)(B), for it to be excused from having to pull and review EPAC's 1,101 items to raise "any objection, together with the grounds for it, that may be made to the admissibility of" those proposed exhibits. (Id. at 1-2.) Thomas Nelson also requests that the Court order EPAC to promptly submit an actual trial exhibit list. (Id. at 2.) The Court finds that the sheer length of EPAC's exhibit list does not constitute good cause, and, therefore, Thomas Nelson's proposed Rule 26(a)(3)(B) Motion is futile. Thomas Nelson's Motion for Leave to File Thomas Nelson's Rule 26(a)(3)(B) Motion is **DENIED**. Thomas Nelson shall file its objections by **January 7, 2019 at 9:00a.m.**

**10. Deposition Motions (Doc. Nos. 992, 1011, 1017)**

First, the parties have filed a Joint Motion to File via Flash Drive Transcripts Containing the Parties' Deposition Designations and Objections. (Doc. No. 992.) Pursuant to Local Rule 39.01(c)(4), EPAC and Thomas Nelson each designated and counter-designated deposition testimony using contrasting electronic color highlighting and objected to certain designated testimony of the other in 18 deposition transcripts. (Id. at 1.) EPAC attempted to file these 18 color-coded deposition transcripts, but the Clerk of Court required that the parties obtain the Court's permission to file the highlighted and notated transcripts via flash drive. (Id.) Second, EPAC has filed a Motion to File Video Deposition Designations (Doc. No. 1011) and Motion to File Original Certified Deposition Transcripts (Doc. No. 1017). EPAC seeks to file these

designations and transcripts with the Clerk of Court so that they may be made part of the record. (See Doc. Nos. 1011, 1017.) The instant motions are **DENIED**. The parties shall make objections to the designated deposition testimony live at trial.

**11. Revised Theories of the Case**

The parties SHALL FILE any revised theories of the case by January 7, 2019 at 9:00a.m. The parties are advised that any edits and revised theories should condense, rather than expand on, their original theories.

IT IS SO ORDERED.

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE