**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **EPAC TECHNOLOGIES, INC.,**      ) | |
|            ) | |
|     **Plaintiff,**        ) | |
|            ) | |
| **v.**                ) | **NO. 3:12-cv-00463** |
|            ) | |
| **HARPERCOLLINS CHRISTIAN**    ) | |
| **PUBLISHING, INC., f/k/a THOMAS**   ) | |
| **NELSON, INC.,**           ) | |
|            ) | |
|     **Defendant.** | |

## MEMORANDUM OPINION

This case was tried before a jury from January 8-18, 2019. EPAC ultimately argued two claims against Thomas Nelson before the jury: (1) breach of the Master Services Agreement ("MSA"); and (2) fraudulent concealment. The jury returned a verdict in favor of EPAC on both claims. (Doc. No. 1061.) The jury awarded EPAC $3 million in compensatory damages for breach of the MSA and $60,000 for compensatory damages and an additional $12 million for punitive damages for fraudulent concealment. (Id. at 1.) Currently pending before the Court is Thomas Nelson's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial (Doc. No. 1083) that has been fully briefed. (See also Doc. Nos. 1119, 1122.) For the reasons below, Thomas Nelson's motion will be granted in part and denied in part.

# I. **Evidence at Trial**[1]

When Johann Gutenberg invented the printing press in 1440, it is doubtful he could have envisioned that many centuries later, sophisticated parties in the industry he birthed would be looking for a way to print less, rather than more. Yet, at heart, this case is about "less is more" revolutions in the printing industry, and the parties' ill-fated attempt to translate these revolutionary processes into profits.

Thomas Nelson is a book publisher that traces its roots back to 1798. (Doc. No. 1102 at 7.) In the broadest terms, as a publisher, Thomas Nelson "curates" content, meaning that it takes raw content from authors or other sources and develops that content into consumable products such as print books, electronic books, and audiobooks. (Id. at 10.) In terms of its print business, Thomas Nelson contracts with multiple printers depending on its needs. (Id. at 14-15.) In December 2007, EPAC sought to become one of Thomas Nelson's printers. (Doc. No. 1098 at 94.)

EPAC was a digital printing company that, through its proprietary EPAC2 system, could print small batches of books "on demand." (Id. at 87-89.) The EPAC2 system "changed the game" because it represented a dynamic supply-chain solution to a problem that had plagued publishers. (Id. at 90-91.) The EPAC2 system allowed publishers, like Thomas Nelson, to order limited batches of books to satisfy limited demand, eliminating the need to store leftover product and thereby lowering inventory and warehousing costs. (Id. at 91.)

In December 2007, Rob Cubelo, EPAC's Senior Vice President for Sales and Marketing, cold-called George Gower, a Thomas Nelson executive in charge of the company's printing

---

[1] The Court has considered this case many times over its seven-year lifespan. (Doc. Nos. 195, 379, 737, 1029.) By now, both the Court and the parties are intimately familiar with the facts and procedural background. Accordingly, the Court only discusses those facts that are necessary to resolve the instant motion.

solutions. (Id. at 95.) Cubelo pitched Gower on the EPAC2 system, which Gower was interested in because he had received a mandate from Thomas Nelson's Chief Financial Officer—Stuart Bitting—to reduce inventory costs. (Id.) After Gower and Cubelo met in person, Gower traveled to Edison, New Jersey, where EPAC had a plant, to see the EPAC2 system in operation. (Id. at 96.) Upon arriving, Gower met with EPAC's CEO, Sasha Dobrovolsky, executed a non-disclosure agreement ("NDA") and toured the plant. (Id. at 95-97.) Gower was intrigued by the system, but stated that he would have to discuss it with his superiors because the system was so new and unfamiliar. (Id. at 100.) Later, in September 2008, EPAC formally pitched its EPAC2 system in a Powerpoint presentation to Thomas Nelson executives, touting the substantial savings Thomas Nelson could realize by partnering with EPAC. (Id. at 104.) Following this meeting, in January 2009, Michael Hyatt, Thomas Nelson's Chief Executive Officer, Bitting, and other high-level executives visited EPAC's Edison plant to observe the EPAC2 system. (Id. at 107-109.) The Thomas Nelson executives left EPAC "incredibly impressed" and eager to move the relationship forward. (Id.)

The parties held a number of meetings and negotiations ensued throughout 2009 and into 2010. (Doc. No. 1099 at 14-15.) Rob Cubelo led negotiations on behalf of EPAC, and Gower and Bitting were the leads for Thomas Nelson. (Id. at 15.) The resulting agreement—the MSA—was highly negotiated and went through more than ten versions before it was executed. (Doc. No. 1103 at 92.) Both sides were represented by counsel during the negotiation process. (Id. at 185.) On August 1, 2010, Jim Gentlicore, EPAC's then-CEO (replacing Dobrovolsky), and Bitting signed the MSA. (Doc. No. 499-1 at 12.) Essentially, the MSA obligated Thomas Nelson to purchase certain categories of books from EPAC. (Id. at 2.) Specifically, under the MSA, Thomas Nelson, as the "Customer," was required to order from EPAC:

all of Customer's requirements of 1-color softbound books that are in formats that EPAC supports and that are defined by Customer as either Print-on-Demand, Short-Run, and Mid-Run but specifically excluded Web Offset/IRON. For avoidance of doubt and to be clear, titles with quantities exceeding 1,500 units are herein defined as Web/Offset/IRON. Print-on-Demand titles are defined to mean titles delivered with one (1) day turnaround in any quantity up to 499 units per title with a maximum of 4,000 units per day during the first year of this Agreement . . . Short-Run titles are defined to mean titles delivered with four (4) days turnaround in quantities up to 499 units per title. Mid-Run titles are defined to mean titles delivered within seven (7) business days in quantities of 500 to 1,500 units per title . . . In the event EPAC cannot provide product in strict accordance with Customer's orders, Customer shall have the right, but not the obligation, to utilize the services of third party suppliers.

(Id.) The MSA was a five-year deal and primary production of the books was to occur at EPAC's new EPAC2 facility in Fairfield, Ohio, which was built, in part, to service Thomas Nelson. (Id. at 4, 7.) Further, the MSA provided that the file formatting and book production processes arising from EPAC2 would be tested to the parties' "reasonable satisfaction" before volume production would commence. (Id. at 13.) Finally, the MSA had a 60-day cure period, allowing a breaching party to cure any material breaches within the cure period and continue performance under the agreement. (Id. at 7.)

Thomas Nelson has contractual relationships with many different printers. Specifically, Thomas Nelson had a preexisting relationship with Lightning Source, Inc. ("LSI"), who partially handled the company's digital printing needs—the very line of business covered by the MSA. (Doc. No. 1102 at 510-51.) EPAC knew of Thomas Nelson's preexisting relationship with LSI, and, indeed, even knew of the prices Thomas Nelson was paying to LSI. (Id. at 164.) In June 2010, during the MSA negotiations with EPAC, Thomas Nelson reached out to LSI and informed it that some of the work covered by LSI would be shifted to EPAC per the MSA. (Id. at 166.)

Upon learning that Thomas Nelson intended to shift a portion of its digital printing business to EPAC, LSI submitted an offer to reduce its existing pricing for print-on-demand and digital

short-run printing (the very business Thomas Nelson was getting ready to send to EPAC) if Thomas Nelson would commit to purchase at least 1 million of such books each year. (Id. at 221-222.) Thomas Nelson rejected this proposal because: (1) they typically did not like to commit to such large volume requirements; and (2) the proposal directly implicated work that they were anticipating sending to EPAC through the MSA. (Doc. No. 1103 at 13-14.) However, LSI, undeterred, sent a new proposal, offering the same reduced pricing but removing the 1 million volume requirement. (Id. at 14-15.) At that point, Thomas Nelson had not signed the MSA, and, therefore, had several choices. (Id. at 16.) It could follow through with the MSA, accept LSI's new proposal, or do some combination of the two. (Id.) Thomas Nelson chose to "go with both providers because [they] wanted to have two vendors and two print suppliers." (Id. at 18.) Thomas Nelson executed the MSA on August 1, 2010 (Doc. No. 499-1 at 12), and, in November 2010, entered into a contract with LSI, per the terms of the reduced-price proposal. (Doc. No. 1103 at 118-119.) EPAC was aware that Thomas Nelson was going to "keep LSI around" for at least a period of time after the MSA. (Doc. No. 1099 at 89.)

After Thomas Nelson and EPAC executed the MSA, Thomas Nelson began to order books from EPAC. (Id. at 90-93.) However, from the outset, Thomas Nelson raised quality concerns regarding the books. (Id.) Among these "quality concerns" were scuffing, chipping, and out-of-square edges (i.e., the book cover was not aligned properly). (Id.) Thomas Nelson "raised pretty much every quality issue they could think of." (Id. at 92.) On November 23, 2010, Gower emailed Cubelo summarizing Thomas Nelson's frustrations:

> We have stayed the course and today I asked [my team] if on December 1st we would be compliant with what we contracted for in regards to quality. The answer was an absolute no. They said quality was a huge issue. I asked what advances were being made. They showed me the last samples that EPAC sent and they are way below our standards. They are now demoralized on what EPAC will provide to us and our retailers . . . Rob, we need to regain focus on the concept that you presented to me . . . [i]f we had dropped all other options to go with EPAC exclusive on August 1st we would have suffered enormous sales loss . . .

(Doc. No. 1103 at 60-62.) Cubelo, on behalf of EPAC, assured Gower that they would "get the quality where it needs to be." (<u>Id.</u> at 64.) In Thomas Nelson's view, this did not happen.

On February 3, 2011, Thomas Nelson sent a formal notice of breach to EPAC, describing the ongoing quality issues and invoking the MSA's 60-day cure period. (<u>Id.</u> at 185; Doc. No. 499-1 at 7.) The parties continued the same line of communications throughout the cure period, i.e., Thomas Nelson continued to complain about perceived quality issues and EPAC continued to assure Thomas Nelson that the issues would be addressed. (<u>Id.</u> at 185-192.) Eventually, a "come-to-Jesus" meeting was held on March 11, 2011 between Stuart Bitting, George Gower, Sasha Dobrovolsky and other high-level EPAC and Thomas Nelson executives. (<u>Id.</u> at 190.) During this meeting, Dobrovolsky informed Thomas Nelson that Gentilcore, EPAC's CEO, and Dennis Morgan, EPAC's CFO, were leaving the company, his (Dobrovolsky's) role at the company was uncertain, and EPAC had "lost its vision." (<u>Id.</u> at 190-91.) Bitting and other Thomas Nelson executives were surprised and concerned by these developments. (<u>Id.</u> at 192.) Nonetheless, they continued to send orders to EPAC. (<u>Id.</u>) Subsequently, right before the end of the cure period, Thomas Nelson indicated that "the quality seemed good." (<u>Id.</u> at 195.) EPAC stated it would be best for the parties to revisit the contract and "revise," specifically in terms of volume. (<u>Id.</u>) The parties never revised the MSA, and, in early April 2011, Thomas Nelson terminated the MSA. (<u>Id.</u> at 202.)

EPAC filed suit against Thomas Nelson in May 2012. (Doc. No. 1.) EPAC brought four claims: (1) breach of the Confidentiality and Non-Disclosure Agreement ("CNDA"); (2) breach of a sperate Non-Disclosure Agreement ("NDA"); (3) breach of the MSA; and (4) fraudulent concealment. (Doc. No. 894 at 4.) Essentially, EPAC's theory was that Thomas Nelson used EPAC, including EPAC's confidential pricing and the resulting MSA, to extract reduced prices from LSI. (Id. at 2.) Once the reduced pricing from LSI was secured, Thomas Nelson then fabricated the "quality issues" with EPAC's books in an attempt to renege on the MSA. (Id.) In EPAC's words, "Thomas Nelson used EPAC to secure the lower pricing from LSI, had no intent to perform under the MSA's terms, misrepresented its intentions to EPAC, concealed its true intentions and wrongfully terminated the MSA." (Id.)

Eventually, this matter went to trial on all four claims. At the close of EPAC's case-in-chief, Thomas Nelson moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on all of the claims. (Doc. No. 1101 at 150.) Ultimately, the Court: (1) granted Thomas Nelson's motion as to the breach of CNDA and breach of NDA claims; (2) took under advisement the motion with respect to the fraudulent concealment claim; and (3) denied the motion as to EPAC's breach of the MSA claim. (Id. at 193.) After considering the matter, the Court also denied Thomas Nelson's motion with regard to EPAC's fraudulent concealment claim. (Id. at 195.) Thomas Nelson renewed its motion at the close of its own proof, but the Court declined to revisit the issue and both the fraudulent concealment and breach of MSA claims went to the jury. (Doc. No. 1104 at 148.) As noted above, the jury returned a verdict for EPAC on the breach of MSA claim, awarding $3 million in compensatory damages. (Doc. No. 1055 at 1.) Similarly, the jury also returned a verdict for EPAC on the fraudulent concealment claim, awarding EPAC $60,000 in compensatory damages and $12 million in punitive damages. (Id.)

## II. <u>Standard of Review</u>

The Court may grant a Federal Rule of Civil Procedure 50(b) motion for judgment as a matter of law only if, "when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." <u>Rhinehimer v. U.S. Bancorp Invs., Inc.</u>, 787 F.3d 797, 804 (6th Cir. 2015) (quoting <u>Barnes v. City of Cincinnati</u>, 401 F.3d 729, 736 (6th Cir. 2005)). "The evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of [the] court should not be substituted for that of the jury." <u>Id.</u> (quoting <u>Balsley v. LFP, Inc.</u>, 691 F.3d 747, 757 (6th Cir. 2012)). "In other words, the decision to grant judgment as a matter of law . . . is appropriate whenever there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ." <u>Jackson v. FedEx Corp. Servs.</u>, 518 F.3d 388, 392 (6th Cir. 2008) (citation omitted). In ruling on a Rule 50(b) motion, the Court may allow the verdict to stand, order a new trial, or direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b).

Rule 59(a)(1)(A) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." "The language of Rule 59(a) has been interpreted to mean that a new trial is warranted when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." <u>E.E.O.C. v. New Breed Logistics</u>, 783 F.3d 1057, 1066 (6th Cir. 2015) (internal quotation marks and citations omitted).

### III. **EPAC's Fraudulent Concealment Claim**

A. Thomas Nelson's Rule 50(b) Motion and EPAC's Response

Thomas Nelson first argues that the Court should grant judgment as a matter of law on EPAC's fraudulent concealment claim because no legal duty to disclose arose from the parties' arm's-length transaction. (Doc. No. 1112 at 14.) Thomas Nelson explains that, for EPAC to prove its fraudulent concealment claim, it was required to show that: (1) Thomas Nelson concealed or suppressed a material fact; (2) Thomas Nelson had a duty to disclose that fact to EPAC; (3) Thomas Nelson intentionally concealed or suppressed the fact with the intent to deceive EPAC; (4) EPAC was not aware of the fact and would have acted differently it if had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression of the fact, EPAC sustained damage. (Id.) Thomas Nelson asserts that it and EPAC were sophisticated business entities, represented by counsel, negotiating in an arm's-length transaction, and, therefore, no duty to disclose arose. (Id. at 14-15.) Thomas Nelson notes that a duty to disclose can only arise where there is a fiduciary or confidential relationship. (Id.) Given that the arm's-length transaction constituted the entirety of EPAC and Thomas Nelson's relationship, no such fiduciary or confidential relationship arose. (Id. at 16-17.) Further, Thomas Nelson contends that EPAC failed to prove that: (1) the fact allegedly concealed (the ongoing discussions with LSI and the reduced price proposal) was material; (2) Thomas Nelson intended to deceive EPAC through the alleged concealment; (3) EPAC would have acted differently had it known of LSI's reduced pricing offer; or (4) EPAC suffered damage as a result of the concealment. (Id. at 17-20.) Finally, Thomas Nelson argues that, if the Court does not outright dismiss EPAC's fraudulent concealment claim, it should grant a new trial on the claim. (Id. at 20-21.)

EPAC filed a response in opposition, first arguing that Thomas Nelson's original Rule 50(a) motion at trial only sought to dismiss the fraudulent concealment claim on two grounds: (1) there was no duty to disclose; and (2) there were no damages. (Doc. No. 1119 at 13.) Therefore, it contends that Thomas Nelson's other arguments couched in terms of its Rule 50(b) motion are waived. (Id.) Moreover, EPAC argues that whether a confidential or fiduciary relationship existed between the parties is a factual question that the jury answered in the affirmative. (Id. at 14-16.) EPAC notes that the parties exchanged confidential information and engaged in discussions for over two years before entering the MSA, and these interactions demonstrate that a confidential relationship existed between them. (Id. at 16-17.) EPAC also maintains that the jury reasonably concluded that Thomas Nelson concealed a material fact; concealed this fact with an intent to deceive; EPAC would have acted differently if Thomas Nelson had not fraudulently concealed this fact; and EPAC suffered damages as a result of the fraudulent concealment. (Id. at 14-21.)

B. <u>Waiver of Rule 50(b) Argument</u>

As a preliminary matter, the Court first considers EPAC's waiver argument. (Doc. No. 1119 at 13.) EPAC argues that Thomas Nelson raises new arguments that it did not preserve. (Id.) Specifically, EPAC argues that Thomas Nelson attempts to "change the standard" by arguing that "no confidential relationship and therefore no duty to disclose can exist unless confidence is placed by one on the other and the recipient of that confidence is the dominant personality with the ability because of that confidence to influence and exercise dominion over the weaker or dominated party." (Id.) EPAC concludes that, because Thomas Nelson did not request a charge on this purported standard during the charge conference, it has waived the right to argue that such a standard now applies. (Id.)

EPAC relies on two cases in support of its waiver argument: (1) Singleton v. Wulff, 428 U.S. 106, 121 (1976); and (2) Pinney Dock and Transp. Co. v. Penn Cent. Corp., 828 F.2d 1445, 1461 (6th Cir. 1988). Neither of these cases support EPAC's waiver argument. In Singleton, the Supreme Court held that:

> The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, or where injustice might otherwise result. Suffice it to say that this is not such a case. The issue resolved by the Court of Appeals have never been passed upon in any decision of this Court. This being so, injustice was more likely to be caused than avoided by deciding the issue without petitioner's having had an opportunity to be heard.

428 U.S. at 121 (internal quotations and citations omitted). Similarly, in Pinney Dock and Transp. Co., the Sixth Circuit reiterated this standard:

> It is the general rule that a federal appellate court does not consider an issue not passed upon below. This rule is not jurisdictional; the Supreme Court has referred to it as a practice and a rule of procedure. Deviations are permitted in exceptional cases or particular circumstances, or when the rule would produce a plain miscarriage of justice. The Supreme Court has declined to list comprehensively the circumstances that should prompt an appellate court to reach an issue not raised below. Furthermore, the Court has stated that this matter is left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We have carefully considered the case law of our circuit and elsewhere involving the exercise of this limited area of discretion and conclude that to the extent the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress of this already protracted litigation, we should address it.

828 F.2d at 1461.

EPAC's legal authority for its waiver argument is clearly inapposite. These cases detail the waiver standard for appellate review when confronted with an issue that was not preserved before the district court, not the standard for whether a party has preserved a particular argument for purposes of its Rule 50(b) motion.

It is generally true that when a party fails to raise an argument in its Rule 50(a) pre-verdict motion, it is precluded from making a Rule 50(b) post-verdict motion on that ground. See Sykes v. Anderson, 625 F.3d 294, 304 (6th Cir. 2010) (citing Ford v. Cty. of Grand Traverse, 535 F.3d 483, 491 (6th Cir.2008)). However, "Rule 50 is not rigidly applied in all circumstances, [but] a pre-verdict motion and a post-verdict motion must be similar enough to 'provid[e] notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury,' thereby fulfilling the stated purpose of the Rule." Id. (citing Ford, 535 F.3d at 492).

There is no question that Thomas Nelson's Rule 50(a) motion raised a duty to disclose argument, including the more granular issues of whether a fiduciary or confidential relationship existed between the parties. Specifically, Thomas Nelson argued in its Rule 50(a) motion:

> Liability for concealment exists only where there's a legal duty to disclose the material fact at issue, and the second is that such a duty to disclose, while it exists in the presence of a fiduciary relationship, it does not exist when, as here, we have two sophisticated business entities with no fiduciary relationship negotiating a transaction at arm's length between them. Your Honor, EPAC has not presented to this jury evidence of circumstances that would give rise to a duty to disclose what they're calling a material fact by Thomas Nelson to EPAC. And obviously, unless you prove facts that establish a duty to disclose, you don't even get to the question of whether a breach of that duty has occurred.

(Doc. No. 1101 at 152-53.) After hearing Thomas Nelson's motion, EPAC responded that a confidential relationship existed between the parties. (Id. at 183-184.) Thomas Nelson replied to this argument, arguing that a confidential relationship cannot exist within an arm's-length transaction. (Id. at 189.) Thus, Thomas Nelson confronted this issue in its Rule 50(a) motion, and, thereby supplied the Court and EPAC with notice of the deficiency in its fraudulent concealment claim before sending it to the jury. Ford, 535 F.3d at 491. Accordingly, Thomas Nelson has not waived any particular argument regarding its legal duty to disclose.

C. <u>Duty to Disclose</u>

In Tennessee[2], "'the tort of fraudulent concealment is committed when a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury.'" <u>Shah v. Racetrac Petroleum Co.</u>, 338 F.3d 557, 571 (6th Cir. 2003) (quoting <u>Chrisman v. Hill Home Dev., Inc.</u>, 978 S.W. 2d 535, 538–39 (Tenn. 1998)). Therefore, liability for the tort of fraudulent concealment only exists where there is a legal duty to disclose the fact at issue. <u>Chrisman</u>, 978 S.W. 2d at 538-39; <u>see also</u> <u>Walker v. First State Bank</u>, 849 S.W. 2d 337, 341 (Tenn. Ct. App. 1992) ("Courts of this state have ruled that liability for non-disclosure can arise only in cases where the person sought to be held responsible had a duty to disclose the facts at issue."). The duty to disclose arises in three distinct circumstances: (1) "[w]here there is a previous definite fiduciary relation between the parties," (2) "[w]here it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other," and (3) "[w]here the contract or transaction is intrinsically fiduciary and calls for perfect good faith." <u>Walker</u>, 849 S.W. 2d at 341 (quoting <u>Domestic Sewing Mach. Co. v. Jackson</u>, 83 Tenn. 418, 425 (1885)). Whether a duty to disclose existed between EPAC and Thomas Nelson is a legal question for the Court to decide. <u>See</u> <u>Shah</u>, 338 F.3d at 571 (affirming district court's grant of summary judgment on plaintiff's fraudulent concealment claim because defendant did not have a duty to disclose); <u>Vanderschaaf v. Bishara</u>, Case No. M2017-00412-

---

[2] As to EPAC's fraudulent concealment claim, the Court applied the general rule that "[f]ederal courts apply the forum state's choice of law provisions to state law claims, such as tort claims" and the Court therefore looked to Tennessee choice of law rules. (<u>See</u> Doc. No. 747 at 3, 5-6.) In a bench ruling, the Court determined that Tennessee's most significant relationship test demonstrated that Tennessee law applied to the fraudulent concealment claim, given that Thomas Nelson's alleged fraudulent conduct occurred primarily in Tennessee. (Doc. Nos. 506-1, 506-4, 506-5) (showing that key meetings and decisions concerning the MSA took place in Nashville, Tennessee). The parties have not challenged the Court's application of Tennessee law in their post-judgment filings.

COA-R3-CV, 2018 WL 4677455, at *6 (Tenn. Ct. App. 2018) (citing Bradshaw v. Daniel, 854 S.W. 2d 865, 869 (Tenn. 1993)) ("The existence or nonexistence of a duty owed by the defendant to the plaintiff is a question of law for the court to decide."); but see also Town of Smyrna v. Mun. Gas Auth. Of Ga., 129 F. Supp. 3d 589, 606 (M.D. Tenn. 2015 (quoting Dickson v. Long, Case No. M2008-00279-COA-R3-CV, 2009 WL 961784, at *8 (Tenn. Ct. App. Apr. 8, 2009) ("Whether or not a fiduciary or confidential relationship existed is a question of fact.").[3]

Fiduciary relationships may arise whenever confidence is reposed by one party in another who exercises dominion and influence. Oak Ridge Precision Indust., Inc. v. First Tenn. Bank Nat. Ass'n, 835 S.W. 2d 25, 30 (Tenn. Ct. App. 1992). "Tennessee law defines a confidential relationship as one that is created when 'confidence is placed by one on the other and the recipient of that confidence is the dominant personality with the ability because of that confidence to influence and exercise dominion over the weaker or dominated party.'" McGuirk Oil Co., Inc. v. Amoco Oil Co., 889 F.2d 734, 737–38 (6th Cir. 1989) (quoting Edwards v. Travelers Ins. of Hartford, 563 F.2d 105, 115 (6th Cir. 1977)). Put another way, a confidential relationship is created when "one person has dominion and control over another." Rogers v. The First Nat'l Bank, No. M2004–02414–COA–R3–CV, 2006 WL 344759, at *8 (Tenn. Ct. App. Feb. 14, 2006) (internal citations omitted). A fiduciary duty creates the duty to act primarily for another's benefit.

_____

[3] The Court acknowledges that there is a split in authority on this issue. However, whether a duty is owed by the defendant to a plaintiff is fundamentally a question of law for the Court to decide. See Bradshaw v. Daniel, 854 S.W.2d 865, 869 (Tenn. 1993.) At heart, the issue in EPAC's fraudulent concealment claim is whether there was a duty to disclose. See Walker v. First State Bank, 849 S.W.2d 337, 341 (Tenn. Ct. App. 1992) ("In all cases, concealment or failure to disclose becomes fraudulent only when it is the duty of a party having knowledge of the facts to discover them to the other party."). Further, EPAC's cited authority on this issue—Town of Smyrna and Dickson—are distinguishable. Town of Smyrna was decided in the context of a Motion to Dismiss and provides almost no analysis on the issue. See 129 F. Supp. 3d at 606. Dickson also provides no rationale or analysis for the holding. 2009 WL 961784, at *8. The Court therefore considers whether Thomas Nelson owed duty to disclose as a legal question.

<u>McRedmond v. Estate of Marianelli</u>, 46 S.W. 3d 730, 738 (Tenn. Ct. App. 2000). Tennessee courts have long recognized that an abuse or breach of a confidential relationship to gain a benefit or advantage will give rise to an action for damages. <u>See</u> <u>Leake v. Gray, Shillinglaw & Co.</u>, 226 S.W. 2d. 298, 305 (Tenn. 1949) ("[W]hen one in a confidential relationship does make a promise and then breaches it . . . he will be penalized for his breach of this promise or relationship.").

D. <u>Analysis</u>

Here, the Court concludes that there was no fiduciary or confidential relationship between the parties, and, therefore, no legal duty to disclose arose that required Thomas Nelson to reveal its ongoing discussions with LSI to EPAC. The Court notes that EPAC does not argue that a fiduciary relationship existed between the parties. (<u>See</u> Doc. No. 1119 at 14-17.) In fact, during oral argument on Thomas Nelson's Rule 50(a) motion, EPAC conceded that "there [is] no fiduciary relationship." (Doc. No. 1101 at 182.) Nor could EPAC credibly argue that a fiduciary relationship existed between the parties. As intertwined as EPAC and Thomas Nelson may have been, their relationship was, at heart, a supplier-to-customer business relationship governed by the MSA. (<u>See</u> Doc No. 499-1.) Nothing in the parties' meetings, communications, or MSA imposed a duty on either party to act primarily for the benefit of the other. <u>McRedmond</u>, 46 S.W. 3d at 738. These were two very sophisticated business entities seeking to better their respective business positions in the publishing marketplace through a supplier-customer relationship. EPAC and Thomas Nelson's relationship also was not "intrinsically fiduciary." <u>See</u> <u>Domestic Sewing Mach.</u>, 83 Tenn. at 424-25 (explaining that a "contract of insurance" is an example of an intrinsically fiduciary contract or transaction). There was no fiduciary relationship between the parties.

Thus, a duty to disclose could only arise because "one or each of the parties to the [MSA] expressly repose[d] a trust and confidence in the other."[4] See id. "The critical feature of a confidential relationship . . . is a 'dominion or influence' of one party over the other as a result of their special relationship." Klein v. May, Case No. 86-184-II, 1986 WL 12177, at *3 (Tenn. Ct. App. Oct. 31, 1986) (citing Turner v. Leathers, 232 S.W. 2d 269, 271 (Tenn. 1950)). "The most common relationships giving rise to a finding of a confidential relationship or one of trust and confidence are trustee and beneficiary, attorney and client, parent and child, guardian and ward, physician and patient, nurse and invalid, or confidential friend and advisor." Id. There is no evidence that there was a "dominion of influence" between EPAC and Thomas Nelson that matches that found in those "most common relationships" that give rise to a "confidential relationship." Id. On this point, the Sixth Circuit's decision in Shah is instructive.

In Shah, the plaintiffs became interested in purchasing a proprietor's interest in Raceway 773, a gas station and convenience store owned by the defendant. 338 F.3d at 561-65. The proprietor operated the gas station according to a lease and contract with the defendant, which contained a clause stating that either party could terminate the agreements with 30 days' written notice. Id. Although the proprietor and defendant both assured the plaintiffs that the defendant would not exercise this clause if the plaintiffs timely paid the rent and operated the business effectively, the defendant, was, at the time of plaintiffs' transaction, actually trying to sell Raceway

_____

[4] The Court notes that, under Shah, the Sixth Circuit appears to consider whether "the parties to the contract expressly repose a trust and confidence in the other" as synonymous with whether the parties were in a "confidential relationship." See 338 F.3d at 572 ("No previously fiduciary relationship existed between the parties, nor was this lease and contract agreement intrinsically fiduciary . . . [n]or were the parties in a confidential relationship.") (internal citations and quotations omitted). Further, the parties present the issue in terms of whether a "confidential relationship" developed between them. (Compare Doc. No. 1112 at 16 with Doc. No. 1119 at 15.) Accordingly, the Court take its cue from the Sixth Circuit and considers whether EPAC and Thomas Nelson were in a confidential relationship.

773. Id. Plaintiffs completed the transaction with the proprietor and entered into a lease and ancillary agreements with the defendant. Id. A little more than one year later, after the plaintiffs expended significant investment in the business, the defendant sold Raceway 773 to a third-party and exercised the 30-day termination clauses. Id. On appeal, the Sixth Circuit affirmed the district court's grant of summary judgment on the plaintiffs' fraudulent concealment claim because the "plaintiffs and defendant in the instant case reached an agreement at arms' length, and defendant did not 'exercise dominion' over plaintiffs . . . [n]one of the Domestic Sewing categories applies; thus, defendants did not have a duty to disclose." Id. at 571.

The Sixth Circuit's analysis in Shah comports with other Tennessee state law cases that hold that the arm's-length nature of a transaction is incongruous with a finding of a "relationship of trust and confidence between the parties." See e.g., Silva v. Crossman, Case No. 95-2607-II, 1996 WL 631492, at *2 (Tenn. Ct. App. Nov. 1, 1996) ("In the present case, there was no fiduciary or other relationship of trust and confidence between the parties . . . [t]he facts before us indicate, without dispute, that this was an arms-length transaction."); Klein, 1986 WL 12177, at *3 ("[T]here is nothing in the record to suggest that their relationship was one in which Mr. May was in a position to exert dominion and influence over Mr. Klein . . . [Mr. Klein] negotiated with Mr. May over a period of several months and the record reflects that the negotiations were always at arm's length . . . [t]herefore, there was no confidential relationship or relationship of trust between the two."). The rationale underlying these decisions is apparent as an arm's length transaction— one in which the parties engage with one another at a distance through various protectory mechanisms—necessarily impedes the type of fiduciary or confidential relationship from forming. The parties guard their business positions carefully, rely on their lawyers, advisers, and other representatives to evaluate the potential relationship, and only commit if benefit or profit can be

extracted. This dynamic is simply incompatible with the concept or creation of a fiduciary or confidential relationship giving rise to a duty to disclose, as neither party can gain a dominion of influence over the other.

Even when viewing the evidence in a light most favorable to the EPAC and giving it the benefit of all reasonable inferences, there is no genuine issue of material fact upon which the jury could have found a fiduciary or confidential relationship. The parties, at bottom, engaged in a multi-year arm's length transaction, wherein each side: (1) approached the transaction in terms of its own self-benefit; (2) had multiple actors (executives, analysts, lawyers, etc.) looking out for its best interests; and (3) remained free to leave the transaction or contract with others at any time. Accordingly, reasonable minds could come to but one conclusion—no confidential or relationship of trust and repose was created between EPAC and Thomas Nelson. Given that reasonable minds could not conclude that Thomas Nelson had a duty to disclose its discussion and agreement with LSI to EPAC, the Court need not proceed any further. Thomas Nelson is entitled to judgment as a matter of law on EPAC's fraudulent concealment claim. The award of compensatory and punitive damages linked to EPAC's fraudulent concealment claim must be vacated.[5]

## IV. **EPAC's Breach of Contract Claim**

### A. Thomas Nelson's Rule 50(b) Motion and EPAC's Response

Thomas Nelson argues that the Court should grant it judgment as a matter of law on EPAC's breach of the MSA claim because EPAC conceded it could not perform and failed to present evidence that supported a lost profits award. (Doc. No. 1112 at 27.) Thomas Nelson notes that, to recover for the alleged breach, EPAC was required to be ready, willing and able to perform

---

[5] Because the Court is granting Thomas Nelson's Rule 50(b) motion as to the fraudulent concealment claim and associated punitive damages on these grounds, the Court does not consider Thomas Nelson's remaining arguments. (See Doc. No. 1112 at 20-26.)

under the MSA at the time of the breach. (Id.) However, Thomas Nelson contends that, at the time of the alleged breach, EPAC attempted to renegotiate the volume commitments under the MSA, affirmatively showing that it was not "ready, willing, and able" to perform according to the MSA's terms. (Id. at 27-28.) Additionally, Thomas Nelson argues that EPAC cannot recover lost profits for books that were not contemplated under the MSA. (Id. at 28.) Thomas Nelson explains that EPAC's "lost profits" damages are limited to the book orders that were actually contemplated under the MSA, but, during trial, EPAC's damages expert (Dr. Charles Mahla), included a fourth category of books ("Other") that was not part of the MSA's terms. (Id. at 28-29.) Therefore, Thomas Nelson argues that lost profits damages derived from this "Other" category should be excluded from the breach of contract award, which would reduce EPAC's damages to "somewhere in the neighborhood of $2 million." (Id. at 29-30.) Finally, Thomas Nelson asserts that EPAC cannot recover lost profits for books that would have been sold after March 2012, given that EPAC sold its EPAC2 system to LSI that month, and therefore could not have produced those books. (Id. at 30-31.) Thomas Nelson also contends that, in the alternative, if the Court does not dismiss EPAC's breach of MSA claim as a matter of law, it should grant a new trial on that claim. (Id. at 31.)

EPAC responds in opposition, first arguing that the jury reasonably concluded it was ready, willing and able to perform under the MSA. (Doc. No. 119 at 31.) EPAC asserts that Thomas Nelson's sole evidence on this issue—an email written by EPAC salesman Chris Sawyer to George Gower—does not mention any limitations on EPAC's capacity to produce books or EPAC's inability to perform. (Id. at 31-32.) EPAC maintains that the overwhelming evidence showed it was ready, willing, and able to perform under the MSA. (Id. at 32.) Additionally, EPAC argues that the jury reasonably calculated the lost profits damages because: (1) the intent of the parties

was that <u>all</u> book orders of less than 1,501 units by Thomas Nelson would be placed with EPAC and the "categories" contemplated under the agreement were simply establishing a delivery schedule; and (2) the post-March 2012 lost profits damages are appropriate as EPAC is entitled to recover damages for the entirety of the 5-year term of the MSA. (<u>Id.</u> at 32-35.) Finally, EPAC notes that the jury's $3 million breach of contract damages award was less than the $5,598,634 in lost profits EPAC requested, but above the $632,000 that Thomas Nelson admitted was owed, and, therefore, the award was well within the bounds of reason. (<u>Id.</u> at 35.)

B. <u>Breach of Contract</u>

Under New York law, the elements of a cause of action for breach of contract are: (1) formation of a contract between the plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage.[6] <u>U.S. Nonwovens Corp. v. Pack Line Corp.</u>, 4 N.Y.S. 3d 868, 872 (N.Y. 2015). A plaintiff claiming anticipatory breach of contract (as EPAC claimed at trial) must show, among other things, that the plaintiff was "'ready, willing, and able to perform its own obligations under the contract when performance was due.'" <u>United States v. Hon Yee–Chau</u>, 17 F.3d 21, 26 (2d Cir. 1994) (quoting <u>Towers Charter & Marine Corp. v. Cadillac Ins. Co.</u>, 894 F.2d 516, 523 (2d Cir. 1990)).

The general rule for measuring damages for breach of contract has long been settled—it is the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract. <u>Indu Craft, Inc. v. Bank of Baroda</u>, 47 F.3d 490, 495 (2d Cir. 1995). "In other words, so far as possible, the law attempts to secure to the injured party the benefit of his bargain, subject to the limitations that the injury—whether it be losses suffered or gains prevented—was foreseeable, and that the amount of damages claimed be measurable with a

---

[6] The MSA is governed by New York law. (<u>See</u> Doc. No. 499-1 at 9.)

reasonable degree of certainty and, of course, adequately proven." <u>Freund v. Washington Square</u>

<u>Press, Inc.</u>, 34 N.Y. 2d 379, 382 (N.Y. 1974). Losses for lost profits are recoverable under New

York law when they are:

> [First] . . . demonstrated with certainty that such damages have been caused by the breach. Second the damages must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of intervening causes. Finally, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.

<u>Randolph Equities, LLC v. Carbon Capital, Inc.</u>, 648 F. Supp. 2d 507, 520 (2d Cir. 2009) (quoting

<u>Care Travel Co. v. Pan Am. World Airways, Inc.</u>, 944 F.2d 983, 994 (2d Cir. 1991)). Where a

contract is silent on liability for lost profits, "the court must take a 'common sense' approach, and

determine what the parties intended by considering 'the nature, purpose and particular

circumstances of the contract known by the parties . . . as well as what liability the defendant fairly

may be supposed to have assumed consciously.'" <u>Smith v. Positive Prods.</u>, 419 F. Supp. 2d 437,

448-49 (S.D.N.Y. 2005) (quoting <u>Kenford Co. v. Cty. of Erie</u>, 73 N.Y.2d 312, 316 (N.Y. 1989));

<u>see also</u> <u>Trademark Research Corp. v. Maxwell Online, Inc.</u>, 995 F.2d 326, 334 (2d Cir. 1993) ("In

the absence of a contractual provision governing the availability of lost profits damages as a

remedy for breach, New York law requires [courts] to consider what the parties would have

concluded had they considered the subject.").

    C. <u>Analysis</u>

    Here, the Court concludes that Thomas Nelson is not entitled to judgment as a matter of

law on EPAC's breach of contract claim. First, when viewing the evidence in a light most favorable

to EPAC, and giving it the benefit of all reasonable inferences, there was a genuine issue of

material fact on which reasonable minds could differ regarding whether EPAC was ready, willing,

and able to perform under the MSA at the time of Thomas Nelson's breach. Thomas Nelson solely relies on an email, sent by EPAC salesman Chris Sawyer after Thomas Nelson sent its breach notice, which stated:

> I understand that the landscape has changed somewhat since our agreement was signed. Both companies have spent a lot of time, money, and energy putting this in place. We are at the goal line and want to find a way to continue that makes sense for both of us. You asked me what our minimum, maximum per week would be for Fairfield. Right now we would be comfortable if we could bring in weekly volume of 10,000 units or 2,000 per day on average. Last week we turned over – a little over 11,000 units for Nelson without missing a step. I would like to see us simply change the volume commitments on the existing agreement to a more realistic number and continue as one of your digital suppliers.

(Doc. No. 1102 at 188-189.) The Court agrees that, on its face, the email seems to demonstrate that EPAC, at the time of the breach, was not "ready, willing, and able" to fulfill the MSA according to its terms. However, EPAC also introduced evidence that it produced over 84,000 books in December 2011 alone and delivered all orders on time in accordance with Thomas Nelson's specifications. (Doc. No. 1104 at 94-96; Doc. No. 1099 at 142.) EPAC also presented testimony that the "volume commitments" language in Sawyer's email referred to the volume of books to which Thomas Nelson was willing to commit, not the actual capacity the EPAC2 system could produce. (Doc. No. 1101 at 48-49.) In other words, when considering whether EPAC was ready, willing, and able to perform under the MSA, there was sufficient evidence to support the jury's finding. See White v. Burlington N. and Santa Fe Ry. Co., Case No. 99-2733-N1/BRE, 200 WL 35498256, at *1 (W.D. Tenn. 2000) ("The inquiry is whether sufficient evidence supported the jury's findings.") In the Court's view, reasonable minds could have concluded that EPAC's history of timely deliveries and the capacity of the EPAC2 system sufficiently demonstrated that EPAC remained ready, willing, and able to perform under the terms of the MSA at the time of the

breach, notwithstanding Sawyer's email. After all, the jury, as judges of fact, could give Sawyer's email whatever weight it deemed appropriate.

Next, the Court examines whether there was sufficient evidence for the jury to conclude that EPAC suffered lost profits in the amount of $3,000,000. EPAC's damages expert, Dr. Mahla, testified that he received data showing that, over the life of the MSA, Thomas Nelson bought: (1) 1,252,321 books that would be categorized as Print-On-Demand; (2) 309,056 books that would be categorized as Short-Run; and (3) 490,605 books that would categorized as Mid-Run. (Doc. No. 1100 at 143-144.) Dr. Mahla also stated that he included an "Other" category not specifically listed under the MSA of 5,646,670 books that would nonetheless have been sold under the MSA. (Id. at 144.) Dr. Mahla opined that total revenue from these sales (8,647,615 books) would have been $14,333,058, expenses during that time would have run EPAC $8,734,424, amounting to $5,598,634 in lost profits. (Id. at 145.)

The "Other" category was defined as books associated with orders of less than 1,501 books that met EPAC's production capabilities but did not strictly fall into one of the Print-On-Demand, Short-Run, or Mid-Run categories. (Id. at 163.) Dr. Mahla admitted that those books were not explicitly provided for in the MSA, and, if those books were taken out of his lost profits analysis, EPAC's lost profits would be in the "neighborhood of $2 million." (Id. at 163-169.) Dr. Mahla admitted that his lost profits calculation assumed that EPAC could produce 6,918 books per day, and this number was greater than the 2,000 per day average referenced in Chris Sawyer's email. (Id. at 173.) However, Dr. Mahla reaffirmed that: (1) the Chris Sawyer email referred to production rather than maximum capacity, and, therefore, the email did not affect his calculations; and (2) the "Other" category was appropriate for inclusion in his analysis because the Print-On-Demand,

Short-Run, and Mid-Run categories referred to delivery schedules, rather than the entire universe of books contemplated under the MSA. (Doc. No. 1101 at 48-51.)

Thomas Nelson presented its own damages expert—Christopher Lovin—who testified that Dr. Mahla based his lost profits calculations on improper revenue projections and then failed to benchmark his results against EPAC's own actual financial performance or industry benchmarks, which significantly affected the reasonableness of his conclusions. (Doc. No. 1104 at 67.) Lovin testified that EPAC's lost profits, if any, under the MSA were limited to those categories of books that were defined in the agreement—Print-On-Demand, Short-Run, Mid-Run. (Id. at 71-72.)

Lovin opined that the "Other" category in Dr. Mahla's lost profits analysis was inappropriate because it did not "come within the MSA's definition of Print-On-Demand, Short-Run, or Mid-Run, [and therefore] he is then forced to make an assumption about the price [Thomas Nelson] would have paid for those other books. This is precisely because the MSA provides pricing only for the books it covers; that is, books that do meet the MSA's definitions of POD, Short-Run, and Mid-Run. (Id. at 72.) Lovin concluded that Dr. Mahla's inclusion of the "Other" category significantly overstated the lost profits estimate and rendered his opinion unreliable. (Id. at 76.) Ultimately, Lovin, based on his own calculations, concluded that EPAC's lost profits were, at most, $632,549 for the entire five-year term of the MSA. (Id. at 76-90.)

Each party presented evidence, in the form of expert reports and testimony, regarding the proper amount of lost profits damages. Thomas Nelson essentially challenges the conclusions of Dr. Mahla and urges the Court to reduce the award to, at most, "somewhere in the neighborhood of $2 million." (Doc. No. 1112 at 30.) However, doing so would require the Court to reweigh the evidence (expert reports and testimony) and the credibility of Dr. Mahla and Lovin. Obviously, the Court cannot and will not engage in such analysis. Rhinehimer, 787 F.3d at 804. Moreover,

the Court finds that it would be unreasonable to grant EPAC judgment as a matter of law when the jury's award of damages ($3 million) lies within a range suggested by both EPAC and Thomas Nelson. Cf. Samuelson v. Cent. Nebraska Pub. Power & Irrigation Dist., 125 F.2d 838, 840-41 (8th Cir. 1942) (holding that the Court could not vacate a damages award where the award "was within the range of the total damages estimated by some of the expert witnesses[.]").

Thomas Nelson's argument regarding post-March 2012 "lost profits" is also unavailing. To the extent that Thomas Nelson continues its argument that EPAC cannot recover lost profits because of the sale of the EPAC2 system to LSI in March 2012, it was the sole province of the jury to give that argument whatever weight it deemed appropriate. The doctrine of anticipatory breach is applicable to bilateral contracts that contemplate some future performance by the non-breaching party. Amer. List Corp. v. U.S. News & World Report, 75 N.Y. 2d 38, 44 (Ct. App. N.Y. 1989) (citing Long Is. R.R. Co. v. Northville Indus. Corp., 41 N.Y. 2d 455, 466–468 (Ct. App. N.Y. 1977) A wrongful repudiation of the contract by one party before the time for performance entitles the non-repudiating party to immediately claim damages for a total breach Id. The non-repudiating party need not prove its ability to perform the contract in the future. Id. Rather, the doctrine relieves the non-repudiating party of its obligation of future performance and entitles that party to recover the present value of its damages from the repudiating party's breach of the total contract. Id.

Given this backdrop, EPAC was entitled to put on evidence regarding the entirety of the MSA's original five-year term. EPAC did so through its expert, Dr. Mahla, and Thomas Nelson attempted to rebut this evidence through its own expert, Lovin. EPAC's post-March 2012 lost profits argument is merely another attempt to undermine Dr. Mahla's lost profits analysis. (See Doc. No. 1112 at 31.) However, as stated above, Thomas Nelson's argument misses the mark as

it relates to the Rule 50(b) motion. There was ample evidence on damages presented by both sides and the jury reasonably concluded that each side had merit, hence the jury's $3 million award, which was higher than Thomas Nelson's projection but lower than EPAC's projection. Thus, from the evidence presented and giving all presumptions in favor of EPAC, there was sufficient evidence from which the jury could determine that EPAC's lost profits damages on its breach of contract claim was $3 million. See White, 2000 WL 35498256, at *1.  Finally, to the extent that Thomas Nelson argues Dr. Mahla failed to include the "testing phase" and "did not contemplate that performance by either party would begin immediately," Thomas Nelson is essentially asking the Court to reweigh Dr. Mahla and his report's credibility, which is prohibited. Accordingly, Thomas Nelson is not entitled to judgment as a matter of law on EPAC's breach of the MSA claim.

## V. **Thomas Nelson's Motion for a New Trial—Breach of the MSA**

Thomas Nelson argues that, for all of its above-cited reasons, if the Court does not grant it judgment as a matter of law, it should, in the alternative, grant a new trial on the breach of the MSA claim. (Doc. No. 1112 at 31.) Further, Thomas Nelson contends that the decision to allow EPAC to pursue its fraudulent concealment claim prejudiced it in the presentation of the breach of contract claim. (Id. at 32.) Thomas Nelson asserts that allowing the fraudulent concealment claim to go forward allowed parol evidence that would otherwise have been excluded to be presented before the jury. (Id.) Thomas Nelson concludes that, as a result, it did not receive a fair jury trial on the breach of contract claim, necessitating a new trial. (Id.) EPAC responds that Thomas Nelson's argument essentially amounts to "improper parol evidence for the breach of contract claim." (Doc. No. 1119 at 36.) EPAC argues that if Thomas Nelson believed evidence admitted at trial was improper, it had an obligation to object to that evidence at the time it was introduced and any failure to object on such grounds waives an evidentiary challenge. (Id.)

Thomas Nelson's arguments do not necessitate a new trial on the breach of contract claim. First, to the extent Thomas Nelson relies on its judgment as a matter of law arguments to support its motion for a new trial, the Court's above analysis applies. Further, as to Thomas Nelson's argument regarding prejudice in the presentation of the breach of contract claim, there is simply no indication that the jury was "inflamed" or considered "inadmissible parol evidence" when resolving EPAC's breach of contract claim. The Court's jury instructions explicitly stated that some evidence was admitted for a limited purpose and "to the extent that it is relevant, you may consider any such evidence only for the purpose for which it was admitted." (Doc. No. 1124 at 19.) Thomas Nelson had an obligation to object to "inadmissible parol evidence" if it felt that such evidence would be used by the jury when considering the breach of contract claim. Given this obligation and the Court's limiting instruction, Thomas Nelson's argument is without merit. Juries are presumed to follow instructions given to them, all actual and potential objections to "inadmissible parol evidence" were covered by the Court's limiting instruction, and, therefore, Thomas Nelson's argument notwithstanding, nothing indicates that the jury's breach of MSA verdict was tainted by the simultaneous presentation of the fraudulent concealment claim. See Barnes v. Owens–Corning Fiberglass Corp., 201 F.3d 815, 822 (6th Cir. 2000) ("[F]ederal courts generally presume the jury will follow the instructions correctly as given."). Therefore, Thomas Nelson's request for a new trial on EPAC's breach of contract claim will be denied.

## VI. Adverse Jury Instructions

Finally, Thomas Nelson argues that it is entitled to a new trial because the adverse-inference jury instructions were unwarranted. (Doc. No. 1112 at 33-40.) EPAC responds that Thomas Nelson cannot continue to relitigate these adverse-inference instructions. (Doc. No. 1119

at 36.) EPAC contends that the adverse-inference instructions were appropriate and remain proper now. (Id.)

"A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." Arban v. West Publ'g Corp., 345 F.3d 390, 404 (6th Cir. 2003). District courts have "broad discretion in crafting a proper sanction for spoliation." Adkins v. Wolever, 554 F.3d 650, 652 (6th Cir. 2009) (en banc). The term spoliation includes the destruction of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. Owner–Operator Indep. Drivers Ass'n v. Comerica Bank, 860 F.Supp. 2d 519, 537-38 (S.D. Ohio 2012). "District courts may 'impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence.'" Automated Sols. Corp. v. Paragon Data Sys., Inc., 756 F.3d 504, 513 (6th Cir. 2014) (quoting Adkins, 554 F.3d at 652–53). "An adverse inference instruction 'is appropriate if the [d]efendants knew the evidence was relevant to some issue at trial and . . . [their culpable] conduct resulted in its loss or destruction.'" Ross v. Am. Red Cross, 567 F. App'x 296, 302 (6th Cir. 2014) (quoting Beaven v. U.S. Dep't of Justice, 622 F.3d 540, 553 (6th Cir. 2010)).

In the context of spoliation sanctions, adverse-inference instructions are typically permissive, in that they allow, but do not require, the factfinder to infer a given fact. See id. at 555 ("[A]n adverse inference is usually only permissive for the factfinder, not mandatory . . . "); Dae Kon Kwon v. Costco Wholesale Corp., 469 Fed. Appx. 579, 580 (9th Cir. 2012) ("A fact finder may draw an inference against any party that destroys or despoils evidence, but that inference is permissive rather than mandatory."). A permissive instruction is particularly appropriate if the

evidence was not intentionally destroyed. See Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1159 (1st Cir. 1996) ("[T]he adverse inference is permissive, not mandatory. If, for example, the factfinder believes that the [evidence was] destroyed accidentally or for an innocent reason, then the factfinder is free to reject the inference.").

As mentioned, this is at least the third time the Court has confronted the adverse-inference instruction issue in this case. (Doc. Nos. 379 at 21-58, 1029 at 22-24.) In its original opinion, the Court found as follows: (1) Thomas Nelson's duty to preserve evidence was triggered on April 18, 2011, and continued to date without interruption; (2) any evidence relevant to the quality, quantity, and delivery of books printed at the EPAC2 facility, the books' disposition, the MSA and its termination, and the relationship between EPAC and Thomas Nelson was therefore subject to the preservation duty, including the books and warehouse data; (3) of the tens of thousands of books supplied by EPAC to Thomas Nelson under the MSA, not a single instance of a misprinted or damaged book appeared to have been retained; (4) the full extent of warehouse data relevant to EPAC's claims had not been restored and that information was relevant to EPAC's claims and its defenses to Thomas Nelson's counterclaims and EPAC was prejudiced by its loss; (5) Thomas Nelson, with gross negligence, allowed the books to be destroyed; and therefore (6) the adverse inference instructions were appropriate. (Doc. No. 379 at 21-58.) Thomas Nelson later challenged these adverse-inference instructions in a motion in limine, which the Court denied. (Doc. No. 1029 at 22-24.) Thomas Nelson now argues that such instructions were inappropriate because the evidence at trial established that: (1) EPAC was at least partially responsible for the destruction and non-retention of the books; and (2) it did not destroy or otherwise damage the warehouse data. (Doc. No. 1112 at 36-38.) Essentially, Thomas Nelson asks the Court to once again weigh the evidence regarding these adverse-inference instructions and conclude that the weight of the

evidence favored not providing such instructions and their inclusion prejudiced Thomas Nelson. See United States v. L.E. Cooke Co., 991 F.2d 336, 343 (6th Cir. 1993) (holding that on motions for a new trial the trial court may weigh the evidence).

However, there are two fundamental problems with Thomas Nelson's argument. First, Thomas Nelson is only entitled to a new trial if the adverse-inference instruction resulted in prejudice. See Holmes v. City of Massilon, Ohio, 78 F.3d 1041, 1045-46 (6th Cir. 1996) ("Generally courts have interpreted this language to mean that a new trial is warranted when a jury has reached a seriously erroneous result as evidenced by . . . the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias."). The permissive nature of the adverse inference instruction necessarily limits the Court from concluding that the instruction's inclusion resulted in prejudice. Thomas Nelson argues that the adverse-inference instruction "affected the jury's consideration of the entire case." (Doc. No. 1112 at 39.) But this is speculative at best. The adverse-inference instructions were permissive—the jury could make those adverse inferences against Thomas Nelson, but was not required to do so—and the Court cannot divine that the jury did or did not make those adverse inferences solely from the verdict. Moreover, Thomas Nelson's argument appears geared towards shifting blame to EPAC, rather than absolving itself of its own wrongdoing. Although Thomas Nelson's argument suggests that adverse-inference instructions may also have been appropriate against EPAC, it does not convince the Court that the adverse inference instructions were inappropriate against Thomas Nelson or that the inclusion of these instructions resulted in prejudice and constitute sufficient grounds for a new trial. Thomas Nelson has not shown that the inclusion of these instructions rendered the instructions, as a whole, misleading or otherwise prejudicial. See Arban, 345 F.3d at 404. Accordingly, Thomas Nelson is not entitled to a new trial on this basis.

## VII. Conclusion

For the above reasons, Thomas Nelson's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial (Doc. No. 1083) will be granted in part and denied in part. Thomas Nelson will be granted judgment as a matter of law on EPAC's fraudulent concealment claim and the accompanying punitive damages. The remainder of the motion will be denied. A revised judgment will be entered for EPAC only on the breach of MSA claim in the amount of $3,000,000 as found by the jury.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE